**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

DARRIN JAMES TIERNAN, on behalf of
himself and others similarly situated,

                Plaintiff,

v.

NATIONAL CARRIERS, INC.,

                Defendant.

Case No.: 3:25-cv-1249-L

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

SUMMARY ....................................................................................................................... 1

SUMMARY JUDGMENT EVIDENCE ........................................................................... 2

STATEMENT OF UNCONTROVERTED FACTS ........................................................... 3

      A.      NCI ................................................................................................................ 3

      B.      NCI driver pay and job conditions ............................................................... 4

      C.      NCI's policies and practices for reimbursing expenses and paying advanced wages ......................................................................................... 9

      D.      Plaintiff's employment with NCI ............................................................... 11

      E.      Plaintiff quits his employment with NCI. .................................................. 17

LEGAL STANDARD ...................................................................................................... 19

ARGUMENT ................................................................................................................... 20

I.      Plaintiff's overtime claim fails as a matter of law because he was an interstate truck driver who was exempt from overtime under the FLSA's MCA exemption ......................................................................................... 20

      A.      Plaintiff was employed by a motor carrier subject to DOT's jurisdiction. .............................................................................................. 21

      B.      Plaintiff's activities affected the safety of the operation of motor vehicle on public highways .......................................................................... 21

      C.      Plaintiff engaged in interstate commerce by picking up and delivering products in states all over the country. ............................................... 21

II.     Plaintiff's claim for underpaid minimum wages fails because Plaintiff earned more than $7.25 per hour for all hours worked and no improper deductions were made. ................................................................................ 22

      A.      Plaintiff effectively admits he earned at least minimum wage in six out of eight workweeks. ............................................................................ 22

      B.      In Weeks 5 and 7, Plaintiff's compensation was above minimum wage when Plaintiff's unsupported estimate of 70 hours per week is replaced with a reasonable (but generous) estimate of Plaintiff's hours actually worked. ........................................................................... 24

         1.      Plaintiff's compensable work activities ....................................................25

         2.      Plaintiff's non-working time..................................................................26

         3.      Dividing Plaintiff's compensation by his hours worked in Week 5, shows he was paid well over minimum wage. ............................27

         4.      Plaintiff's Week 7 pay was earned over just four days, resulting in a rate that is well above minimum wage................................28

    C.     NCI did not violate the FLSA by deducting advanced wages from Plaintiff's pay, even if it brought Plaintiff's net pay below minimum wage...............................................................................................29

**III.**   Plaintiff's claim for retaliatory discharge fails as a matter of law because Plaintiff cannot make a prima facie showing of retaliation. ..............................................30

    A.     Plaintiff did not suffer an adverse employment action because he quit. ..................................................................................................................30

    B.     There is no causal link between the alleged protected activity and any adverse action............................................................................................31

CONCLUSION..................................................................................................................31

## TABLE OF AUTHORITIES

### Cases

*Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156 (5th Cir. 2006) .........................................19

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .....................................................................18

*Brennan v. Veterans Cleaning Serv., Inc.*, 482 F.2d 1362, 1369 (5th Cir. 1973) ..........................28

*Bright v. Hous. Northwest Med. Ctr. Survivor, Inc.*, 934 F.2d 671 (5th Cir. 1991) ......................25

*Brown v. Kinney Shoe Corp.*, 237 F.3d 556 (5th Cir. 2001) ............................................................29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................................18

*DeHart v. Baker Hughes Oilfield Operations, Inc.*,
    214 Fed. App'x 437 (5th Cir. 2007) .....................................................................................30

*Driscoll v. Fannin Cty.*, 2013 WL 644305 (E.D. Tex. Jan. 4, 2013), *report and
    recommendation adopted*, 2013 WL 617055 (E.D. Tex. Feb. 19, 2013) ...........................25

*Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997) ..................................................29

*Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) .........................................................................30

*Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617 (5th Cir. 2008) ................................................29

*Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 440 (5th Cir. 2005) ..................................30

*Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627 (5th Cir. 2014) ...............................26

*Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568 (5th Cir. 2004) ..............................................29

*Lasater v. Texas A & M Univ.-Com.*, 495 F. App'x 458 (5th Cir. 2012) ........................................29

*Lauderdale v. Tex. Dep't of Crim. Just.*, 512 F.3d 157, 167 (5th Cir. 2007) .................................30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .....................................18

*Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001) ....................................................30

*Miss. River Basin Alliance v. Westphal*, 230 F.3d 170 (5th Cir. 2000) ..........................................19

*Mornford v. Andrews*, 151 F.2d 511, 511 (5th Cir. 1945) ...............................................................22

*Newbury v. City of Windcrest, Texas*, 991 F.3d 672, 677 (5th Cir. 2021) ......................................29

*Songer v. Dillon Res., Inc.*, 618 F.3d 467 (5th Cir. 2010) ..............................................................20

*Sossamon v. Lone Star State of Texas*, 560 F.3d 316 (5th Cir. 2009)............................................18

*Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)...........................................30

*Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir. 2007)...........................................19

*Worsham v. B.G. Prop. Mgmt., LLC*, 2020 WL 7353906 (S.D. Tex. Sept. 4, 2020), *report and recommendation adopted*, 2020 WL 6784217 (S.D. Tex. Nov. 18, 2020) ......................................................................................................22

**Statutes**

29 U.S.C. § 213(b)(1) ....................................................................................................................20

**Regulations and Agency Guidance**

29 C.F.R. § 782.2(a)......................................................................................................................20

29 C.F.R. § 785.16(a).....................................................................................................................25

29 C.F.R. § 785.16(b) ....................................................................................................................25

U.S. Dep't of Labor, Opinion Letter Fair Labor Standards Act (FLSA), 2004 WL 3177896 (Oct. 8 20024) ...........................................................................................................28

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................................................1, 18

Local Rule 56.5 ................................................................................................................................1

Pursuant to Federal Rule of Civil Procedure 56(a) and Local Rule 56.5, Defendant National Carriers, Inc. ("NCI") files this Brief in Support of Defendant's Motion for Summary Judgment on all of Plaintiff Darrin James Tiernan's ("Plaintiff's") claims.

## SUMMARY

NCI employed Plaintiff as a long-haul truck driver for eight weeks beginning in March 2023. Plaintiff spent most of four weeks driving around the country with a trainer and then drove solo interstate trips until quitting his employment on May 19, 2023. Throughout his time as a solo driver, Plaintiff drove less than a full schedule, missing time when his tractor was in the shop and when he twice refused to drive loads assigned to him and instead drove home without authorization, including on the day before he quit. Plaintiff also regularly took advances against his wages, which were later deducted from his pay. At the time his employment ended, Plaintiff's advances far outpaced his earnings, resulting in two pay checks that netted to $0.00 and a remaining debt of over $800 in unrepaid advances. Plaintiff claims he quit because he was frustrated with his pay, but Plaintiff admits he did not complain to any NCI employee about compensation until after he quit.

NCI moves for summary judgment because each of Plaintiff's claims fails as a matter of law. Plaintiff's Complaint brings two claims, one for unpaid wages under the Fair Labor Standards Act ("FLSA") and one for retaliatory discharge in violation of the FLSA.

It is unclear whether Plaintiff's first cause of action seeks both overtime and minimum wage compensation or just the latter. Regardless, summary judgment is appropriate. As an over-the-road truck driver subject to Department of Transportation ("DOT") regulations, Plaintiff is exempt from the FLSA's overtime provisions pursuant to the Motor Carrier Act ("MCA") exemption. And Plaintiff's minimum wage claim is similarly without merit because it is

undisputed that Plaintiff earned more than the minimum wage in each workweek of his employment and the deductions from his pay for advanced wages are permitted under the FLSA.

Finally Plaintiff's FLSA retaliation claim fails because he cannot satisfy two of the three elements of the prima facie case of that claim: Plaintiff—who readily admits he quit his employment—did not suffer an adverse employment action and there can be no causal connection between Plaintiff's complaints and his discharge because he did not make any complaints about his pay until after he decided to quit.

## SUMMARY JUDGMENT EVIDENCE

| EXHIBIT | DOCUMENT | APPENDIX |
|---------|----------|----------|
| A | Driver History Report | App. 1-3 |
| B | Handbook | App. 4-64 |
| C | Mileage Memo | App. 65 |
| D | Settlement Statements | App. 66-79 |
| E | Trip 1 - Tiernan Trip 3652214 | App. 80-85 |
| F | Trip 2 - Tiernan Trip 3635965 | App. 86-94 |
| G | Trip 3 - Tiernan Trip 3644440 | App. 95-108 |
| H | Trip 4 - Tiernan Trip 3645645 | App. 109-116 |
| I | Trip 5 - Tiernan Trip 3642115 | App. 117-121 |
| J | Trip 6 - Tiernan Trip 3644391 | App. 122-127 |
| K | Trip 7 - Tiernan Trip 3646430 | App. 128-140 |
| L | Trip 8 - Tiernan Trip 3646780 | App. 141-148 |

| EXHIBIT | DOCUMENT | APPENDIX |
|---|---|---|
| M | Trip 9 - Tiernan Trip 3646054 | App. 149-170 |
| N | Trip 10 - Tiernan Trip 3651248 | App. 171-182 |
| O | Trip 11 - Tiernan Trip 3646751 | App. 183-191 |
| P | Trip 12 - Tiernan Trip 3655205 | App. 192-202 |
| Q | Trip 13 - Tiernan Trip 3651855 | App. 203-211 |
| R | Trip 14 - Tiernan Trip 3655737 | App. 212-220 |
| S | Trip 15 - Tiernan Trip 3657766 | App. 221-241 |
| T | Wage Statements | App. 242-249 |
| U | Declaration of Brandee Chatham | App. 250-260 |
| V | Declaration Of Jill Maschmeier | App. 261-266 |
| W | Plaintiff Darrin Tiernan's Deposition Excerpts | App. 267- |

## STATEMENT OF UNCONTROVERTED FACTS[1]

**A.    NCI**

1.    National Carriers, Inc. ("NCI") is a diversified motor carrier servicing all 48 states in the continental United States with transportation offerings which include refrigerated, livestock, and logistics services. Exhibit V, Declaration of Jill Maschmeier ¶ 4 [hereinafter, "JM Dec. ¶ ___"], App. 261.

2.    NCI's primary operations hubs are Kansas and Texas. NCI employs over 300 drivers, who operate NCI-owned tractors, typically pulling refrigerated trailers. Some drivers also

---

[1] Filed with this brief is an Appendix ("App.") containing all affidavits, deposition transcripts, and other documents supporting Defendants' Statement of Uncontroverted Facts.

haul live cattle in a livestock trailer or assorted nonperishable items in non-refrigerated trailers. JM Dec. ¶ 5, App. 261.

3.      NCI drivers operate Kenworth T680 tractors, each of which has a gross vehicle weight rating (GVWR) of over 50,000 pounds. JM Dec. ¶ 7, App. 262.

4.      NCI drivers live all over the country. In most circumstances, NCI drivers are permitted to drive their vehicles from and to their homes before and after completing trips. JM Dec. ¶ 8, App. 262.

5.      NCI is actively registered with FMCSA as a carrier/broker authorized to transport property interstate. JM Dec. ¶ 9, App. 262.

6.      NCI has always complied, and has always required its truck drivers to comply, with all applicable safety regulations issued by the FMCSA. JM Dec. ¶ 10, App. 262.

7.      All NCI drivers must possess a valid Commercial Driver's License. JM Dec. ¶ 11, App. 262.

8.      Plaintiff's work as an over-the-truck was subject to DOT regulations, including limits on his hours of work, DOT inspections, and DOT drug testing. Exhibit W, Deposition of Plaintiff Darrin Tiernan 90:14-21; 136:11-19; 137:3-5 [hereinafter, "Plaintiff Dep. __"], App. 280, 286-87. Plaintiff has had a commercial driver's license since 2022, including during his entire time driving for NCI. Plaintiff Dep. 29:3-7, App. 272.

**B.      NCI driver pay and job conditions**

9.      Newly hired NCI drivers are initially paid a flat amount ($250) for orientation, which takes approximately three days. During orientation, the new hires complete paperwork and receive training on company policies, practices, and benefits. JM Dec. ¶ 12, App. 262.

10.      After orientation, new hires train by driving NCI routes with experienced drivers who observe and train the new drivers. Drivers are paid a flat daily rate for their training days of

$100 per day (up to $700 per week). The length of the training period varies by driver, but it is typically around three weeks. JM Dec. ¶ 13, App. 262.

11.  After their training period, NCI drivers begin driving routes on their own. JM Dec. ¶ 14, App. 262.

12.  NCI drivers are paid primarily on a per-mile basis. Drivers are paid a set rate (which increases with experience) for each mile driven with a loaded or empty truck as directed by the dispatcher. JM Dec. ¶ 15, App. 262.

13.  Drivers are not paid for driving any route or diversion that is not authorized by NCI, even if they are in an NCI tractor. JM Dec. ¶ 16, App. 262.

14.  NCI driver pay largely depends on how often they are available to drive and how many loads they handle per week. Fully active NCI drivers average over 2,000 miles per week. JM Dec. ¶ 17, App. 263.

15.  New NCI drivers start earning a rate of at least $0.36 per mile. After ninety days, that rate increases to at least $0.38 per mile. After driving for six months, it increases again to at least $0.40 per mile. Depending on their individual circumstances, some NCI drivers earn higher rates. JM Dec. ¶ 18, App. 263.

16.  Driver mileage pay is intended to compensate them all for work time spent delivering loads, including non-driving work time, with limited exceptions where additional pay is offered. JM Dec. ¶ 19, App. 263; Exhibit C, App. 65; Plaintiff Dep. 251: 3-20, App. 290.

17.  With their per-mile rate, NCI drivers are paid certain additional amounts (collectively called "accessorial pay" in the industry). JM Dec. ¶ 20, App. 263; Exhibit B, App. 38-39.

18.     NCI drivers earn "stop pay" for each stop they make enroute that is not their first or last stop. Stop pay is $20 per additional stop. JM Dec. ¶ 21, App. 263; Exhibit B, App. 38.

19.     NCI drivers earn "detention pay" when they are required to wait to load or unload for more than two (2) hours at a customer location. Detention pay is $10 per hour. JM Dec. ¶ 22, App. 263; Exhibit B, App. 38.

20.     NCI drivers can earn "layover pay" when they are laid over for more than 24 hours between loads. Layover pay is $10 per hour (up to $50 per day). While on a layover, NCI drivers are free to use their time as their own. JM Dec. ¶ 23, App. 263 Exhibit B, App. 38.

21.     NCI drivers earn "breakdown pay" for time that their tractor is in the shop. Breakdown pay is $50 per day if other work is available but they choose not to take it. Breakdown pay is $100 per day if no other work is available. JM Dec. ¶ 24, App. 263; Exhibit B, App. 38.

22.     NCI drivers can also earn lump sum payments for transporting hazardous materials, moving trailers within the same city, or delivering in New York City. NCI drivers are also eligible for bonus opportunities based on NCI's performance and successful driver referrals. JM Dec. ¶ 25, App. 264; Exhibit B, App. 39.

23.     NCI drivers are not eligible for overtime pay because they are subject to DOT regulations that limit the number of hours they can drive. JM Dec. ¶ 26, App. 264.

24.     Under the relevant DOT regulations, NCI drivers cannot drive more than eleven hours per day or more than seventy hours in an eight-day period. Drivers must take a break of at least thirty minutes after driving for eight hours. Drivers must complete their daily driving within a fourteen-hour driving window and then have at least ten hours of rest before driving again. After drivers reach their weekly limit of driving hours, they must be off duty long enough to reset their driving hours. JM Dec. ¶ 27, App. 264.

25.     Whenever an NCI driver is not "under a load" (that is, when they have either an empty trailer or no trailer attached to their tractor), they are free to use the time however they see fit. JM Dec. ¶ 28, App. 264; Plaintiff Dep. 86:16-88:23; App. 277-79.

26.     NCI drivers are permitted to use their NCI tractor to run personal errands within a reasonable radius (referred to as "personal conveyance"). JM Dec. ¶ 29, App. 264; Plaintiff Dep. 86:16-88:23; App. 277-79.

27.     During DOL-mandated break and off-duty time, NCI drivers are free to use the time as they see fit, even when under a load. JM Dec. ¶ 30, App. 264.

28.     None of NCI's drivers operate on a fixed schedule with the same start and stop times each day or from week to week. JM Dec. ¶ 31, App. 264.

29.     The majority of NCI's drivers do not drive a fixed route that is the same every day or every week. Some drivers are assigned to dedicated lanes where the routes are generally the same from week to week, but the exact start and end times still vary. JM Dec. ¶ 32, App. 264.

30.     NCI's drivers are assigned trips by NCI's dispatchers who tell them when and where to begin the trip and where and when to end the trip. This information is also available to the drivers via an electronic dispatching system in their tractors. JM Dec. ¶ 33, App. 265.

31.     All NCI drivers are expected to be available to drive interstate trips at any time while they are working. Trips are assigned based on driver availability and location in relation to a load that needs to be picked up. JM Dec. ¶ 34, App. 265.

32.     Subject to the DOT regulations and the dispatched pickup and drop-off times, drivers have discretion over when they drive during a trip. JM Dec. ¶ 35, App. 265.

33.     The time working varies from driver to driver, and each driver's time working hours vary from day to day and from week to week, depending on numerous factors that are in and out

of NCI's or the driver's control. For example, the time spent working varies based on which routes they drive, traffic, weather, road condition, vehicle maintenance issues, delays in loading or unloading trailers, the availability of helpers (called "lumpers") to assist with loading or unloading, and the amount of time spent in communicating with dispatchers or completing paperwork. JM Dec. ¶ 36, App. 265.

34.    When starting to drive each day, NCI's drivers, like Plaintiff, are expected to conduct a pre-trip inspection of their truck and trailer. Plaintiff estimated that the pre-trip inspection lasted fifteen to twenty minutes each time. Plaintiff Dep. 130:1-3, App. 281.

35.    Similarly, when ending their driving each day, NCI's drivers, like Plaintiff, are expected to conduct a post-trip inspection of their truck and trailer. Plaintiff estimated that the post-trip inspection lasted ten minutes each time. Plaintiff Dep. 130:8-10, App. 281.

36.    When picking up a new load, Plaintiff had to wait for the trailer to be loaded. That process could take thirty minutes up to five hours (in extreme circumstances). Plaintiff Dep. 132:6-20, App. 282. On days that it took up to five hours, the majority of that time would be waiting for the loading to start. *Id.* 132:23-133:2, App. 283. In his trip envelopes and the dispatcher notes, Plaintiff often recorded the times at which he arrived at a location to pick up a load and the time at which the loading was complete. *See generally* Exhibits E-S, App. 80-241.

37.    When dropping off a load, Plaintiff had to wait for the trailer to be unloaded. That process could take thirty minutes up to three hours (in extreme circumstances). Plaintiff Dep. 134:2-21, 135:6-9, App. 284-85. As with loading, the longer unload times were caused by waiting for the crew to start unloading the trailer. *Id.* 134:22-135:5, App. 284-85. In his trip envelopes and the dispatcher notes, Plaintiff recorded often recorded the times at which he arrived at a location

to drop off a load and the time at which the unloading was complete. *See generally* Exhibits E-S, App. 80-241.

38.    During his trips, Plaintiff would have to stop to fuel his truck and add fuel to the reefer on the trailer (which powered the refrigeration). Fueling would take approximately ten minutes. Plaintiff Dep. 135:13-136:2, App. 286-87.

39.    NCI drivers are paid on a weekly basis. Payroll is run on Wednesday and deposited on Friday. Exhibit U, Declaration of Brandee Chatham, ¶ 4 [hereinafter "BC Dec. ¶ __"], App. 250.

40.    NCI's pay periods are seven-day periods that run from Monday to Sunday. BC Dec. ¶ 5, App. 250.

41.    Each pay day, NCI drivers are paid for orientation, training, accessorial pay, and/or trips that were completed during the most recently completed pay period. BC Dec. ¶ 6, App. 250.

42.    If a driver has a trip that begins in one pay period and ends in another, the pay for all of the work performed on that trip is included in the pay for the second pay period. BC Dec. ¶ 7, App. 250.

43.    NCI's workweek also runs from Monday to Sunday. Because trips are not paid until complete, there are pay periods that include pay for work performed in two different workweeks. BC Dec. ¶ 8, App. 251.

**C.    NCI's policies and practices for reimbursing expenses and paying advanced wages**

44.    Pursuant to its policy, NCI pays for all reasonable and necessary business expenses incurred by its drivers in performing their duties. BC Dec. ¶ 9, App. 251.

45.    Because NCI drivers travel far from NCI's office locations, NCI permits its drivers to incur and pay necessary business expenses on NCI's behalf. For example, while out on a trip,

drivers are able to purchase maintenance items needed for their tractor or trailer, to purchase fuel for their tractor and trailer, to pay tolls, scale fees, or cleaning fees, and to pay for lumpers to unload trailers. BC Dec. ¶ 10, App. 251.

46.     There are two primary ways in which NCI drivers are able to use NCI funds while on the road. First, each driver has access to a credit card (referred to as a ComCard) that they typically use to purchase fuel. Purchases made on the ComCard are billed to and paid directly by NCI. BC Dec. ¶ 11, App. 251.

47.     Drivers can also request funds to be paid via ComChek. ComCheks work similarly to standard checks but require an NCI-issued authorization code to be used. NCI uses the authorization codes to efficiently track each payment and assign it to a particular driver. BC Dec. ¶ 12, App. 251.

48.     Because NCI does not pay for trips until they are complete, NCI permits its drivers to take advances on their wages to cover personal expenses while on the road. NCI employees are able to use the ComCard or ComChek to take an advance for personal expenses. BC Dec. ¶ 13, App. 251.

49.     Pursuant to NCI policy, all business expenses paid for by ComChek or ComCard (other than fuel) must be reported to NCI at the end of every trip using a trip envelope form, which lists the type and amount of each expense. Drivers must also provide itemized receipts for any business expenses. Fuel purchases made by the ComCard are separately reported to NCI. BC Dec. ¶ 14, App. 251-52.

50.     Plaintiff understood he was required to submit receipts for expenses and had at least one expense that did not get reimbursed because he could nor produce a receipt. Plaintiff Dep. 265:16-19, 266:20-267:19, App. 291-93.

51.     If a driver does not report or provide an itemized receipt for an expense purchased by ComChek or ComCard, it is assumed to be a personal expense and is treated as an advance of wages to be repaid from the driver's pay earned for that trip. BC Dec. ¶ 15, App. 252.

52.     Drivers are typically given two weeks to report a business expense and turn in the receipt before the ComChek or ComCard amount is deducted from their pay. That time period is often extended if an employee reports the expense and requests additional time to locate and submit the receipt. BC Dec. ¶ 16, App. 252.

53.     For payroll accounting purposes, NCI treats all ComChek or ComCard payments as advances that are then deducted from the relevant driver's pay. If a driver turns in the paperwork for a business expense paid by ComChek or ComCard, the amount is recorded as a reimbursement and added to the driver's pay, zeroing out the effect on the driver's pay. BC Dec. ¶ 17, App. 252.

54.     If a driver turns in business expense receipts after a ComChek or ComCard purchase has been deducted from his pay, NCI reverses the deduction and credits the reimbursement on the next paycheck. BC Dec. ¶ 18, App. 252.

55.     The receipt requirement is of vital importance to NCI. NCI is unable to directly monitor its driver's purchases when they are out on the road, and an itemized receipt is a necessary protection against potential fraud and abuse. Also, NCI is subject to auditing for its fuel and other expenses. That is, NCI reports its fuel purchases and mileage to the federal government and all fifty states and NCI must keep receipts proving its fuel costs in the event of an audit. BC Dec. ¶ 19, App. 252.

56.     After completing a trip, drivers are expected to complete and submit a "trip envelope" that includes details on the trip, including the tractor mileage and any requested reimbursements. The trip envelope should also include all relevant paperwork for the trip,

11

including expense receipts, bills of lading, delivery receipts, and truck scale documentation. Drivers submit trip envelopes electronically to NCI. BC Dec. ¶ 20, App. 252-53.

57.    During a trip, drivers are in consistent contact with their assigned dispatcher who records information in NCI's dispatching system related to touch points with the driver and or other trip information, including when a new trip is dispatched to the driver, when the driver arrives and picks up a load, and when arrives at a stop and drops off a load. BC Dec. ¶ 21, App. 253.

58.    For each pay period, NCI produces a settlement statement that catalogues the amounts and types of pay for that pay period, along with a list of all deductions and reimbursements. These settlement statements are provided to NCI's drivers after payroll is run. BC Dec. ¶ 22, App. 253.

59.    For each pay period, NCI also provides a wage statement that lists all amounts paid to each driver for the pay period, including any deductions for advanced wages. BC Dec. ¶ 23, App. 253.

**D.    Plaintiff's employment with NCI**

60.    Plaintiff began working for NCI in late March 2023. BC Dec. ¶ 25, App. 253.

61.    While working for NCI, Plaintiff continued to live in Louisiana, and his job kept him away from his home in Louisiana for long stretches of time. Plaintiff Dep. 65:1-2, App. 275.

62.    Plaintiff understood there was no limit to how far he would drive for NCI and "[i]t was supposed to be in all 48 states." Plaintiff Dep. 73:17-20, App. 276.

63.    During his first workweek (March 27 to April 2, 2023), Plaintiff earned $250 in orientation pay (for three days of orientation) and $400 in training pay (for the first four days of training), while starting a training trip from Texas to Florida. BC Dec. ¶ 29, App. 254; Exhibit D, App. 66; Exhibit E, App. 80-85.

64. During his second workweek (April 3 to April 9, 2023), Plaintiff earned $700 in training pay (for seven days of training) while completing his training trip to Florida, driving a second training trip from Florida to Oklahoma, and beginning his third training trip from Oklahoma to Kansas to Maine. BC Dec. ¶ 30, App. 254; Exhibit D, App. 67; Exhibits E-G, App. 80-108.

65. During his third workweek (April 10 to April 16, 2023), Plaintiff earned $700 in training pay (for seven days of training) while completing his training trip to Maine, driving his fourth training trip from Maine to New Jersey, driving his fifth training trip from New Jersey to Texas, driving his sixth training trip from Texas to Kansas, and beginning his seventh training trip from Kansas to Illinois. BC Dec. ¶ 31, App. 254; Exhibit D, App. 68; Exhibits G-K, App. 95-140.

66. During his fourth workweek (April 17 to April 23, 2023) earned $400 in training pay (for the last four days of his training) while completing his training trip to Illinois and completing his eighth training trip from Illinois to Texas. The drop-off for Plaintiff's final training trip occurred at around 10:20 AM on April 19, 2023, in Lancaster, TX. BC Dec. ¶ 32, App. 254; Exhibit D, App. 69; Exhibits K-L, App. 128-148.

67. Also, during his fourth week, Plaintiff completed his first solo trip, earning $123.20 ($0.40 per mile for 308 miles). His solo trip started in Irving, Texas on April 20, 20023. On that day, he drove 91 miles to the pick-up location in Sulphur Springs, TX, arriving at 9:50 PM and departing with a loaded trailer at 10:20 PM. The next day, he completed the 217-mile trip and arrived at the drop-off location in Conroe, Texas at 12:40 PM, leaving with an empty trailer at 3:30 PM. BC Dec. ¶ 33, App. 254; Exhibit D, App. 69; Exhibit M, App. 149-70.

68. Also, during his fourth workweek—on April 21, 2023—Plaintiff was dispatched to take another load but chose not to complete the trip. On that day, Plaintiff arrived at a shipping

13

location that did not provide load locks, claimed not to know the process for purchasing load locks, and chose to leave the load at the shipper and drive his tractor without a trailer (also known as "bobtailing") over 330 miles to his home in Louisiana without authorization and without alerting anyone. Plaintiff remained at home into the beginning of his fifth workweek. BC Dec. ¶ 34, App. 255; Exhibit M, App. 149-70.

69. During his fifth workweek (April 24 to April 30, 2023), Plaintiff began at his home in Louisiana until he was directed by dispatch on April 25, 2023, at 10:29 AM to return to the Houston area (where he was before bobtailing home). BC Dec. ¶ 35, App. 255; Exhibit D, App. 70-71; Exhibit M, App. 149-70.

70. During his fifth workweek, Plaintiff completed two trips, earning $265.60 ($0.40 per mile for 664 miles). Plaintiff started his first trip at 5:04 PM in Conroe, TX on April 25, 2023. He drove 68 miles to Baytown, Texas, arriving at the shipper around 10:43 AM on April 26, 2023, and leaving with a loaded tailer at 12:00 PM. He then drove 278 miles to Irving, TX, arriving at 8:14 PM, and dropping the loaded trailer off at the NCI yard there. The energy drinks in that trailer were then driven to Wichita, KS by another NCI driver. BC Dec. ¶ 36, App. 255; Exhibit D, App. 70-71.; Exhibits N-O, App. 171-82.

71. Plaintiff started the second trip of his fifth workweek on April 27, 2023, at 11:45 AM by picking up a trailer loaded with frozen meat that another NCI driver had delivered to Irving, Texas from Mississippi. Plaintiff then drove 318 miles to Lubbock, Texas, arriving at the final destination at 7:20 AM on April 28, 2026, and leaving with an empty trailer at 9:59 AM. BC Dec. ¶ 37, App. 255; Exhibit O, App. 183-91.

72. During his fifth workweek, Plaintiff was dispatched on another trip that required him to pick up a loaded trailer from NCI's yard in Dodge City, KS. On April 28, 2023, at

14

approximately 8:46 PM, the fully loaded trailer disconnected from Plaintiff's truck in the Dodge City yard, falling to the ground and causing minor damage to the bottom front of the trailer. BC Dec. ¶ 38, App. 255-56.

73.     NCI has an internal system for tracking all accidents involving its commercial vehicles that cause damage of any kind to person or property. BC Dec. ¶ 39, App. 256.

74.     Pursuant to NCI's policy, all such accidents are to be promptly recorded in NCI's system. BC Dec. ¶ 40, App. 256.

75.     NCI recorded the dropped trailer incident in its internal system at 10:27 AM on April 29, 2023, the morning after it occurred. BC Dec. ¶ 41, App. 256.

76.     Upon inspection of Plaintiff's tractor by mechanics, it was determined that the accident was caused by worn out parts on the tractor and Plaintiff was not at fault. Plaintiff was not subject to discipline for the accident, and the accident was classified as "non-preventable." BC Dec. ¶ 42, App. 256.

77.     The accident was also categorized as non-DOT-recordable because it did not result in either a fatality, a personal injury to any person that requires immediate medical attention away from the scene of the accident, or any disabling damage to any vehicle that requires it to be towed from the scene. BC Dec. ¶ 43, App. 256.

78.     After the trailer drop incident, Plaintiff did not drive any more during his fifth workweek because Plaintiff's tractor was in the shop from April 29, 2023, to May 1, 2023 (the last day of his fifth workweek and the first two days of his sixth workweek) to repair damage to the tractor that had caused it the trailer to drop. Plaintiff earned $150 in breakdown pay ($50 per day) because he chose not to take on other available work during that time. BC Dec. ¶ 44, App. 256; Exhibit D, App. 70-71.

79.    During his sixth week of work (May 1 to May 7, 2023), Plaintiff completed one trip, earning $554.80 ($0.40 per mile for 1,387 miles). Plaintiff started this trip on May 2, 2023, in Lubbock, TX. He then drove 455 miles without a load to Dodge City, KS and then to Liberal, KS, arriving on May 4, 2023, at 9:42 AM. Plaintiff left Liberal with a loaded trailer on May 4, and drov932 miles to make two stops to unload, first in Hammond, LA, at 7:33 AM on May 6, and then in Pearl River, LA, where he arrived at 10:25 PM on May 6, and left with an empty trailer at 1:30 AM on May 7, 2023. Because he made the extra stop, Plaintiff earned $20 in stop pay. BC Dec. ¶ 45, App. 256-57; Exhibit D, App. 72; Exhibit P, App. 192-202.

80.    During his seventh week of work (May 8 to May 15, 2023), Plaintiff completed two trips, earning $468 ($0.40 per mile for 1,170 miles). Plaintiff's first trip started in Pearl River, LA on May 8, 2023. Plaintiff then drove 151 empty miles to Richland, MS, arriving at the shipper at 2:11 PM, on May 8, 2023. Plaintiff then drove a loaded trailer 427 miles to Missouri City, TX, arriving at the drop-off location at 9:44 AM and leaving with an empty trailer at 1:52 PM on May 9, 2023. BC Dec. ¶ 46, App. 257; Exhibit D, App. 72; Exhibits Q-R, App. 203-20.

81.    During his seventh week of work, Plaintiff's second trip started in Missouri City, TX at 8:08 AM on May 10, 2023. Plaintiff drove 37 empty miles to Baytown, TX, arriving at the shipper at 10:03 AM, and leaving with a loaded trailer at 12:14 PM on May 10, 2023. Plaintiff then drove 555 miles to Enid, OK, arriving at the drop-off location at 11:45 AM and leaving with an empty trailer at 1:45 PM on May 11, 2023. BC Dec. ¶ 47, App. 257; Exhibit R, App. 212-20.

82.    During his seventh week of work, Plaintiff started a third trip that he did not complete until the eighth week of work. This trip started in Enid, OK, at 2:54 PM on May 11, 2023. Plaintiff then 202 empty miles to NCI's yard in Dodge City, KS, where he arrived at 6:12 AM on May 13, 2023. Plaintiff picked up a loaded trailer and then drove 1,113 miles to make two

16

stops, one in Newnan and one in Marietta, Georgia. BC Dec. ¶ 48, App. 257; Exhibit S, App. 221-41.

83.     During his eighth week of work (May 15 to May 22, 2023), Plaintiff completed the trip that began at the end of his seventh week of work, earning $546 ($0.40 per mile for 1,315 miles). Plaintiff arrived at his first stop in Newnan, GA, at 11:25 PM on May May 16, 2023, and left Newnan at 1:55 AM on May 17, 2023. Plaintiff then arrived at his second stop in Marietta, GA, at 7:00 AM, and finished unloading at 9:39 AM, on May 17, 2023. Because he made the extra stop, Plaintiff earned $20 in stop pay. BC Dec. ¶ 49, App. 257-58; Exhibit D, App. 75-76; Exhibit S, App. 221-41.

**E.     Plaintiff quits his employment with NCI.**

84.     Later during his eighth week of work—on May 18, 2023—Plaintiff was dispatched to pick up a load in Marietta, Georgia, where he had dropped off a load the previous day. Upon arriving to pick up, the load was not ready. Plaintiff chose to abandon the load and drove home to Monroe, Louisiana with an empty trailer attached to his tractor (referred to as "deadheading"). Plaintiff was not paid for the miles driven during the unauthorized deadhead. BC Dec. ¶ 50, App. 258; Exhibit S, App. 221-41.

85.     On May 19, 2023, Plaintiff stopped communicating with dispatch. BC Dec. ¶ 51, App. 258; Exhibit S, App. 221-41.

86.     Plaintiff eventually communicated with two managers on May 19, 2023, informing them that he quit his employment with NCI because he was unhappy with his pay. Plaintiff Dep. 52:13-53:18, App. 273-74.

17

87. Specifically, Plaintiff states he told his managers that he was not getting paid, he wanted a solution to his money, but he was already done with the company and had decided to quit. Plaintiff Dep. 189:5-23, App 288.

88. Plaintiff had never complained to either of the managers or anyone else at NCI about his pay before that day. Plaintiff Dep. 190:7-12, App. 289.

89. NCI terminated Plaintiff's employment after he abandoned his position. BC Dec. ¶ 52, App. 258.

90. When any driver's employment with NCI ends, NCI provides information to a third-party database that provides driver information to motor carriers conducting background checks on drivers. That information includes all accident records associated with the driver. The accidents are reported as either DOT recordable or non-DOT recordable, and the nature of the accident is provided. BC Dec. ¶ 53, App. 258.

91. Consistent with this practice, NCI reported information for Plaintiff on May 20, 2023, including the trailer accident that had been in Plaintiff's file since April 2023. NCI reported the accident as non-preventable and non-DOT recordable. BC Dec. ¶ 54, App. 258; Exhibit A, App. 1-3.

92. During his employment, Plaintiff regularly used the ComChek and ComCard process to receive advances on his wages for personal expenses. He also regularly used those systems to pay for business expenses and turn in receipts with this trip envelopes. Plaintiff was reimbursed for all ComChek or ComCard transactions for which he submitted a receipt. BC Dec. ¶ 55, App. 258.

93.     Consistent with its policy, NCI treated all other transactions as personal advances and deducted them from his pay and reported that deduction in Plaintiff's wage statements and settlement statements. BC Dec. ¶ 56, App. 259; Exhibit D, App. 66-79; Exhibit T, App. 242-49.

94.     Because his advances far exceeded his earned wages for the seventh and eighth pay periods, Plaintiff's net pay was zero for both of those pay periods. BC Dec. ¶ 57, App. 259; Exhibit D, App. 73-76; Exhibit T, App. 248-49.

95.     At the conclusion of his employment with NCI, Plaintiff owed NCI $804.81 for personal expenses charged to the ComChek or ComCard that NCI paid as an advance against Plaintiff's future wages. Plaintiff has not paid back the advanced wages. BC Dec. ¶ 58, App. 259; Exhibit D, App. 79.

## LEGAL STANDARD

Summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (citation modified).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v.*

19

*Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). And the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000).

## ARGUMENT

**I.   Plaintiff's overtime claim fails as a matter of law because he was an interstate truck driver who was exempt from overtime under the FLSA's MCA exemption.**

Although there are few specific allegations related to overtime, the first cause of action in Plaintiff's Complaint appears to include a claim for unpaid overtime. *See, e.g.*, Complaint, Dkt. No. 1, ¶ 2 ("Defendant carried out an unlawful payroll policy and practice by failing to pay Plaintiff and others similarly situated the minimum wage for all worked hours and proper overtime compensation as required by federal law."); *id.* ¶ 5 ("Plaintiff has initiated this action on behalf of himself and others similarly situated to recover unpaid minimum wages and overtime compensation . . . .").

If Plaintiff is pursuing an overtime claim under the FLSA, that claim fails here as a matter of law because there is no dispute that Plaintiff was exempt from the overtime requirements of the FLSA pursuant to the MCA exemption.

Under the MCA exemption, the FLSA's overtime pay requirement "shall not apply" to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours-of-service pursuant to the" MCA. 29 U.S.C. § 213(b)(1). The

MCA exemption applies to employees who (1) are employed by a motor carrier subject to DOT's jurisdiction and (2) "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA]." *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 472 (5th Cir. 2010) (quoting 29 C.F.R. § 782.2(a)).

### A.    **Plaintiff was employed by a motor carrier subject to DOT's jurisdiction.**

Here, there is no dispute that Plaintiff was an over-the-road truck driver employed by NCI, a motor carrier subject to DOT's jurisdiction. NCI is actively registered with FMCSA as a carrier/broker authorized to transport property interstate. Statement of Uncontroverted Facts, *supra*, ¶ 5 [hereinafter, "SUF ¶ __"].

### B.    **Plaintiff's activities affected the safety of the operation of motor vehicle on public highways.**

Plaintiff similarly cannot dispute that his work as a truck driver directly affected the safety of operation of motor vehicles in the transportation of property on public highways. *Songer*, 618 F.3d at 473. Unsurprisingly, Plaintiff readily admits that his work as an over-the-truck was subject to DOT regulations, including limits on his hours of work, DOT inspections, and DOT drug testing. SUF ¶ 8. Plaintiff has had a commercial driver's license since 2022, including during his entire time driving for NCI. *Id.*

### C.    **Plaintiff engaged in interstate commerce by picking up and delivering products in states all over the country.**

Finally, Plaintiff cannot dispute that NCI, which transports various goods throughout the continental United States, is engaged in interstate commerce or that he engaged in interstate work subjecting him to the MCA. Plaintiff's job kept him away from his home in Louisiana for long stretches of time. SUF ¶ 61. Plaintiff understood there was no limit to how far he would drive for NCI and "[i]t was supposed to be in all 48 states." SUF ¶ 62. During his short tenure with NCI,

21

Plaintiff drove interstate trips that crisscrossed large portions of the country. Plaintiff's training trips included stops (to pick up or drop off goods) in Texas, Florida Oklahoma, Kansas, Maine, New Jersey, and Illinois. SUF ¶¶ 63-66. Plaintiff's solo trips included stops in Texas, Kansas, Louisiana, Mississippi, Oklahoma, and Georgia. SUF ¶¶ 68-71, 79-83.

Because Plaintiff was exempt from overtime under the MCA exemption, his claim for unpaid overtime fails as a matter of law.

## II.      Plaintiff's claim for underpaid minimum wages fails because Plaintiff earned more than $7.25 per hour for all hours worked and no improper deductions were made.

In order to prevail on his minimum wage claim, Plaintiff must show that there existed an employer-employee relationship during the unpaid minimum wage periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's minimum wage requirements; and (4) the amount of minimum wage compensation due. *See Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014). In addition, an employee must establish that the employer failed to pay the employee at least $7.25 per hour. 29 U.S.C. § 206(a)(1)(C).

While there is no dispute that Plaintiff was NCI's employee, Plaintiff cannot show that all of his activities were covered "work" under the FLSA or that NCI failed to satisfy the FLSA's requirements.

### A.      Plaintiff effectively admits he earned at least minimum wage in six out of eight workweeks.

The Fifth Circuit has not explicitly addressed whether courts should evaluate minimum wage claims using a weekly wage standard (determining the rate by dividing the week's pay by the total hours worked that week) or an hourly wage standard (requiring an employer to pay an employee the minimum wage for each individual hour of work). At least five other circuits have adopted the weekly wage standard. *See Worsham v. B.G. Prop. Mgmt., LLC*, 2020 WL 7353906,

at *12 (S.D. Tex. Sept. 4, 2020) (collecting cases), *report and recommendation adopted*, 2020 WL 6784217 (S.D. Tex. Nov. 18, 2020). The Fifth Circuit tacitly endorsed something other than an hourly wage standard in *Mornford v. Andrews*, when it held "[a]n employee may be paid a fixed amount each week, provided it is an amount sufficient to cover the minimum wages." 151 F.2d 511, 511 (5th Cir. 1945). And "[d]istrict courts in the Fifth Circuit that have considered the issue have also adopted the weekly wage standard." *Worsham*, 2020 WL 7353906, at *12 (collecting cases). This Court should join them in doing so.

Applying the weekly wage standard, Plaintiff's minimum wage claim boils down to eight equations solved by dividing all of the wages Plaintiff earned during the week by the hours worked to see if the quotient is greater than $7.25.

For six of the eight weeks, determining the inputs for the equations are simple. Plaintiff claims to have worked up to 70 hours per week. Dkt. No. 1, ¶ 16. Applying the weekly wage standard to those alleged hours, Plaintiff would need to earn total compensation of at least $507.50 ($7.25 per hour multiplied by 70 hours). Even if this Court were to credit Plaintiff's estimate of his hours worked—as described below, this Court should not—Plaintiff's compensation exceeded the minimum wage threshold in six of his eight weeks.

The table below summarizes the wages Plaintiff earned for training or trips completed in each week.

| Week # | Pay Period Begin | Pay Period End | Pay Date | Gross Wages |
|--------|------------------|----------------|----------|-------------|
| 1 | March 27, 2023 | April 2, 2023 | April 7, 2023 | $650.01 |
| 2 | April 3, 2023 | April 9, 2023 | April 14, 2023 | $700.03 |
| 3 | April 10, 2023 | April 16, 2023 | April 21, 2023 | $700.03 |
| 4 | April 17, 2023 | April 23, 2023 | April 28, 2023 | $523.20 |
| 5 | April 24, 2023 | April 30, 2023 | May 5, 2023 | $415.60 |
| 6 | May 1, 2023 | May 7, 2023 | May 12, 2023 | $574.80 |
| 7 | May 8, 2023 | May 14, 2023 | May 19, 2023 | $468.00 |
| 8 | May 15, 2023 | May 21, 2023 | May 26, 2023 | $546.00 |

Exhibit T, App. 242-49.

As the table shows, in Weeks 1-4, 6, and 8, Plaintiff earned more than $507.50, bringing his effective hourly wage above the minimum wage threshold (ranging from $7.47 per hour in week 4 up to $10.00 per hour in Weeks 2 and 3). For each of these workweeks, Plaintiff has no minimum wage claim as a matter of law because he cannot show that NCI underpaid the minimum wage.

**B.    In Weeks 5 and 7, Plaintiff's compensation was above minimum wage when Plaintiff's unsupported estimate of 70 hours per week is replaced with a reasonable (but generous) estimate of Plaintiff's hours actually worked.**

For the remaining two weeks, there is the more challenging question of determining how many hours Plaintiff actually worked in each week. Plaintiff's conclusory and unsupported claim that he worked a consistent schedule of seventy hours a week is belied by all of the documents and Plaintiff's testimony about the nature of over-the-road truck driving.  See generally SUF ¶¶ 63-83.

In order to evaluate Plaintiff's hours of work, it is necessary to sort out Plaintiff's activities into those that are compensable under the FLSA and those that are not.

24

### 1.    Plaintiff's compensable work activities

In addition to his primary duty of driving, Plaintiff engaged in other activities that—at least for the sake of NCI's Motion—NCI will assume are compensable work under the FLSA.

***Pre-trip inspections***: When starting to drive each day, NCI's drivers, like Plaintiff, are expected to conduct a pre-trip inspection of their truck and trailer. Plaintiff estimated that the pre-trip inspection lasted fifteen to twenty minutes each time. SUF ¶ 34.

***Post-trip inspections***: Similarly, when they end their driving each day, NCI's drivers, like Plaintiff, are expected to conduct a post-trip inspection of their truck and trailer. Plaintiff estimated that the post-trip inspection lasted ten minutes each time. SUF ¶ 35.

***Waiting for trailer to be loaded***: When picking up a new load, Plaintiff had to wait for the trailer to be loaded. That process could take thirty minutes up to five hours (in extreme circumstances). SUF ¶ 36. On days that it took up to five hours, the majority of that time would be waiting for the loading to start. *Id*. Plaintiff sometimes recorded the times that loading started and stopped in his trip envelopes or dispatch communications. *Id.*

***Waiting for trailer to be unloaded***: When dropping off a load, Plaintiff had to wait for the trailer to be unloaded. That process could take thirty minutes up to three hours (in extreme circumstances). SUF ¶ 37. As with loading, the longer unload times were caused by waiting for the crew to start unloading the trailer. *Id.* Plaintiff sometimes recorded the times that unloading started and stopped. *Id.*

***Fueling the truck and reefer***: During his trips, Plaintiff would have to stop to fuel his truck and add fuel to the reefer on the trailer (which powered the refrigeration). Fueling would take approximately ten minutes. SUF ¶ 38.

### 2.    Plaintiff's non-working time

***Plaintiff's off-duty time was not work.*** "Periods during which an employee is completely relieved from duty, and which are long enough to enable him to use the time effectively for his own purposes are not hours worked." 29 C.F.R. § 785.16(a). The regulations go on to specifically exclude time that a truck driver spends on the road when he is relieved from duty after completing a trip. *Id.* § 785.16(b) ("[I]f the truck driver is sent from Washingtion [sic], DC to New York City, leaving at 6 a.m. and arriving at 12 noon, and is completely and specifically relieved from all duty until 6 p.m. when he again goes on duty for the return trip the idle time is not working time.").

Whenever Plaintiff was not "under a load" (that is, when he either had an empty trailer or no trailer attached to his tractor), he was free to use the time however he sees fit. He was permitted to use the tractor to run personal errands within a reasonable radius (referred to as "personal conveyance"). SUF ¶¶ 25-26. That slight restriction on Plaintiff's movement while off duty falls well short of the type of restrictions that can convert idle time into work time. *See Driscoll v. Fannin Cty.*, 2013 WL 644305, at *3 (E.D. Tex. Jan. 4, 2013) ("The Fifth Circuit has been extremely reluctant to uphold rewards of compensation for 'on-call' time, noting . . . that '[e]mployees who have received compensation for idle time generally have had almost no freedom at all.'"(quoting *Bright v. Hous. Northwest Med. Ctr. Survivor, Inc.*, 934 F.2d 671, 676 (5th Cir. 1991)), *report and recommendation adopted*, 2013 WL 617055 (E.D. Tex. Feb. 19, 2013).

***Plaintiff's rest time was not work.*** Pursuant to DOL regulations, Plaintiff was required to get a thirty-minute break after driving eight hours and ten hours of rest time between driving days. During his break and rest time, Plaintiff was free to use his time as he saw fit, even when he was under a load. SUF ¶ 27. Like his off-duty time between loads, his time spent on breaks or sleeping was not working time.

### 3. Dividing Plaintiff's compensation by his hours worked in Week 5, shows he was paid well over minimum wage.

During Plaintiff's fifth week of work (April 24 to April 30, 2023), he earned $415.60, he worked on only five days, his total hours worked were—at most—less than 40 hours, and his hourly rate was therefore well above minimum wage at over $10.00 per hour.

Plaintiff was at home and off duty on April 24 and April 25 until he was dispatched for a trip at 5:04 PM on April 25 in Conroe, TX. SUF ¶ 70. Between that time and 10:43 AM the next day, Plaintiff drove 68 miles. Generously estimating that drive took two hours and crediting Plaintiff with a fueling stop (10 minutes), a pre-trip inspection (30 minutes), Plaintiff worked for, at most, 2 hours and 50 minutes on April 25.

On April 26, Plaintiff loaded his vehicle in Baytown, TX, starting at 10:43 AM, then left at 12:00 PM for Irving, TX, arriving there at 8:14 PM to drop the trailer. SUF ¶ 70. Crediting Plaintiff with a fueling stop (10 minutes), a pre-trip inspection (30 minutes), and a post-trip inspection, and treating all time between 10:43 AM and 8:14 PM except for a 30-minute break as work (9 hours, 1 minute). Plaintiff worked, at most 9 hours, 51 minutes on April 26.

On April 27, Plaintiff picked up a loaded trailer at 11:45 AM, and drove it 318 miles to Lubbock, Texas, arriving the next day at 7:20 AM. SUF ¶ 71. Crediting Plaintiff with a fueling stop (10 minutes), a pre-trip inspection (30 minutes), and a post-trip inspection (10 minutes) and generously assuming the drive to Lubbock took ten hours, Plaintiff worked, at most, 10 hours, 50 minutes on April 27.

On April 28, Plaintiff unloaded the trailer in Lubbock, which started at 7:20 AM. SUF ¶ 71. Plaintiff then drove to Dodge City, Kansas to pick up another trailer before he had a trailer drop accident at the Dodge City location at 8:46 PM. SUF ¶ 72. Crediting Plaintiff with a fueling stop (10 minutes), a pre-trip inspection (30 minutes), and a post-trip inspection (10 minutes)

27

treating all time between 7:20 AM and 8:46 PM except for a 30-minute break as work (10 hours, 56 minutes), Plaintiff worked, at most, 11 hours, 46 minutes on April 28.

Plaintiff did not work on either April 29 or April 30 because his tractor was in the shop. SUF ¶ 78.

In total, Plaintiff worked, at most, 35 hours, 17 minutes in his fifth week of work. Based on his $415.60 pay for that week, Plaintiff earned around $11.78 per hour during that week. Even if Plaintiff's estimation of 10 hours per workday is used Plaintiff's rate would still be over the minimum wage because 10 hours per day for five days is 50 hours and $415.60 divided by those 50 hours results in a rate of $8.31 per hour.

Simply put, Plaintiff was paid more than minimum wage for Week 5 and his minimum wage claim should be dismissed.

### 4. Plaintiff's Week 7 pay was earned over just four days, resulting in a rate that is well above minimum wage.

During Plaintiff's seventh week of work (May 8 to May 14, 2023), he earned $468.00. Plaintiff claims that this put him below minimum wage based on his claim that he worked 10 hours per day for all 7 days that week. But the $468 in pay that Plaintiff received for Week 7 were earned over just the first four days of that week because the last three days of that week were spent starting a trip that ended in the next pay period and was therefore paid in the next workweek. SUF ¶¶ 80-83. Assuming, as Plaintiff claims, that he worked 10 hours per day for those first four days in Week 7, Plaintiff worked a total of 40 hours to earn his Week 4 pay. Dividing $468 by those 40 hours of work results in a rate of $11.70 per hour, well above minimum wage.

During Plaintiff's eighth week of work (May 15 to May 21, 2023), Plaintiff worked on just three days before he deadheaded home and quit. SUF ¶ 83. Combined with the three days carried over from Week 7, Plaintiff worked a total of six days to earn $546 for the trip that started in Week

7 and ended in Week 8. Assuming 10 hours per day for those 6 days results in 60 hours and an hourly rate of $9.10 per hour, well above minimum wage.

It is therefore undisputed even taking Plaintiff's estimate of daily hours worked, Plaintiff earned more than the minimum wage in Week 7 and his claim for minimum wage for that week should be dismissed.

**C.      NCI did not violate the FLSA by deducting advanced wages from Plaintiff's pay, even if it brought Plaintiff's net pay below minimum wage.**

Plaintiff may claim that NCI made improper deductions from his pay that caused his compensation to drop below the minimum wage threshold. But NCI's deductions were to recover payroll advances made to Plaintiff during his employment and longstanding Fifth Circuit and Department of Labor authority makes it clear that such deductions are permitted under the law. *Brennan v. Veterans Cleaning Serv., Inc.*, 482 F.2d 1362, 1369 (5th Cir. 1973) ("We agree with the district court that a similar rule should obtain for repayment by paycheck deductions of free and clear advances to employees, for the Act does not require inflexibility in the timing of the payment of wages or seek to discourage loans to employees."); U.S. Dep't of Labor, Opinion Letter Fair Labor Standards Act (FLSA), 2004 WL 3177896, at *1 (Oct. 8 20024) ("It has been our longstanding position that where an employer makes a loan or an advance of wages to an employee, the principal may be deducted from the employee's earnings even if such deduction cuts into the minimum wage or overtime pay due the employee under the FLSA.").

Pursuant to NCI's policy, NCI permitted Plaintiff to receive advances on his compensation. SUF ¶¶ 48-52. Plaintiff regularly took advantage of that option, and the advances were then deducted from Plaintiff's pay. SUF ¶¶ 92-95.

29

**III.    Plaintiff's claim for retaliatory discharge fails as a matter of law because Plaintiff cannot make a prima facie showing of retaliation.**

Plaintiff cannot establish a claim for retaliation under the FLSA because he cannot make a prima facie showing of retaliation. "A retaliation claim under the FLSA is subject to the *McDonnell Douglas* analytical framework." *Lasater v. Texas A & M Univ.-Com.*, 495 F. App'x 458, 461 (5th Cir. 2012) (citing *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 577 (5th Cir. 2004). To satisfy the first step of that analysis, "a plaintiff must make a prima facie showing of (1) participation in protected activity under the FLSA; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action." *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008) (citation omitted). Even assuming Plaintiff's vague complaints about NCI not paying him constitute protected activity under the FLSA, Plaintiff's claim fails because he cannot satisfy either of the last two elements.

**A.    Plaintiff did not suffer an adverse employment action because he quit.**

It is undisputed that Plaintiff voluntarily quit his employment. SUF ¶ 86. Voluntary resignation does not constitute an adverse employment action. *Newbury v. City of Windcrest, Texas*, 991 F.3d 672, 677 (5th Cir. 2021) (stating that resignation is only actionable if it constitutes constructive discharge).

In the event that Plaintiff attempts to assert that his decision to quit qualifies as an adverse employment action, "[a] resignation is actionable . . . only if the resignation qualifies as a constructive discharge." *Id.* at 677 (quoting *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)). "A plaintiff alleging constructive discharge must show that his or her 'working conditions were so intolerable that a reasonable employee would feel compelled to resign.'" *Id.* (quoting *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997)). To establish a constructive discharge, a plaintiff must demonstrate a greater degree of harassment than would be

necessary to show a hostile work environment. *Id.* When determining whether working conditions are sufficiently intolerable, courts consider whether the plaintiff suffered:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* (quoting *Lauderdale v. Tex. Dep't of Crim. Just.*, 512 F.3d 157, 167 (5th Cir. 2007)); *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 440 (5th Cir. 2005) (stating that the standard for a plaintiff to prove constructive discharge is higher than that of hostile work environment). Plaintiff can show none of the requisite mistreatment to establish a constructive discharge.

Because he quit under circumstances that do not rise to a constructive discharge, Plaintiff's retaliation claim fails as a matter of law.

### B. There is no causal link between the alleged protected activity and any adverse action.

If Plaintiff were somehow able to claim he suffered an adverse action when he quit, his retaliation claim still fails because there can be no causal link between any mistreatment that led to his resignation and his complaint under the FLSA because he decided to quit before he made his first complaint. SUF ¶ 87-88.

"A 'causal link' is established when the evidence demonstrates that the [adverse employment action] was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001) (second set of internal quotation marks and citation omitted); *see also Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (noting that "but for" causation is not required to satisfy the third element of a plaintiff's prima facie retaliation case). While temporal proximity is not determinative, "[c]lose timing between the protected activity and adverse employment action may provide a causal link." *DeHart v. Baker Hughes Oilfield*

31

*Operations, Inc.*, 214 Fed. App'x 437, 442 (5th Cir. 2007) (citing *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)).

It is axiomatic that there can be no causal connection between conduct that precedes the protected activity. Thus, Plaintiff's claim for retaliation should be dismissed.

## CONCLUSION

Based on the arguments above and the undisputed facts, NCI respectfully requests that the Court grant summary judgment in its favor and dismiss Plaintiff's claims with prejudice.

Respectfully submitted,

Dated: June 12, 2026

*/s/ Andrew J. Weissler*
Cooper R. Page, #24118728
HUSCH BLACKWELL, LLC
1900 N. Pearl Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 999-6146
Fax: (214) 999-6170
Email: cooper.page@huschblackwell.com

Andrew J. Weissler, admitted *pro hac vice*
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: 816.983.8123
Fax: 816.983.8080
Email: aj.weissler@huschblackwell.com

*Attorney for Defendants*
*National Carriers, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2026, I will electronically file the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter.

*/s/ Andrew J. Weissler*_____
