**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| DARRIN JAMES TIERNAN, on behalf of himself and others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NATIONAL CARRIERS, INC.,<br><br>Defendant. | Case No.: 3:25-cv-1249-L-BT (SAL) (RAR) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**CONSUMER ATTORNEYS, PLLC**
Emanuel Kataev, Esq.
*Admitted pro hac vice*
6829 Main Street
Flushing, NY, 11367
(718) 412-2421 (office)
(718) 489-4155 (facsimile)
ekataev@consumerattorneys.com

Moshe O. Boroosan, NY Bar No. 5429915
68-29 Main Street
Flushing, NY 11367
Telephone: (718) 887-2926
Fax: (718) 715-1750
mboroosan@consumerattorneys.com

*Attorneys for Plaintiff*
*Darrin James Tiernan*

# TABLE OF CONTENTS

INTRODUCTION ........ 1

STATEMENT OF UNCONTROVERTED FACTS ........ 2

STANDARD OF REVIEW ........ 30

ARGUMENT ........ 33

I. The Motor Carrier Act Exemption Is Limited to Overtime and Does Not Apply Here ........ 33

II. NCI Failed to Establish Weekly Minimum-Wage Compliance ........ 37

A. NCI's Week 7 Calculation Omits Work on May 13 and 14 ........ 38

B. NCI Assigns Three (3) Days of Breakdown Pay to the Wrong Workweek ........ 39

C. Compensable Hours in Weeks 5 and 7 Remain Genuinely Disputed ........ 40

D. "Not Under a Load" Does Not Conclusively Establish Non-compensable Time ........ 41

E. Week 8 Arithmetic and Allocation Reinforce That NCI's Figures Are Not Uncontroverted ........ 42

F. All of Plaintiff's time was compensable work ........ 43

III. NCI's Own Sworn Evidence Creates a Genuine Termination Dispute ........ 44

CONCLUSION ........ 47

# TABLE OF AUTHORITIES

**Cases**

Allen v. Coil Tubing Servs., L.L.C.,
846 F. Supp. 2d 678 (S.D. Tex. 2012), aff'd, 755 F.3d 279 (5th Cir. 2014) .. 32, 33, 34, 35

Amaya v. NOYPI Movers, L.L.C.,
741 Fed. Appx. 203 (5th Cir. 2018) (unpublished)........................................................ 35

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)........................................................................................................ 31

Anderson v. Mt. Clemens Pottery Co.,
328 U.S. 680 (1946) ................................................................................................ 40, 41

Bank of La. v. Aetna U.S. Healthcare, Inc.,
468 F.3d 237 (5th Cir. 2006) ......................................................................................... 33

Beliz v. W.H. McLeod & Sons Packing Co.,
765 F.2d 1317 (5th Cir. 1985) ....................................................................................... 41

Brennan v. Veterans Cleaning Serv., Inc.,
482 F.2d 1362 (5th Cir. 1973) ....................................................................................... 42

Bright v. Houston Nw. Med. Ctr. Survivor, Inc.,
934 F.2d 671 (5th Cir. 1991) ......................................................................................... 43

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)........................................................................................................ 31

Collins v. Heritage Wine Cellars, Ltd.,
589 F.3d 895 (7th Cir. 2009) ................................................................................. 36 n.2

Dalheim v. KDFW-TV,
918 F.2d 1220 (5th Cir. 1990) ....................................................................................... 33

Dauphin v. Chestnut Ridge Transp., Inc.,
544 F. Supp. 2d 266 (S.D.N.Y. 2008) ........................................................................... 36

E.E.O.C. v. LHC Grp., Inc.,
773 F.3d 688 (5th Cir. 2014) ......................................................................................... 32

Escobedo v. Ace Gathering, Inc.,
109 F.4th 831 (5th Cir. 2024) ......................................................................................... 36

Fontenot v. Upjohn Co.,
780 F.2d 1190 (5th Cir. 1986) .......................................................................... 31

Gee v. Principi,
289 F.3d 342 (5th Cir. 2002) .......................................................................... 45

Hagan v. Echostar Satellite, L.L.C.,
529 F.3d 617 (5th Cir. 2008) .......................................................................... 44, 46

Harvill v. Westward Commc'ns, L.L.C.,
433 F.3d 428 (5th Cir. 2005) .......................................................................... 31

In re Hinsley,
201 F.3d 638 (5th Cir. 2000) .......................................................................... 32

Kelly v. Borough of Union Beach,
2011 U.S. Dist. LEXIS 12839 (D.N.J. 2011) .................................................... 36

Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.,
331 F.3d 452 (5th Cir. 2003) .......................................................................... 31

Little v. Liquid Air Corp.,
37 F.3d 1069 (5th Cir. 1994) .......................................................................... 32

Maynor v. Dow Chem. Co.,
671 F. Supp. 2d 902 (S.D. Tex. 2009) .............................................................. 47

Mornford v. Andrews,
151 F.2d 511 (5th Cir. 1945) .......................................................................... 37

Orozco v. SBX Logistics, LLC,
No. 7:24-CV-00283, 2026 WL 886295 (S.D. Tex. Mar. 31, 2026) ................................ 41

Quartararo v. J. Kings Food Serv. Prof'ls,
2021 US Dist LEXIS 63648 (E.D.N.Y. 2021) ..................................................... 36

Skipper v. Superior Dairies, Inc.,
512 F.2d 409 (5th Cir. 1975) .......................................................................... 40

Songer v. Dillon Res., Inc.,
618 F.3d 467 (5th Cir. 2010) .......................................................................... 34

Starnes v. Wallace,
849 F.3d 627 (5th Cir. 2017) .......................................................................... 46

Steadman v. Texas Rangers,

179 F.3d 360 (5th Cir.1999) .......... 31

Sulzer Carbomedics, Inc. V. Oregon Cardio-Devices, Inc., 257 F.3d 449 (5th Cir. 2001) .......... 31

United States v. Diebold, Inc., 369 U.S. 654 (1962) .......... 31

Wirtz v. C & P Shoe Corp., 336 F.2d 21 (5th Cir. 1964) .......... 35

Worsham v. B.G. Prop. Mgmt., LLC, No. 4:16-CV-2712, 2020 WL 7353906, at *12 (S.D. Tex. Sept. 4, 2020), report and recommendation adopted sub nom. Worsham v. BG Prop. Mgmt. LLC, No. 4:16-CV-02712, 2020 WL 6784217 (S.D. Tex. Nov. 18, 2020) .......... 37

**Statutes**

29 U.S.C. § 206 .......... 37

29 U.S.C. § 207 .......... 33

29 U.S.C. § 213 .......... 33-34

29 U.S.C.S. § 215 .......... 46

49 U.S.C. § 31502 .......... 34

**Rules and Regulations**

29 C.F.R. § 516.2 .......... 40

29 C.F.R. § 778.103 .......... 37

29 C.F.R. § 778.104 .......... 37

29 C.F.R. § 778.111 .......... 37

29 C.F.R. § 782.2 .......... 34, 35, 36

29 C.F.R § 782.7 .......... 36 n.2

29 C.F.R. § 785.16 .......... 42, 43

Fed. R. Civ. P. 56 .......... 30, 32

## INTRODUCTION

Plaintiff Darrin James Tiernan ("Plaintiff" or "Tiernan"), individually and on behalf of all others similarly situated, opposes Defendant National Carriers, Inc.'s ("NCI" or "Defendant") motion for summary judgment. Defendant's motion overstates the record.

The Motor Carrier Act ("MCA") exemption should not apply because there were weeks in which Plaintiff did not engage in interstate travel, and Defendant failed to offer evidence that any intrastate travel constitutes interstate commerce under the MCA.

In any event, summary judgment should be denied as to Plaintiff's minimum-wage claim as well as his retaliation claim as genuine disputes of material fact preclude summary judgment on those claims.

Three defects in Defendant's own evidence independently require denial on the wage claims: (1) NCI assigns the entire May 13–17 trip to Week 8 even though May 13 and 14 fell in Week 7; (2) NCI assigns all three days of April 29–May 1 breakdown pay to Week 5 even though May 1 fell in Week 6; and (3) NCI has not established complete compensable hours for Weeks 5 and 7, while its own mileage memorandum confirms extensive non-driving work within mileage pay.

As to retaliation, Plaintiff does not deny his deposition testimony that he intended to quit. Defendant itself, however, has sworn that "NCI terminated Plaintiff's employment," directly conflicting with their theory that he voluntarily quit and suffered no adverse action. Separately, Defendant's report of an incident that it previously decided not to report is a separate retaliatory act.

Those concrete documentary disputes, and the disputed facts raised, require a trial.

## STATEMENT OF UNCONTROVERTED FACTS[1]

### A. As to "NCI"

1. National Carriers, Inc. ("NCI") is a diversified motor carrier servicing all 48 states in the continental United States with transportation offerings which include refrigerated, livestock, and logistics services. Exhibit V, Declaration of Jill Maschmeier ¶ 4 [hereinafter, "JM Dec. ¶ ___"], App. 261.

**Response: Admit.**

2. NCI's primary operations hubs are Kansas and Texas. NCI employs over 300 drivers, who operate NCI-owned tractors, typically pulling refrigerated trailers. Some drivers also haul live cattle in a livestock trailer or assorted nonperishable items in non-refrigerated trailers. JM Dec. ¶ 5, App. 261.

**Response: Admit.**

3. NCI drivers operate Kenworth T680 tractors, each of which has a gross vehicle weight rating (GVWR) of over 50,000 pounds. JM Dec. ¶ 7, App. 262.

**Response: Admit.**

4. NCI drivers live all over the country. In most circumstances, NCI drivers are permitted to drive their vehicles from and to their homes before and after completing trips. JM Dec. ¶ 8, App. 262.

**Response: Admit.**

5. NCI is actively registered with FMCSA as a carrier/broker authorized to transport property interstate. JM Dec. ¶ 9, App. 262.

[1] Filed with this brief is an Appendix ("App.") containing the Declaration of Tiernan and any other documents supporting Defendants' Statement of Uncontroverted Facts.

**<u>Response</u>: Admit.**

6. NCI has always complied, and has always required its truck drivers to comply, with all applicable safety regulations issued by the FMCSA. JM Dec. ¶ 10, App. 262.

**<u>Response</u>: Admit.**

7. All NCI drivers must possess a valid Commercial Driver's License. JM Dec. ¶ 11, App. 262.

**<u>Response</u>: Admit.**

8. Plaintiff's work as an over-the-truck was subject to DOT regulations, including limits on his hours of work, DOT inspections, and DOT drug testing. Exhibit W, Deposition of Plaintiff Darrin Tiernan 90:14-21; 136:11-19; 137:3-5 [hereinafter, "Plaintiff Dep. __"], App. 280, 286-87. Plaintiff has had a commercial driver's license since 2022, including during his entire time driving for NCI. Plaintiff Dep. 29:3-7, App. 272.

**<u>Response</u>: Admit.**

**B. <u>As to "NCI driver pay and job conditions"</u>**

9. Newly hired NCI drivers are initially paid a flat amount ($250) for orientation, which takes approximately three days. During orientation, the new hires complete paperwork and receive training on company policies, practices, and benefits. JM Dec. ¶ 12, App. 262.

**<u>Response</u>: Deny. While the payroll records corroborate $250.00 orientation pay and the $100.00-per-day training structure, Plaintiff disputes that the compensation he actually received for each workweek, divided by all compensable hours, always equaled or exceeded at least $7.25 per hour. <u>Tiernan Decl. ¶ 4.</u>**

10. After orientation, new hires train by driving NCI routes with experienced drivers who observe and train the new drivers. Drivers are paid a flat daily rate for their training days of

$100 per day (up to $700 per week). The length of the training period varies by driver, but it is typically around three weeks. JM Dec. ¶ 13, App. 262.

**Response: Deny. While the payroll records support orientation pay of $250 and training pay of $100 per day (e.g., $400 for four training days; $700 for seven), Plaintiff disputes that the compensation he actually received for each workweek, divided by all compensable hours, always equaled or exceeded at least $7.25 per hour. Tiernan Decl. ¶ 5.**

11. After their training period, NCI drivers begin driving routes on their own. JM Dec. ¶ 14, App. 262.

**Response: Admit.**

12. NCI drivers are paid primarily on a per-mile basis. Drivers are paid a set rate (which increases with experience) for each mile driven with a loaded or empty truck as directed by the dispatcher. JM Dec. ¶ 15, App. 262.

**Response: Deny. Although Defendant used a per-mile compensation method for solo trips and Plaintiff's solo rate was $0.40 per mile, Plaintiff disputes that the resulting compensation, divided by all compensable hours in each individual workweek, always equaled or exceeded $7.25 per hour. Tiernan Decl. ¶ 11.**

13. Drivers are not paid for driving any route or diversion that is not authorized by NCI, even if they are in an NCI tractor. JM Dec. ¶ 16, App. 262.

**Response: Deny. Plaintiff was not authorized to drive any specific routes, and was trusted to use his own GPS to establish his own routes, nor is there any evidence that Tiernan drove an unauthorized route or diverted at any point in time. Tiernan Decl. ¶ 13; Tiernan Dep. 70:9-17.**

14. NCI driver pay largely depends on how often they are available to drive and how many loads they handle per week. Fully active NCI drivers average over 2,000 miles per week. JM Dec. ¶ 17, App. 263.

**Response: Admit that pay depends on availability and loads handled. Deny that the asserted 2,000-mile average is material to whether Plaintiff received $7.25 per compensable hour in any particular workweek, and object to relevance. Tiernan Decl. ¶¶ 4-5, 14-15; Tiernan Dep. 102:17-20; 255:14-256:2.**

15. New NCI drivers start earning a rate of at least $0.36 per mile. After ninety days, that rate increases to at least $0.38 per mile. After driving for six months, it increases again to at least $0.40 per mile. Depending on their individual circumstances, some NCI drivers earn higher rates. JM Dec. ¶ 18, App. 263.

**Response: Deny; Plaintiff was never told he would earn a rate of $0.36, $0.38, or $0.40 per mile. Tiernan Decl. ¶ 14. Admit that some NCI drivers earn higher rates. Tiernan Decl. ¶ 15.**

16. Driver mileage pay is intended to compensate them all for work time spent delivering loads, including non-driving work time, with limited exceptions where additional pay is offered. JM Dec. ¶ 19, App. 263; Exhibit C, App. 65; Plaintiff Dep. 251: 3-20, App. 290.

**Response: Deny, as Plaintiff disputes whether the amount actually earned in each workweek, divided by all compensable hours, satisfied the federal minimum wage. Tiernan Decl. ¶¶ 12, 16.**

17. With their per-mile rate, NCI drivers are paid certain additional amounts (collectively called "accessorial pay" in the industry). JM Dec. ¶ 20, App. 263; Exhibit B, App. 38-39.

**<u>Response</u>: Admit that NCI's policies provide for certain accessorial pay categories in addition to per-mile compensation. Plaintiff disputes whether he received all accessorial pay to which he was entitled and whether total weekly compensation satisfied the minimum wage. <u>Tiernan Decl. ¶¶ 19, 12, 16.</u>**

18. NCI drivers earn "stop pay" for each stop they make enroute that is not their first or last stop. Stop pay is $20 per additional stop. JM Dec. ¶ 21, App. 263; Exhibit B, App. 38.

**<u>Response</u>: Admit that Defendant's stated stop-pay policy is $20.00 per additional enroute stop. Whether other drivers regularly received stop pay is immaterial absent evidence tied to Plaintiff's claim. Plaintiff notes Defendant's own Week 8 figures appear to double-count or misstate stop pay relative to mileage arithmetic (1,315 × $0.40 = $526, plus $20 stop pay = $546), which bears on the reliability of Defendant's weekly totals. Further, Plaintiff was not paid "stop pay," and is aware that other drivers were not paid this either. <u>Tiernan Decl. ¶ 20;</u> <u>Tiernan Dep. 151:21-152:7.</u> Plaintiff further objects to relevance and materiality.**

19. NCI drivers earn "detention pay" when they are required to wait to load or unload for more than two (2) hours at a customer location. Detention pay is $10 per hour. JM Dec. ¶ 22, App. 263; Exhibit B, App. 38.

**<u>Response</u>: Admit the stated detention-pay policy. Whether Plaintiff earned detention pay in particular weeks is not independently dispositive of the weekly minimum-wage calculation. Further, Plaintiff never earned "detention pay." <u>Tiernan Decl. ¶ 21;</u> <u>Tiernan Dep. 153:20-154:1.</u> Plaintiff further objects to relevance and materiality.**

20. NCI drivers can earn "layover pay" when they are laid over for more than 24 hours between loads. Layover pay is $10 per hour (up to $50 per day). While on a layover, NCI drivers are free to use their time as their own. JM Dec. ¶ 23, App. 263 Exhibit B, App. 38.

**Response: Admit the stated layover-pay policy. Plaintiff disputes any categorical assertion that time labeled "layover" or "not under a load" is automatically non-compensable without proof that he was completely relieved of duty. Further, Plaintiff never earned "layover pay." Tiernan Decl. ¶ 22; Tiernan Dep. 155:18-20. Plaintiff further objects to relevance and materiality.**

21. NCI drivers earn "breakdown pay" for time that their tractor is in the shop. Breakdown pay is $50 per day if other work is available but they choose not to take it. Breakdown pay is $100 per day if no other work is available. JM Dec. ¶ 24, App. 263; Exhibit B, App. 38.

**Response: Admit the stated breakdown-pay policy. Plaintiff further admits NCI paid breakdown pay for April 29–May 1, 2023, but disputes NCI's workweek allocation of that pay: under NCI's Monday–Sunday workweek, April 29 and 30 fall in Week 5 and May 1 falls in Week 6, so only $100 (not $150) is properly attributable to Week 5. Tiernan Decl. ¶ 28.**

22. NCI drivers can also earn lump sum payments for transporting hazardous materials, moving trailers within the same city, or delivering in New York City. NCI drivers are also eligible for bonus opportunities based on NCI's performance and successful driver referrals. JM Dec. ¶ 25, App. 264; Exhibit B, App. 39.

**Response: Admit that NCI's policies provide for certain lump-sum and bonus opportunities. Whether NCI sometimes transports hazardous materials, or whether bonus opportunities existed generally, is immaterial to Plaintiff's minimum-wage and retaliation claims. Further, Plaintiff delivered food products, not hazardous materials. Tiernan Decl. ¶ 29; Tiernan Dep. 67:12-68:3; 137:15-17, 160:14-24.**

23. NCI drivers are not eligible for overtime pay because they are subject to DOT regulations that limit the number of hours they can drive. JM Dec. ¶ 26, App. 264.

**<u>Response</u>: Deny, as Plaintiff was not at all times engaged in interstate commerce during his employment with Defendant. <u>Tiernan Decl. ¶ 34.</u>**

24. Under the relevant DOT regulations, NCI drivers cannot drive more than eleven hours per day or more than seventy hours in an eight-day period. Drivers must take a break of at least thirty minutes after driving for eight hours. Drivers must complete their daily driving within a fourteen-hour driving window and then have at least ten hours of rest before driving again. After drivers reach their weekly limit of driving hours, they must be off duty long enough to reset their driving hours. JM Dec. ¶ 27, App. 264.

**<u>Response</u>: Deny. Plaintiff was taught in orientation to not drive more than eight (8) or nine (9) hours, so that Defendant would not have to afford Plaintiffs a "34" (rest break). <u>Tiernan Dep. 248:21-249:1.</u>**

25. Whenever an NCI driver is not "under a load" (that is, when they have either an empty trailer or no trailer attached to their tractor), they are free to use the time however they see fit. JM Dec. ¶ 28, App. 264; Plaintiff Dep. 86:16-88:23; App. 277-79.

**<u>Response</u>: Deny that "not under a load" conclusively establishes non-compensable time. NCI's own mileage memorandum and declarations recognize compensable activities while a driver is not hauling a loaded trailer, including waiting, pre- and post-trip inspection, fueling, paperwork, loading and unloading, deadheading, repositioning equipment, maintenance-related activity, and communication with dispatch. An employee is off duty only when completely relieved of duty for a period long enough to use the time effectively for personal**

**purposes. See 29 C.F.R. § 785.16. Plaintiff denies that he was off duty during these times. Tiernan Decl. ¶¶ 24-25.**

26. NCI drivers are permitted to use their NCI tractor to run personal errands within a reasonable radius (referred to as "personal conveyance"). JM Dec. ¶ 29, App. 264; Plaintiff Dep. 86:16-88:23; App. 277-79.

**Response: Admit that personal conveyance within a reasonable radius was permitted, but deny that this permission establishes that all time outside loaded hauls were non-compensable. Plaintiff denies that he was off duty during these times. Tiernan Decl. ¶ 26.**

27. During DOL-mandated break and off-duty time, NCI drivers are free to use the time as they see fit, even when under a load. JM Dec. ¶ 30, App. 264.

**Response: Admit that during bona fide DOL-mandated break and off-duty periods that completely relieve the driver of duty, the time is non-compensable. Plaintiff disputes that NCI has shown any particular interval was so relieved, as opposed to waiting, property-care, inspection, communication, or other compensable activity. Tiernan Decl. ¶ 27.**

28. None of NCI's drivers operate on a fixed schedule with the same start and stop times each day or from week to week. JM Dec. ¶ 31, App. 264.

**Response: Admit, but object to relevance and materiality.**

29. The majority of NCI's drivers do not drive a fixed route that is the same every day or every week. Some drivers are assigned to dedicated lanes where the routes are generally the same from week to week, but the exact start and end times still vary. JM Dec. ¶ 32, App. 264.

**Response: Admit, and note that Plaintiff did not drive a fixed route. Tiernan Decl. ¶ 13; Tiernan Dep. 70:9-17.**

30. NCI's drivers are assigned trips by NCI's dispatchers who tell them when and where to begin the trip and where and when to end the trip. This information is also available to the drivers via an electronic dispatching system in their tractors. JM Dec. ¶ 33, App. 265.

**Response: Deny. Tiernan Dep. 70:9-17.**

31. All NCI drivers are expected to be available to drive interstate trips at any time while they are working. Trips are assigned based on driver availability and location in relation to a load that needs to be picked up. JM Dec. ¶ 34, App. 265.

**Response: Deny that Plaintiff drove interstate at all times while he was working; I did not engage in interstate commerce during my fifth workweek, April 24th through April 30th, as I did not leave the State of Texas.. Tiernan Decl. ¶ 34.**

32. Subject to the DOT regulations and the dispatched pickup and drop-off times, drivers have discretion over when they drive during a trip. JM Dec. ¶ 35, App. 265.

**Response: Object that this is vague. Plaintiff lacks sufficient information to admit this statement and dispute it to the extent it rests on conclusory or unsupported assertions. Plaintiff primarily went by the guideline he was taught during training to not exceed eight (8) or nine (9) hours driving. Tiernan Dep. 70:9-17; 248:23-249:1.**

33. The time working varies from driver to driver, and each driver's time working hours vary from day to day and from week to week, depending on numerous factors that are in and out of NCI's or the driver's control. For example, the time spent working varies based on which routes they drive, traffic, weather, road condition, vehicle maintenance issues, delays in loading or unloading trailers, the availability of helpers (called "lumpers") to assist with loading or unloading, and the amount of time spent in communicating with dispatchers or completing paperwork. JM Dec. ¶ 36, App. 265.

**<u>Response</u>: Admit.**

34. When starting to drive each day, NCI's drivers, like Plaintiff, are expected to conduct a pre-trip inspection of their truck and trailer. Plaintiff estimated that the pre-trip inspection lasted fifteen to twenty minutes each time. Plaintiff Dep. 130:1-3, App. 281.

**<u>Response</u>: Admit.**

35. Similarly, when ending their driving each day, NCI's drivers, like Plaintiff, are expected to conduct a post-trip inspection of their truck and trailer. Plaintiff estimated that the post-trip inspection lasted ten minutes each time. Plaintiff Dep. 130:8-10, App. 281.

**<u>Response</u>: Admit.**

36. When picking up a new load, Plaintiff had to wait for the trailer to be loaded. That process could take thirty minutes up to five hours (in extreme circumstances). Plaintiff Dep. 132:6-20, App. 282. On days that it took up to five hours, the majority of that time would be waiting for the loading to start. *Id.* 132:23-133:2, App. 283. In his trip envelopes and the dispatcher notes, Plaintiff often recorded the times at which he arrived at a location to pick up a load and the time at which the loading was complete. *See generally* Exhibits E-S, App. 80-241.

**<u>Response</u>: Admit.**

37. When dropping off a load, Plaintiff had to wait for the trailer to be unloaded. That process could take thirty minutes up to three hours (in extreme circumstances). Plaintiff Dep. 134:2-21, 135:6-9, App. 284-85. As with loading, the longer unload times were caused by waiting for the crew to start unloading the trailer. *Id.* 134:22-135:5, App. 284-85. In his trip envelopes and the dispatcher notes, Plaintiff recorded often recorded the times at which he arrived at a location to drop off a load and the time at which the unloading was complete. *See generally* Exhibits E-S, App. 80-241.

**<u>Response</u>: Admit.**

38. During his trips, Plaintiff would have to stop to fuel his truck and add fuel to the reefer on the trailer (which powered the refrigeration). Fueling would take approximately ten minutes. Plaintiff Dep. 135:13-136:2, App. 286-87.

**<u>Response</u>: Admit.**

39. NCI drivers are paid on a weekly basis. Payroll is run on Wednesday and deposited on Friday. Exhibit U, Declaration of Brandee Chatham, ¶ 4 [hereinafter "BC Dec. ¶ __"], App. 250.

**<u>Response</u>: Admit.**

40. NCI's pay periods are seven-day periods that run from Monday to Sunday. BC Dec. ¶ 5, App. 250.

**<u>Response</u>: Admit.**

41. Each pay day, NCI drivers are paid for orientation, training, accessorial pay, and/or trips that were completed during the most recently completed pay period. BC Dec. ¶ 6, App. 250.

**<u>Response</u>: Admit, but note that Plaintiff was not engaged at all times in interstate commerce and disputes that amounts paid for completed trips always satisfied the minimum wage when measured against all compensable hours in each workweek in which the work was performed.**

42. If a driver has a trip that begins in one pay period and ends in another, the pay for all of the work performed on that trip is included in the pay for the second pay period. BC Dec. ¶ 7, App. 250.

**<u>Response</u>: Admit.**

43. NCI's workweek also runs from Monday to Sunday. Because trips are not paid until complete, there are pay periods that include pay for work performed in two different workweeks. BC Dec. ¶ 8, App. 251.

**Response: Admit.**

## C. As to "NCI's policies and practices for reimbursing expenses and paying advanced wages"

44. Pursuant to its policy, NCI pays for all reasonable and necessary business expenses incurred by its drivers in performing their duties. BC Dec. ¶ 9, App. 251.

**Response: Admit.**

45. Because NCI drivers travel far from NCI's office locations, NCI permits its drivers to incur and pay necessary business expenses on NCI's behalf. For example, while out on a trip, drivers are able to purchase maintenance items needed for their tractor or trailer, to purchase fuel for their tractor and trailer, to pay tolls, scale fees, or cleaning fees, and to pay for lumpers to unload trailers. BC Dec. ¶ 10, App. 251.

**Response: Admit.**

46. There are two primary ways in which NCI drivers are able to use NCI funds while on the road. First, each driver has access to a credit card (referred to as a ComCard) that they typically use to purchase fuel. Purchases made on the ComCard are billed to and paid directly by NCI. BC Dec. ¶ 11, App. 251.

**Response: Admit.**

47. Drivers can also request funds to be paid via ComChek. ComCheks work similarly to standard checks but require an NCI-issued authorization code to be used. NCI uses the authorization codes to efficiently track each payment and assign it to a particular driver. BC Dec. ¶ 12, App. 251.

**<u>Response</u>: Admit.**

48. Because NCI does not pay for trips until they are complete, NCI permits its drivers to take advances on their wages to cover personal expenses while on the road. NCI employees are able to use the ComCard or ComChek to take an advance for personal expenses. BC Dec. ¶ 13, App. 251.

**<u>Response</u>: Admit.**

49. Pursuant to NCI policy, all business expenses paid for by ComChek or ComCard (other than fuel) must be reported to NCI at the end of every trip using a trip envelope form, which lists the type and amount of each expense. Drivers must also provide itemized receipts for any business expenses. Fuel purchases made by the ComCard are separately reported to NCI. BC Dec. ¶ 14, App. 251-52.

**<u>Response</u>: Admit that NCI's stated policy requires reporting business expenses (other than fuel) with trip envelopes and itemized receipts. Plaintiff disputes that every deduction from his pay was a *bona fide* personal advance rather than an unreimbursed business expense, and denies that he was ever taught or instructed about this during training. <u>Tiernan Decl. ¶ 30.</u>**

50. Plaintiff understood he was required to submit receipts for expenses and had at least one expense that did not get reimbursed because he could nor produce a receipt. Plaintiff Dep. 265:16-19, 266:20-267:19, App. 291-93.

**<u>Response</u>: Admit, but maintain that Plaintiff was never taught or instructed to report fuel purchases. <u>Tiernan Decl. ¶ 30.</u>**

51. If a driver does not report or provide an itemized receipt for an expense purchased by ComChek or ComCard, it is assumed to be a personal expense and is treated as an advance of wages to be repaid from the driver's pay earned for that trip. BC Dec. ¶ 15, App. 252.

**Response: Admit that this is NCI's stated accounting treatment. Plaintiff disputes that NCI has established the personal nature of every deducted amount as to him, and maintains that he was never taught or instructed about this during training. Tiernan Decl. ¶ 30.**

52. Drivers are typically given two weeks to report a business expense and turn in the receipt before the ComChek or ComCard amount is deducted from their pay. That time period is often extended if an employee reports the expense and requests additional time to locate and submit the receipt. BC Dec. ¶ 16, App. 252.

**Response: Deny. It would be impossible for Plaintiff to report expenses while on the road. Tiernan Decl. ¶ 30-32. Moreover, Plaintiff believes he was kept out on the road so that he could not report such expenses. Tiernan Decl. ¶ 30-32.**

53. For payroll accounting purposes, NCI treats all ComChek or ComCard payments as advances that are then deducted from the relevant driver's pay. If a driver turns in the paperwork for a business expense paid by ComChek or ComCard, the amount is recorded as a reimbursement and added to the driver's pay, zeroing out the effect on the driver's pay. BC Dec. ¶ 17, App. 252.

**Response: Admit the general accounting description, but Plaintiff disputes that every ComChek/ComCard amount deducted from his pay was properly classified and that all documented business expenses were reimbursed. Tiernan Decl. ¶ 31.**

54. If a driver turns in business expense receipts after a ComChek or ComCard purchase has been deducted from his pay, NCI reverses the deduction and credits the reimbursement on the next paycheck. BC Dec. ¶ 18, App. 252.

**Response: Deny. Despite Plaintiff's use of reporting envelopes, there were still deductions in his pay. Tiernan Decl. ¶ 31.**

55. The receipt requirement is of vital importance to NCI. NCI is unable to directly monitor its driver's purchases when they are out on the road, and an itemized receipt is a necessary protection against potential fraud and abuse. Also, NCI is subject to auditing for its fuel and other expenses. That is, NCI reports its fuel purchases and mileage to the federal government and all fifty states and NCI must keep receipts proving its fuel costs in the event of an audit. BC Dec. ¶ 19, App. 252.

**Response: Admit that NCI has legitimate reasons for requiring receipts. Object that the general importance of the receipt policy is not independently material to weekly minimum-wage compliance, and that despite submitting reporting envelopes, Plaintiff was not reimbursed for his expenses. Tiernan Decl. ¶ 31.**

56. After completing a trip, drivers are expected to complete and submit a "trip envelope" that includes details on the trip, including the tractor mileage and any requested reimbursements. The trip envelope should also include all relevant paperwork for the trip, including expense receipts, bills of lading, delivery receipts, and truck scale documentation. Drivers submit trip envelopes electronically to NCI. BC Dec. ¶ 20, App. 252-53.

**Response: Admit.**

57. During a trip, drivers are in consistent contact with their assigned dispatcher who records information in NCI's dispatching system related to touch points with the driver and or other trip information, including when a new trip is dispatched to the driver, when the driver arrives and picks up a load, and when arrives at a stop and drops off a load. BC Dec. ¶ 21, App. 253.

**Response: Admit that dispatchers record certain "touch points" (dispatch, pickup arrival, load pickup, stop arrival, drop-off), but deny that those touch points constitute a complete record of all compensable time. Defendant does not claim the system records every pre-trip inspection, post-trip inspection, fuel stop, loading/unloading delay, paperwork task, required communication, repair-related task, or other compensable activity identified in NCI's own mileage memorandum. Among other examples, Plaintiff's dispatcher was not in contact with him on the day he decided to quit, and the dispatcher previously claimed Plaintiff accepted a load that he had not. Tiernan Decl. ¶ 33.**

58. For each pay period, NCI produces a settlement statement that catalogues the amounts and types of pay for that pay period, along with a list of all deductions and reimbursements. These settlement statements are provided to NCI's drivers after payroll is run. BC Dec. ¶ 22, App. 253.

**Response: Admit.**

59. For each pay period, NCI also provides a wage statement that lists all amounts paid to each driver for the pay period, including any deductions for advanced wages. BC Dec. ¶ 23, App. 253.

**Response: Admit.**

**D. As to "Plaintiff's employment with NCI"**

60. Plaintiff began working for NCI in late March 2023. BC Dec. ¶ 25, App. 253.

**Response: Admit.**

61. While working for NCI, Plaintiff continued to live in Louisiana, and his job kept him away from his home in Louisiana for long stretches of time. Plaintiff Dep. 65:1-2, App. 275.

**Response: Admit.**

62. Plaintiff understood there was no limit to how far he would drive for NCI and "[i]t was supposed to be in all 48 states." Plaintiff Dep. 73:17-20, App. 276.

**Response: Admit.**

63. During his first workweek (March 27 to April 2, 2023), Plaintiff earned $250 in orientation pay (for three days of orientation) and $400 in training pay (for the first four days of training), while starting a training trip from Texas to Florida. BC Dec. ¶ 29, App. 254; Exhibit D, App. 66; Exhibit E, App. 80-85.

**Response: Admit, but note that for at least two weeks, Plaintiff was exclusively in Texas, transporting goods that were not bound for any destination beyond Texas. Tiernan Decl. ¶ 10, 34; Tiernan Dep. 173:15-24; 104:1-3; 104:20-105:4; 66:5-14; 72:15-73:3; 178:23-179:5 ("And that first trip, […], started in Irving, Texas, and ended in Sulfur [*sic*] Springs and to Conroe, Texas, correct? A. Correct. Q. And you mentioned at the beginning that you were driving mostly around Texas or […] near Texas, right? A. Correct"); 230:20-25 (Irving, Texas is where one of Defendant's main terminals is, and is the location Plaintiff started at); 258:2-13 (Defendant was hired out of the Irving, Texas location and conducted orientation there).**

64. During his second workweek (April 3 to April 9, 2023), Plaintiff earned $700 in training pay (for seven days of training) while completing his training trip to Florida, driving a second training trip from Florida to Oklahoma, and beginning his third training trip from Oklahoma to Kansas to Maine. BC Dec. ¶ 30, App. 254; Exhibit D, App. 67; Exhibits E-G, App. 80-108.

**Response: Deny that Plaintiff earned $700. Plaintiff was paid $650.01. Exhibit T App. 242-249; Tiernan Dep. 104:1-3; 104:20-105:4. Moreover, for at least two weeks, Plaintiff was**

**exclusively in Texas, transporting goods that were not bound for any destination beyond Texas. Tiernan Decl. ¶ 10, 34; Tiernan Dep. 173:15-24; 104:1-3; 104:20-105:4; 66:5-14; 72:15-73:3; 178:23-179:5 ("And that first trip, […], started in Irving, Texas, and ended in Sulfur [*sic*] Springs and to Conroe, Texas, correct? A. Correct. Q. And you mentioned at the beginning that you were driving mostly around Texas or […] near Texas, right? A. Correct"); 230:20-25 (Irving, Texas is where one of Defendant's main terminals is, and is the location Plaintiff started at); 258:2-13 (Defendant was hired out of the Irving, Texas location and conducted orientation there).**

65. During his third workweek (April 10 to April 16, 2023), Plaintiff earned $700 in training pay (for seven days of training) while completing his training trip to Maine, driving his fourth training trip from Maine to New Jersey, driving his fifth training trip from New Jersey to Texas, driving his sixth training trip from Texas to Kansas, and beginning his seventh training trip from Kansas to Illinois. BC Dec. ¶ 31, App. 254; Exhibit D, App. 68; Exhibits G-K, App. 95-140.

**Response: Deny that Plaintiff earned $700. Plaintiff was paid $650.01. Exhibit T App. 242-249; Tiernan Dep. 104:1-3; 104:20-105:4; 175:17-176:6. Moreover, for at least two weeks, Plaintiff was exclusively in Texas, transporting goods that were not bound for any destination beyond Texas. Tiernan Decl. ¶ 10, 34; Tiernan Dep. 173:15-24; 104:1-3; 104:20-105:4; 66:5-14; 72:15-73:3; 178:23-179:5 ("And that first trip, […], started in Irving, Texas, and ended in Sulfur [*sic*] Springs and to Conroe, Texas, correct? A. Correct. Q. And you mentioned at the beginning that you were driving mostly around Texas or […] near Texas, right? A. Correct"); 230:20-25 (Irving, Texas is where one of Defendant's main terminals is,**

**and is the location Plaintiff started at); 258:2-13 (Defendant was hired out of the Irving, Texas location and conducted orientation there).**

66. During his fourth workweek (April 17 to April 23, 2023) earned $400 in training pay (for the last four days of his training) while completing his training trip to Illinois and completing his eighth training trip from Illinois to Texas. The drop-off for Plaintiff's final training trip occurred at around 10:20 AM on April 19, 2023, in Lancaster, TX. BC Dec. ¶ 32, App. 254; Exhibit D, App. 69; Exhibits K-L, App. 128-148.

**Response: Admit. Note that, Moreover, for at least two weeks, Plaintiff was exclusively in Texas, transporting goods that were not bound for any destination beyond Texas. Tiernan Decl. ¶ 10, 34; Tiernan Dep. 173:15-24; 104:1-3; 104:20-105:4; 66:5-14; 72:15-73:3; 178:23-179:5 ("And that first trip, […], started in Irving, Texas, and ended in Sulfur [*sic*] Springs and to Conroe, Texas, correct? A. Correct. Q. And you mentioned at the beginning that you were driving mostly around Texas or […] near Texas, right? A. Correct"); 230:20-25 (Irving, Texas is where one of Defendant's main terminals is, and is the location Plaintiff started at); 258:2-13 (Defendant was hired out of the Irving, Texas location and conducted orientation there).**

67. Also, during his fourth week, Plaintiff completed his first solo trip, earning $123.20 ($0.40 per mile for 308 miles). His solo trip started in Irving, Texas on April 20, 20023 [*sic*]. On that day, he drove 91 miles to the pick-up location in Sulphur Springs, TX, arriving at 9:50 PM and departing with a loaded trailer at 10:20 PM. The next day, he completed the 217-mile trip and arrived at the drop-off location in Conroe, Texas at 12:40 PM, leaving with an empty trailer at 3:30 PM. BC Dec. ¶ 33, App. 254; Exhibit D, App. 69; Exhibit M, App. 149-70.

**Response: Deny that Plaintiff earned $123.20. Although Defendant used a per-mile compensation method for solo trips and Plaintiff's solo rate was $0.40 per mile according to my records, Plaintiff disputes that the resulting compensation, divided by all compensable hours in each individual workweek, always equaled or exceeded $7.25 per hour. Tiernan Decl. ¶ 11. Note that this trip was exclusively in Texas, and did not involve goods bound for any destination beyond Texas. Tiernan Decl. ¶ X; Tiernan Dep. 66:5-14; 72:15-73:3; 178:23-179:5 ("And that first trip, […], started in Irving, Texas, and ended in Sulfur [*sic*] Springs and to Conroe, Texas, correct? A. Correct. Q. And you mentioned at the beginning that you were driving mostly around Texas or […] near Texas, right? A. Correct"); 230:20-25 (Irving, Texas is where one of Defendant's main terminals is, and is the location Plaintiff started at); 258:2-13 (Defendant was hired out of the Irving, Texas location and conducted orientation there).**

68. Also, during his fourth workweek—on April 21, 2023—Plaintiff was dispatched to take another load but chose not to complete the trip. On that day, Plaintiff arrived at a shipping location that did not provide load locks, claimed not to know the process for purchasing load locks, and chose to leave the load at the shipper and drive his tractor without a trailer (also known as "bobtailing") over 330 miles to his home in Louisiana without authorization and without alerting anyone. Plaintiff remained at home into the beginning of his fifth workweek. BC Dec. ¶ 34, App. 255; Exhibit M, App. 149-70.

**Response: Admit, but note that Plaintiff was unable to contact the night shift dispatcher regarding how to purchase load locks. Tiernan Decl. ¶ 33.**

69. During his fifth workweek (April 24 to April 30, 2023), Plaintiff began at his home in Louisiana until he was directed by dispatch on April 25, 2023, at 10:29 AM to return to the

Houston area (where he was before bobtailing home). BC Dec. ¶ 35, App. 255; Exhibit D, App. 70-71; Exhibit M, App. 149-70.

**Response: Admit.**

70. During his fifth workweek, Plaintiff completed two trips, earning $265.60 ($0.40 per mile for 664 miles). Plaintiff started his first trip at 5:04 PM in Conroe, TX on April 25, 2023. He drove 68 miles to Baytown, Texas, arriving at the shipper around 10:43 AM on April 26, 2023, and leaving with a loaded tailer at 12:00 PM. He then drove 278 miles to Irving, TX, arriving at 8:14 PM, and dropping the loaded trailer off at the NCI yard there. The energy drinks in that trailer were then driven to Wichita, KS by another NCI driver. BC Dec. ¶ 36, App. 255; Exhibit D, App. 70-71.; Exhibits N-O, App. 171-82.

**Response: Admit. Note that Plaintiff was exclusively in Texas for these two trips, transporting goods that were not bound for any destination beyond Texas. Tiernan Decl. ¶ 34; Tiernan Dep. 66:5-14; 72:15-73:3; 178:23-179:5 ("And that first trip, […], started in Irving, Texas, and ended in Sulfur [*sic*] Springs and to Conroe, Texas, correct? A. Correct. Q. And you mentioned at the beginning that you were driving mostly around Texas or […] near Texas, right? A. Correct"); 230:20-25 (Irving, Texas is where one of Defendant's main terminals is, and is the location Plaintiff started at); 258:2-13 (Defendant was hired out of the Irving, Texas location and conducted orientation there).**

71. Plaintiff started the second trip of his fifth workweek on April 27, 2023, at 11:45 AM by picking up a trailer loaded with frozen meat that another NCI driver had delivered to Irving, Texas from Mississippi. Plaintiff then drove 318 miles to Lubbock, Texas, arriving at the final destination at 7:20 AM on April 28, 2026, and leaving with an empty trailer at 9:59 AM. BC Dec. ¶ 37, App. 255; Exhibit O, App. 183-91.

**Response: Admit.**

72. During his fifth workweek, Plaintiff was dispatched on another trip that required him to pick up a loaded trailer from NCI's yard in Dodge City, KS. On April 28, 2023, at approximately 8:46 PM, the fully loaded trailer disconnected from Plaintiff's truck in the Dodge City yard, falling to the ground and causing minor damage to the bottom front of the trailer. BC Dec. ¶ 38, App. 255-56.

**Response: Deny; the trailer was dropped, but Plaintiff was able to fix the issue; at the time, Plaintiff was not made aware of any minor damage to the bottom front of the trailer. Tiernan Decl. ¶ 43; Tiernan Dep. 46:24-47:10. Moreover, object to relevance and materiality.**

73. NCI has an internal system for tracking all accidents involving its commercial vehicles that cause damage of any kind to person or property. BC Dec. ¶ 39, App. 256.

**Response: Plaintiffs lack sufficient information to admit this statement and dispute it to the extent it rests on conclusory or unsupported assertions. In addition, Plaintiff objects to relevance and materiality.**

74. Pursuant to NCI's policy, all such accidents are to be promptly recorded in NCI's system. BC Dec. ¶ 40, App. 256.

**Response: Plaintiffs lack sufficient information to admit this statement and dispute it to the extent it rests on conclusory or unsupported assertions. In addition, Plaintiff objects to relevance and materiality.**

75. NCI recorded the dropped trailer incident in its internal system at 10:27 AM on April 29, 2023, the morning after it occurred. BC Dec. ¶ 41, App. 256.

**Response: Admit. Plaintiffs object to relevance and materiality.**

76. Upon inspection of Plaintiff's tractor by mechanics, it was determined that the accident was caused by worn out parts on the tractor and Plaintiff was not at fault. Plaintiff was not subject to discipline for the accident, and the accident was classified as "non-preventable." BC Dec. ¶ 42, App. 256.

**Response: Admit. Plaintiff objects to relevance and materiality.**

77. The accident was also categorized as non-DOT-recordable because it did not result in either a fatality, a personal injury to any person that requires immediate medical attention away from the scene of the accident, or any disabling damage to any vehicle that requires it to be towed from the scene. BC Dec. ¶ 43, App. 256.

**Response: Admit. Plaintiff objects to relevance and materiality.**

78. After the trailer drop incident, Plaintiff did not drive any more during his fifth workweek because Plaintiff's tractor was in the shop from April 29, 2023, to May 1, 2023 (the last day of his fifth workweek and the first two days of his sixth workweek) to repair damage to the tractor that had caused it the trailer to drop. Plaintiff earned $150 in breakdown pay ($50 per day) because he chose not to take on other available work during that time. BC Dec. ¶ 44, App. 256; Exhibit D, App. 70-71.

**Response: Admit that Plaintiff's tractor was in the shop from April 29 through May 1, 2023, and that NCI paid $150 in breakdown pay ($50/day). Deny NCI's workweek allocation and calendar characterization. Under NCI's Monday–Sunday workweek, Saturday April 29 and Sunday April 30 are Week 5, and Monday May 1 is Week 6. Only $100 of breakdown pay is properly attributable to Week 5; $50 belongs to Week 6. NCI's assignment of the entire $150 to Week 5 inflates Week 5 gross compensation used in its minimum-wage calculation (from a corrected $365.60 to NCI's $415.60). Plaintiff also disputes that he refused other available**

**work. In addition, Plaintiff did not engage in interstate commerce during this week. Tiernan Decl. ¶ 34.**

79. During his sixth week of work (May 1 to May 7, 2023), Plaintiff completed one trip, earning $554.80 ($0.40 per mile for 1,387 miles). Plaintiff started this trip on May 2, 2023, in Lubbock, TX. He then drove 455 miles without a load to Dodge City, KS and then to Liberal, KS, arriving on May 4, 2023, at 9:42 AM. Plaintiff left Liberal with a loaded trailer on May 4, and drov932 miles to make two stops to unload, first in Hammond, LA, at 7:33 AM on May 6, and then in Pearl River, LA, where he arrived at 10:25 PM on May 6, and left with an empty trailer at 1:30 AM on May 7, 2023. Because he made the extra stop, Plaintiff earned $20 in stop pay. BC Dec. ¶ 45, App. 256-57; Exhibit D, App. 72; Exhibit P, App. 192-202.

**Response: Admit.**

80. During his seventh week of work (May 8 to May 15, 2023), Plaintiff completed two trips, earning $468 ($0.40 per mile for 1,170 miles). Plaintiff's first trip started in Pearl River, LA on May 8, 2023. Plaintiff then drove 151 empty miles to Richland, MS, arriving at the shipper at 2:11 PM, on May 8, 2023. Plaintiff then drove a loaded trailer 427 miles to Missouri City, TX, arriving at the drop-off location at 9:44 AM and leaving with an empty trailer at 1:52 PM on May 9, 2023. BC Dec. ¶ 46, App. 257; Exhibit D, App. 72; Exhibits Q-R, App. 203-20.

**Response: Admit.**

81. During his seventh week of work, Plaintiff's second trip started in Missouri City, TX at 8:08 AM on May 10, 2023. Plaintiff drove 37 empty miles to Baytown, TX, arriving at the shipper at 10:03 AM, and leaving with a loaded trailer at 12:14 PM on May 10, 2023. Plaintiff then drove 555 miles to Enid, OK, arriving at the drop-off location at 11:45 AM and leaving with an empty trailer at 1:45 PM on May 11, 2023. BC Dec. ¶ 47, App. 257; Exhibit R, App. 212-20.

**<u>Response</u>: Admit.**

82. During his seventh week of work, Plaintiff started a third trip that he did not complete until the eighth week of work. This trip started in Enid, OK, at 2:54 PM on May 11, 2023. Plaintiff then 202 empty miles to NCI's yard in Dodge City, KS, where he arrived at 6:12 AM on May 13, 2023. Plaintiff picked up a loaded trailer and then drove 1,113 miles to make two stops, one in Newnan and one in Marietta, Georgia. BC Dec. ¶ 48, App. 257; Exhibit S, App. 221-41.

**<u>Response</u>: Admit.**

83. During his eighth week of work (May 15 to May 22, 2023), Plaintiff completed the trip that began at the end of his seventh week of work, earning $546 ($0.40 per mile for 1,315 miles). Plaintiff arrived at his first stop in Newnan, GA, at 11:25 PM on May May [*sic*] 16, 2023, and left Newnan at 1:55 AM on May 17, 2023. Plaintiff then arrived at his second stop in Marietta, GA, at 7:00 AM, and finished unloading at 9:39 AM, on May 17, 2023. Because he made the extra stop, Plaintiff earned $20 in stop pay. BC Dec. ¶ 49, App. 257-58; Exhibit D, App. 75-76; Exhibit S, App. 221-41.

**<u>Response</u>: Admit that NCI attributes $546 to the May 13–17 trip completed in Week 8, but dispute the calculation and allocation. NCI states "$546 ($0.40 per mile for 1,315 miles)," yet 1,315 × $0.40 = $526; with $20 stop pay the total is $546. If Defendant counts $546 as mileage and then adds another $20.00 stop pay, compensation is overstated by $20. More importantly, NCI assigns the entire May 13–17 trip to Week 8 even though May 13 and 14 fell in Week 7 (Monday May 8–Sunday May 14). FLSA compliance is measured workweek-by-workweek; mileage earnings and compensable hours from May 13–14 must be allocated**

**to Week 7, not shifted solely because payroll waits until trip completion. Tiernan Decl. ¶¶ 4-5, 11, 16, 35-39.**

**E. As to "Plaintiff quits his employment with NCI"**

84. Later during his eighth week of work—on May 18, 2023—Plaintiff was dispatched to pick up a load in Marietta, Georgia, where he had dropped off a load the previous day. Upon arriving to pick up, the load was not ready. Plaintiff chose to abandon the load and drove home to Monroe, Louisiana with an empty trailer attached to his tractor (referred to as "deadheading"). Plaintiff was not paid for the miles driven during the unauthorized deadhead. BC Dec. ¶ 50, App. 258; Exhibit S, App. 221-41.

**Response: Deny that Plaintiff was dispatched to pick up another load; Plaintiff never abandoned a load. Tiernan Decl. ¶ 40. He quit while in Georgia, and was *en route* to return the truck. Tiernan Decl. ¶ 41; Tiernan Dep. 52:13-53:10.**

85. On May 19, 2023, Plaintiff stopped communicating with dispatch. BC Dec. ¶ 51, App. 258; Exhibit S, App. 221-41.

**Response: Admit; Plaintiff's last day communicating with any dispatch was around 12am or 1am on May 19, 2023. Tiernan Decl. ¶ 33; 40.**

86. Plaintiff eventually communicated with two managers on May 19, 2023, informing them that he quit his employment with NCI because he was unhappy with his pay. Plaintiff Dep. 52:13-53:18, App. 273-74.

**Response: Admit.**

87. Specifically, Plaintiff states he told his managers that he was not getting paid, he wanted a solution to his money, but he was already done with the company and had decided to quit. Plaintiff Dep. 189:5-23, App 288.

**<u>Response</u>: Admit.**

88. Plaintiff had never complained to either of the managers or anyone else at NCI about his pay before that day. Plaintiff Dep. 190:7-12, App. 289.

**<u>Response</u>: Admit.**

89. NCI terminated Plaintiff's employment after he abandoned his position. BC Dec. ¶ 52, App. 258.

**<u>Response</u>: Admit that Plaintiff testified he quit, told managers he was "done," turned his phone down, drove home, and removed his belongings. Plaintiff does not contradict that deposition testimony. But NCI itself has sworn that "NCI terminated Plaintiff's employment." Whether Plaintiff's communication was an immediately effective resignation, whether NCI accepted it, whether an employment relationship remained, and whether NCI later took a materially adverse termination action are genuine factual disputes. The Court cannot resolve the conflict between NCI's "he quit" theory offered by Defendant and NCI's own sworn "NCI terminated" evidence by picking which of NCI's versions is more credible on summary judgment.**

90. When any driver's employment with NCI ends, NCI provides information to a third-party database that provides driver information to motor carriers conducting background checks on drivers. That information includes all accident records associated with the driver. The accidents are reported as either DOT recordable or non-DOT recordable, and the nature of the accident is provided. BC Dec. ¶ 53, App. 258.

**<u>Response</u>: Admit, but object to relevance and materiality.**

91. Consistent with this practice, NCI reported information for Plaintiff on May 20, 2023, including the trailer accident that had been in Plaintiff's file since April 2023. NCI reported

the accident as non-preventable and non-DOT recordable. BC Dec. ¶ 54, App. 258; Exhibit A, App. 1-3.

**Response: Admit, but object to relevance and materiality. Moreover, note that this incident only appeared on Plaintiff's record after he quit. Tiernan Decl. ¶¶ 43-45. Further, note that this accident was non-preventable and non-DOT recordable. Tiernan Dep. 42:7-16; 43:1-3; 45:13-19; 46:14-23; 237:21-238:13.**

92. During his employment, Plaintiff regularly used the ComChek and ComCard process to receive advances on his wages for personal expenses. He also regularly used those systems to pay for business expenses and turn in receipts with this trip envelopes. Plaintiff was reimbursed for all ComChek or ComCard transactions for which he submitted a receipt. BC Dec. ¶ 55, App. 258.

**Response: Admit that Plaintiff used ComChek/ComCard for some transactions. Deny that NCI has established every deducted amount was a bona fide personal advance rather than a business expense. The minimum-wage claim is framed around gross compensation per workweek, not net pay after potentially lawful advance repayments. Tiernan Decl. ¶¶ 11; 16; 39.**

93. Consistent with its policy, NCI treated all other transactions as personal advances and deducted them from his pay and reported that deduction in Plaintiff's wage statements and settlement statements. BC Dec. ¶ 56, App. 259; Exhibit D, App. 66-79; Exhibit T, App. 242-49.

**Response: Admit.**

94. Because his advances far exceeded his earned wages for the seventh and eighth pay periods, Plaintiff's net pay was zero for both of those pay periods. BC Dec. ¶ 57, App. 259; Exhibit D, App. 73-76; Exhibit T, App. 248-49.

**Response: Admit that Plaintiff's net pay was zero for the seventh and eighth pay periods. A $0 net paycheck does not, by itself, prove that gross wages fell below the federal minimum. Plaintiff disputes the characterization and completeness of the "advances" NCI deducted. Tiernan Decl. ¶¶ 46-47; Tiernan Dep. 186:19-187:21; 189:5-25; 197:13-18; 201:12-13; 201:19-202:6; 210:18-24; 262:8-17.**

95. At the conclusion of his employment with NCI, Plaintiff owed NCI $804.81 for personal expenses charged to the ComChek or ComCard that NCI paid as an advance against Plaintiff's future wages. Plaintiff has not paid back the advanced wages. BC Dec. ¶ 58, App. 259; Exhibit D, App. 79.

**Response: Deny that NCI has established Plaintiff owes $804.81 in unreimbursed personal advances. Plaintiff testified he stopped taking advances and did not take large amounts. Even if some bona fide advances existed, they require separate treatment from the weekly gross-wage minimum-wage analysis. Tiernan Decl. ¶¶ 30; 32; 46-47; Tiernan Dep. 170:10-14 ("I had stopped taking advances out"); 186:12-17 ("I just know that some things probably was getting taken out of my check that I had no knowledge of. […] I wouldn't take advances, […] I ended up stop taking the advances"); 193:11-12 ("I stopped. […] taking advances out"); 194:2-9 ("I never took nothing big out, nothing like over a hundred. I didn't take large amounts out").**

## STANDARD OF REVIEW

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). "The moving party has the burden of demonstrating that there are no genuine issues of material fact in dispute. […] 'If the record, taken as a whole, could not lead a rational trier of fact

to find for the non-moving party, then there is no genuine issue for trial.' See Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 433 (5th Cir. 2005), citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) and quoting Steadman v. Texas Rangers, 179 F.3d 360, 366 (5th Cir.1999).

"A material fact is one that 'might affect the outcome of the suit under the governing law' and a 'dispute about a material fact is 'genuine'... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" See Leasehold Expense Recovery, Inc. v. Mothers Work, Inc., 331 F.3d 452, 456 (5th Cir. 2003), citing Sulzer Carbomedics, Inc., 257 F.3d at 456 and quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." See Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. See Celotex, 477 U.S. at 322-25.

"'[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." […] If the moving party

succeeds, the onus shifts to 'the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' ' […] The court must 'draw all reasonable inferences in favor of the nonmoving party' and 'refrain from making credibility determinations or weighing the evidence.' […]." See E.E.O.C. v. LHC Grp., Inc., 773 F.3d 688, 694 (5th Cir. 2014) (internal citations omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' […], by 'conclusory allegations,' […], by 'unsubstantiated assertions,' […], or by only a 'scintilla' of evidence[…]. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. […] summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.' […]. If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted." See Little v. Liquid Air Corp., 37 F.3d 1069, 1075-76 (5th Cir. 1994) (internal citations omitted).

"[A] party must support any assertion that a fact cannot be or is genuinely disputed by "(a) citing to particular parts of materials in the record ...; or (b) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact." […]. Affidavits cannot defeat summary judgment unless they contain competent and otherwise admissible evidence. […]. A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary." See Allen v. Coil Tubing Servs., L.L.C., 846 F. Supp. 2d 678, 688 (S.D. Tex. 2012), aff'd, 755 F.3d 279 (5th Cir. 2014), citing Fed. R. Civ. P. 56(c)(1) and (4) and In re Hinsley, 201 F.3d 638, 643 (5th Cir. 2000).

"In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. […]. The Court may make no credibility determinations or weigh any evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe. […]. However, factual controversies are resolved in favor of the non-movant 'only 'when both parties have submitted evidence of contradictory facts.''" See Allen v. Coil Tubing Servs., L.L.C., 846 F. Supp. 2d 678, 688 (S.D. Tex. 2012), aff'd, 755 F.3d 279 (5th Cir. 2014) (internal citations omitted).

Critically, "[f]or a defendant to obtain summary judgment on an affirmative defense, it must establish beyond dispute all of the defense's essential elements." See Bank of La. v. Aetna U.S. Healthcare, Inc., 468 F.3d 237, 241 (5th Cir. 2006).

## ARGUMENT

### I. The Motor Carrier Act Exemption Is Limited to Overtime and Does Not Apply Here

"'Exemptions under the FLSA are construed narrowly against the employer, and the employer bears the burden to establish a claimed exemption.'" See Allen v. Coil Tubing Servs., L.L.C., 846 F. Supp. 2d 678, 689 (S.D. Tex. 2012), aff'd, 755 F.3d 279 (5th Cir. 2014) (internal citations omitted); see also Dalheim v. KDFW-TV, 918 F.2d 1220, 1224 (5th Cir. 1990) (holding that the Defendant has the burden to prove that the Motor Carrier Act ("MCA") exemption applies).

The FLSA requires employers to pay an employee one and a half times his "regular rate" for time spent working beyond forty hours in a week. See 29 U.S.C. § 207(a)(1). The MCA exemption to this requirement is introduced by the FLSA itself; specifically, the statute notes that the overtime requirement does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to

the provisions of section 31502 of Title 49." Id. § 213(b)(1). Section 31502, in turn, permits the Secretary to "prescribe requirements for ... qualifications and maximum hours of service of employees of ... motor carrier[s]" and "motor private carrier[s]." See 49 U.S.C. § 31502(b). The Department of Labor promulgated regulations to define these employees further. Specifically, they: (1) [a]re employed by carriers whose transportation of passengers or property by motor vehicle is subject to [the Secretary of Transportation's] jurisdiction under section 204 of the [MCA] ... and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA]. See 29 C.F.R. § 782.2(a); see also Allen v. Coil Tubing Servs., L.L.C., 755 F.3d 279, 283 (5th Cir. 2014).

As the Fifth Circuit has long noted, this definition comprises qualifications for both the employer and employee. See Songer v. Dillon Res., Inc., 618 F.3d 467, 472 (5th Cir. 2010). "For the motor carrier exemption to apply ... [the employees] must meet both of these requirements." Allen, 755 F.3d at 283 (internal quotation omitted).

Here, while the Plaintiff concedes that his employer qualifies as a carrier subject to the Secretary's jurisdiction, he disputes his status as an employee covered by the MCA.

The MCA exemption is available only to certain types of employees who perform a specific type of work. Only employees who—either "wholly or in part"—engage in work as "drivers, driver's helpers, loaders, [or] mechanics" may be exempt. See 29 C.F.R. § 782.2(b)(2)(i). Notably, the responsibility must not be a "casual[ ] or occasional ... part of an employee's activities." Id. As to the type of work, the court must discern whether it "directly affect[s] the safety of operation of motor vehicles on the public highways in transportation in interstate ... commerce." Id. § 782.2(b)(2)(ii).

The proper application of these requirements entails an analysis that is both specific and general. On the one hand, courts do not merely rely on "the name given to [the] position nor that given to the work" done. See Allen, 755 F.3d at 283 (quoting 29 C.F.R. § 782.2(b)(2)). Instead, "[i]t is the character of the activities rather than the proportion of either the employee's time or of his activities" that controls. See Levinson v. Spector Motor Serv., 330 U.S. 649, 674-75 (1947); see also 29 C.F.R. § 782.2(b)(2).

Conversely, consistent with regulatory guidance, there is no set specific quantification of how frequently employees must engage in the sort of work that would qualify for the MCA exemption. For example, "[courts] look to whether the employees 'could reasonably have been expected to [engage] in interstate commerce consistent with their job duties.'" See Allen, 755 F.3d at 284 (quoting Songer, 618 F.3d at 476); see also 29 C.F.R. § 782.2(b)(3) (noting that the determination must look to what an employee does in "the ordinary course of his work").

Courts cannot merely rubber-stamp an employer's assertion that the MCA exemption applies. See Amaya v. NOYPI Movers, L.L.C., 741 Fed. Appx. 203, 206 (5th Cir. 2018) (unpublished) Notably, "where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be *de minimis*, the exemption will not apply to [the employee]." See 29 C.F.R. § 782.2(b)(3); see also Allen, 755 F.3d at 284; Wirtz v. C & P Shoe Corp., 336 F.2d 21, 29–30 (5th Cir. 1964) (no FLSA exemption for employees "who sporadically helped on the trucks or acted as drivers").

The MCA exemption applies to individuals who: (1) performed work as a driver, driver's helpers, loader, or mechanic; (2) engaged in work that directly affects the "safety of operation of motor vehicles on the public highways *in transportation in interstate or foreign commerce within*

*the meaning of the Motor Carrier Act*;" and (3) work for an employer that is a "motor carrier" engaged in the transportation of passengers or property in interstate commerce.[2] See 29 C.F.R. § 782.2 (a)-(b)(2) (emphasis added); see also Escobedo v. Ace Gathering, Inc., 109 F.4th 831, 834 (5th Cir. 2024). Whether a Plaintiff engaged in interstate commerce under the MCA requires a "fact-specific analysis." See Quartararo v. J. Kings Food Serv. Prof'ls, 2021 US Dist LEXIS 63648, at *29 (E.D.N.Y. 2021).

Here, Plaintiff did not "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act" during every week of his employment such that the MCA exemption should not apply. See Dauphin v. Chestnut Ridge Transp., Inc., 544 F. Supp. 2d 266, 275 (S.D.N.Y. 2008) (denying summary judgment, in part, because defendants did not "establish whether interstate travel was part of either plaintiff's job duties during the entire period at issue in this litigation, the Court cannot determine whether the motor carrier exemption applies to them for all the relevant workweeks"); see also Kelly v. Borough of Union Beach, 2011 U.S. Dist. LEXIS 12839 (D.N.J. 2011) (court denied defendant's motion to dismiss because defendants failed to show that an FLSA exemption applied to all of the compensatory time claimed).

Indeed, Plaintiff spent a week or more in training exclusively within the State of Texas and, at all times when Plaintiff was exclusively working within Texas, the goods transported by

[2] The term "interstate commerce" is more narrowly defined under the MCA than under the FLSA. See 29 C.F.R § 782.7(b)(1). The plain language of the MCA "does not indicate a congressional intent of regulating a purely intrastate shipment merely because of its effect on interstate commerce." See Collins v. Heritage Wine Cellars, Ltd., 589 F.3d 895, 898 (7th Cir. 2009) (Posner, J.). Rather, the shipment itself must be "'in' interstate commerce" in order for the intrastate portion of the journey to fall under the scope of the MCA. Id., at 900.

Plaintiff within Texas were not ultimately bound for any destinations beyond Texas. Critically, Defendant – who bears the burden of establishing the MCA exemption defense – failed to identify the source and/or nature of the goods being transported intrastate between destinations in Texas such that this Court may determine whether the goods shipped and driven by Plaintiff fall within the MCA's definition of interstate commerce.

Accordingly, there exists an issue of fact concerning those weeks in which Plaintiff never left the State of Texas such that summary judgment must be denied because Plaintiff was not engaging in activities affecting interstate commerce at all times.

## II. NCI Failed to Establish Weekly Minimum-Wage Compliance

The FLSA requires that "[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates: […] $7.25 an hour." See 29 U.S.C.S. § 206(1)(c). Courts in this Circuit generally evaluate minimum-wage claims pursuant to 29 U.S.C. § 206 under a weekly wage standard, dividing total compensation for the workweek by total hours worked. See Mornford v. Andrews, 151 F.2d 511, 512 (5th Cir. 1945); Worsham v. B.G. Prop. Mgmt., LLC, No. 4:16-CV-2712, 2020 WL 7353906, at *12 (S.D. Tex. Sept. 4, 2020), report and recommendation adopted sub nom. Worsham v. BG Prop. Mgmt. LLC, No. 4:16-CV-02712, 2020 WL 6784217 (S.D. Tex. Nov. 18, 2020). Each workweek stands alone. See 29 CFR § 778.104. Piece-rate and mileage earnings must be measured against all hours worked in the applicable workweek; an employer may not shift work or earnings into a later week merely because its payroll system waits until a multi-day trip is completed. See 29 C.F.R. §§ 778.103, 778.111.

NCI admits its workweek runs Monday through Sunday and that it does not pay a trip until the trip is completed, even when the trip spans two workweeks. BC Dec. ¶¶ 5, 7–8.

NCI has not established, as a matter of law, Plaintiff's total compensable hours or correctly allocated earnings in Weeks 5, 7, and potentially 8. Genuine disputes therefore preclude summary judgment on the minimum-wage claim.

### A. NCI's Week 7 Calculation Omits Work on May 13 and 14

This is the strongest minimum-wage defect. Week 7 ran Monday, May 8 through Sunday, May 14, 2023. Week 8 ran Monday, May 15 through Sunday, May 21, 2023. NCI's own evidence shows Plaintiff completed two Week 7 trips ending May 9 and May 11 and earned $468.00, and that his next trip began on May 13 and ended on May 17. BC Dec. ¶¶ 46–49. NCI nevertheless categorizes the entire May 13–17 trip as Week 8 compensation.

Defendant then argues Plaintiff earned the Week 7 compensation over only four working days, producing an hourly rate above the minimum wage. That argument excludes work performed on Saturday, May 13 and Sunday, May 14 – days that NCI's own trip records place Plaintiff at work (including arrival at Dodge City on May 13 and continued loaded driving). That is not a permissible workweek analysis.

The issue is material in at least three ways. First, Defendant's assertion that Week 7 involved only four (4) workdays is demonstrably incomplete. Second, NCI has not allocated either the mileage compensation or the compensable hours from the May 13–17 trip between Weeks 7 and 8; Defendant explains when NCI paid the trip, not when the mileage compensation was earned for workweek-compliance purposes. Third, NCI's $468.00 figure exceeds $7.25 per hour only if Plaintiff worked no more than approximately 64.55 hours in Week 7 ($468 ÷ $7.25 ≈ 64.55). Once May 13 and 14 are included, working more than 64.55 compensable hours in a seven-day

workweek is not facially implausible for an over-the-road driver operating within a fourteen-hour duty window and performing non-driving work.

NCI therefore has not established Plaintiff's Week 7 hourly rate as a matter of law because it omitted two days of a concededly work-related trip and failed to allocate the trip's mileage earnings and compensable hours between the two workweeks in which the work occurred. Correctly allocating May 13–14 to Week 7 also requires recalculating Week 8; NCI cannot count those days as non-work for Week 7 while counting all May 13–17 compensation as Week 8 pay.

**B. NCI Assigns Three (3) Days of Breakdown Pay to the Wrong Workweek**

NCI's declarant states Plaintiff's tractor was in the shop from April 29 through May 1, 2023, and that he received breakdown pay of $50.00 per day, totaling $150.00. BC Dec. ¶ 44. Under NCI's Monday-through-Sunday workweek: Saturday, April 29 and Sunday, April 30 fall in Week 5; Monday, May 1 falls in Week 6. Daily breakdown compensation should presumptively be allocated $100 to Week 5 and $50 to Week 6.

However, NCI assigns the entire $150 to Week 5, inflating Week 5 gross compensation. The declaration even misdescribes the three repair days as "the last day of [the] fifth workweek and the first two days of [the] sixth workweek." In fact, April 29 and 30 were both in Week 5, and May 1 was the only Week 6 date among the three.

The arithmetic is material. NCI's asserted Week 5 gross is $265.60 trip pay + $150 breakdown = $415.60 (threshold ≈ 57.32 hours at $7.25). Corrected Week 5 allocation is $265.60 + $100 = $365.60 (threshold ≈ 50.43 hours). Even under NCI's inflated figure, Plaintiff need only show more than about 57 compensable hours; under the proper allocation, more than about 50 hours. This is a clean documentary dispute that does not depend solely on Plaintiff's credibility or

sworn statements. Defendant's own evidence shows that they failed to properly pay Plaintiff such that summary judgment must be denied.

**C. Compensable Hours in Weeks 5 and 7 Remain Genuinely Disputed**

Defendant's minimum-wage argument depends on reconstructing Plaintiff's hours downward from his seventy (70) hours worked. NCI does not offer contemporaneous daily and weekly hour totals. Its interrogatory response did not state precise hours worked each workweek; it said documents relating to time would be produced. Chatham's declaration describes dispatch "touch points" (dispatch, pickup arrival, load pickup, stop arrival, drop-off). Those touch points are not a complete record of compensable time.

NCI's own signed mileage memorandum identifies work included within mileage compensation: pre-trip and post-trip inspections; driving; fueling; waiting; loading and unloading; completing paperwork; deadheading or repositioning equipment; and meetings. Maschmeier's declaration similarly acknowledges that working time varies based on traffic, weather, maintenance, loading and unloading, lumpers, communications with dispatch, and paperwork. That evidence undercuts any effort to derive total compensable hours merely from dispatch departure and arrival entries.

Employers subject to the FLSA's minimum-wage provisions ordinarily must maintain records of hours worked each workday and total hours worked each workweek. See 29 C.F.R. § 516.2(a)(7). When an employer fails to maintain adequate records, the employee's burden is relaxed: the employee may establish the amount of work through reasonable inference and approximation, after which the burden shifts to the employer to negate the inference or establish the precise amount. See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687–88 (1946); see also Skipper v. Superior Dairies, Inc., 512 F.2d 409, 420 (5th Cir. 1975).

In light of the lack of evidence of Plaintiff's hours worked, his declaration as to the number of hours worked controls. See, e.g., Orozco v. SBX Logistics, LLC, No. 7:24-CV-00283, 2026 WL 886295, at *5 (S.D. Tex. Mar. 31, 2026) ("Orozco's affidavit … constitutes "sufficient evidence to show the amount and extent of [hours] work[ed] as a matter of just and reasonable inference") (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946); Beliz v. W.H. McLeod & Sons Packing Co., 765 F.2d 1317, 1331 (5th Cir. 1985) (stating that testimony of hours worked based on personal knowledge is sufficient evidence under Anderson)).

The proper question is not whether the Court believes a round "seventy-hour" figure in isolation. It is whether NCI has established an undisputed alternative calculation covering all compensable activities. It has not. Plaintiff's estimate should be tied to specific trip dates, dispatch and delivery times, driving duration, inspection, fueling, waiting, loading/unloading, breakdown-related duties, communications and paperwork, and the May 13–17 cross-workweek trip—converting a generalized estimate into a reasonable workweek calculation. Defendant has failed to establish the actual hours worked, and in light of Plaintiff's sworn statement establishing as a matter of just and reasonable inference that he worked seventy (70) hours per week every week except his first week, its motion for summary judgment must be denied.

**D. "Not Under a Load" Does Not Conclusively Establish Non-compensable Time**

NCI asserts that whenever a driver is not "under a load," the driver may use the time however he chooses. That assertion cannot conclusively establish non-compensable time because NCI's own records recognize numerous compensable activities while the driver is not hauling a loaded trailer—waiting, inspections, fueling, paperwork, loading and unloading, deadheading, repositioning, maintenance-related activity, and dispatch communications.

Under 29 C.F.R. § 785.16, an employee is truly off duty only when completely relieved of duty for a period long enough to use the time effectively for personal purposes. A label such as "not under a load," "waiting," or "off duty" does not itself control and is insufficient.

Defendant's categorical treatment risks excluding compensable time merely because no loaded trailer was attached. See 29 C.F.R. § 785.16(b) (truck driver waiting for goods to be loaded is working; waiting is an integral part of the job).

As such, Defendant's motion for summary judgment must be denied on this ground.

**E. Week 8 Arithmetic and Allocation Reinforce That NCI's Figures Are Not Uncontroverted**

NCI's prior declaration says Plaintiff earned "$546 ($0.40 per mile for 1,315 miles)." But 1,315 × $0.40 = $526.00. The same paragraph separately identifies $20.00 in stop pay, so the proper components are $526.00 mileage pay plus $20.00 stop = $546.00. If Defendant counts $546.00 as mileage and then adds another $20.00 stop pay, it overstates compensation by $20.00. Standing alone, this is not independently dispositive, but it reinforces that the weekly figures submitted by Defendant do not withstand the scrutiny of a proper workweek-by-workweek accounting—especially after reallocating May 13–14 earnings and hours to Week 7.

Further, wage-advance deductions do not lead the opposition. Bona fide repayment of free-and-clear advances by paycheck deduction can be lawful. See Brennan v. Veterans Cleaning Serv., Inc., 482 F.2d 1362, 1369 (5th Cir. 1973). A $0 net paycheck does not, by itself, prove gross wages fell below the federal minimum. The minimum-wage claim is framed around gross compensation earned per workweek. Deductions become material only if particular amounts are shown to be business expenses, unauthorized, duplicative, or not bona fide advances—proof NCI has not made undisputed as to every line item, and which Plaintiff need not carry as the primary theory to defeat summary judgment.

**F. All of Plaintiff's time was compensable work**

Plaintiff agrees with NCI that all of the listed compensable work duties are compensable. Moreover, Plaintiff's alleged "off-duty" and "rest" time was also compensable work. Section (b) of 29 C.F.R. § 785.16 provides truck driver exceptions to what Defendant deems "off duty" work:

> A truck driver who has to wait at or near the job site for goods to be loaded is working during the loading period. If the driver reaches his destination and while awaiting the return trip is required to take care of his employer's property, he is also working while waiting. In both cases the employee is engaged to wait. Waiting is an integral part of the job.

See 29 C.F.R. § 785.16(b).

While the statute distinguishes this from "if the truck driver is sent from Washington, DC to New York City, leaving at 6 a.m. and arriving at 12 noon, and is completely and specifically relieved from all duty until 6 p.m. when he again goes on duty for the return trip the idle time is not working time. He is waiting to be engaged," nonetheless, Plaintiff partook in compensable waiting as an integral part of his job. Id.

The Fifth Circuit has "held that as a matter of law the plaintiff there could use the time effectively for her own purposes and that she was hence not entitled to recover, stating: 'The facts show that Halferty could visit friends, entertain guests, sleep, watch television, do laundry, and babysit. We, therefore, conclude that she could use the time for her own purposes and that she is not entitled to compensation for her idle time....' […] We noted that "[e]mployees who have received compensation for idle time generally have had almost no freedom at all.'" See Bright v. Houston Nw. Med. Ctr. Survivor, Inc., 934 F.2d 671, 676 (5th Cir. 1991) (internal citations omitted).

There were times when Plaintiff was not "under a load" when he was waiting during compensable time, in a manner totally distinguished from a hypothetical six (6) hour time-block

between trips. During these times, Plaintiff was required to take care of his employer's property by attending to either an empty trailer or a trailer-less tractor. While Plaintiff may have had time to run personal errands during these times, Plaintiff was not fully free to use the time however he saw fit, due to his attending to said property. At these times, Plaintiff was not able to leave that property and could not use the time for his own unrelated activities. While true duty-free rest periods are non-compensable, Plaintiff's rest periods were never truly duty-free, due to his ongoing duty to attend to Defendant's property. Notably, the evidence in the record establishes that Plaintiff does not ever recall having a time where he went more than twenty-four (24) hours without being assigned a load.

Moreover, Defendant failed to present any evidence supporting its contention that Plaintiff was free from all work during specific hours while employed as a driver or trainee such that he was properly paid. Summary judgment must therefore be denied on this ground, as well.

## III. NCI's Own Sworn Evidence Creates a Genuine Termination Dispute

To establish FLSA retaliation, a plaintiff must make a prima facie showing of (1) participation in protected activity; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action. If the plaintiff meets that burden, the defendant must articulate a legitimate, non-retaliatory reason, and the plaintiff may then show pretext. See Hagan v. Echostar Satellite, L.L.C., 529 F.3d 617, 624 (5th Cir. 2008).

Defendant argues Plaintiff cannot establish an adverse employment action because he voluntarily quit. There is substantial evidence supporting NCI's position: Plaintiff testified, "I quit;" he saw no money in his account; he turned his phone down; he drove home and removed his belongings; and he told James White he was "done."

But NCI's position is not factually uncontroverted because NCI itself previously submitted sworn evidence stating that "NCI terminated Plaintiff's employment." BC Dec. ¶ 52 states NCI terminated Plaintiff after he abandoned his position. NCI's Maschmeier declaration likewise stated that NCI terminated Plaintiff's employment. NCI's interrogatory responses describe persons with knowledge of "Plaintiff's termination from employment," rather than unequivocally maintaining that no termination occurred.

The Court cannot resolve this conflict by selecting which of NCI's own sworn versions is more credible. Plaintiff concedes that he intended to quit and told NCI he was done. But NCI itself has sworn that it subsequently terminated his employment. Whether Plaintiff's communication constituted an immediately effective resignation, whether NCI accepted it, whether an employment relationship remained, and whether NCI later took a materially adverse action are disputed factual issues.

NCI has also offered inconsistent explanations for the end of employment: voluntary quit (Defendant's current theory); termination for job abandonment and performance issues; and "NCI terminated Plaintiff" (sworn declaration evidence). Inconsistent explanations can support an inference of pretext when they concern whether the employer took an adverse action and why. See Gee v. Principi, 289 F.3d 342, 347-48 (5th Cir. 2002).

An additional inconsistency undercuts any performance narrative built on the dropped-trailer incident. Chatham's declaration states mechanics concluded the incident resulted from worn tractor parts, Plaintiff was not at fault, the incident was classified as nonpreventable, and he was not disciplined. BC Dec. ¶ 42. That accident cannot fairly be presented as an undisputed performance basis for termination. NCI may still rely on other asserted issues (load-lock incident,

unauthorized travel, communication failures, alleged abandonment), but the accident cuts against a generalized "poor performance" justification.

Moreover, the timing of Defendant's report concerning the accident gives rise to an inference of retaliation. The incident occurred in late April 2023 and the Defendant decided not to report it. However, one (1) day after Plaintiff's complaint concerning wages, Defendant reported the incident approximately a month after it occurred.

Plaintiff satisfies each of the three elements required to survive summary judgment.

*First*, Plaintiff participated in protected activity under the FLSA by complaining to Defendant about his inaccurate compensation and wage discrepancy, on May 19, 2023. "[E]ven an informal, internal complaint could constitute protected activity under the FLSA." See Hagan v. Echostar Satellite, L.L.C., 529 F.3d 617, 625 (5th Cir. 2008). Moreover, "the FLSA protects employees engaged in otherwise protected activity if that employee possesses a good faith belief that the employer had violated the law." Id. Here, Plaintiff's internal complaint consisted of a good faith belief that Defendant had violated the law. Tiernan Dep 189:5-25. Accordingly, Plaintiff engaged in protected activity under the FLSA.

*Second*, setting aside the termination, Defendant unnecessarily reported a non-preventable damage incident after Plaintiff separated from employment after initially not reporting it, which led to Tiernan being unable to find new work. Tiernan Dep. 42:7-16; 43:1-3; 45:13-19; 46:14-23; 51:13-52:8. This was an adverse employment action. Defendant also terminated Plaintiff on May 20, 2023, which constitutes an adverse employment action.

Under the FLSA, "it shall be unlawful for any person […] to discharge or in any other manner discriminate against any employee because such employee has filed any complaint." See 29 U.S.C.S. § 215(a)(3). See Starnes v. Wallace, 849 F.3d 627, 632 (5th Cir. 2017).

*Third*, the temporal proximity of one (1) day between Plaintiff complaining of inaccurate compensation on May 19, 2023, and his being terminated by Defendant on May 20, 2023, suggests a causal link between Plaintiff's complaint and his termination. "Title VII retaliation cases, which require the same 'causal link,' are instructive. Under Title VII, a 'causal link' for a *prima facie* is shown if 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity.' […]. 'Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation.' […]. The Supreme Court has noted that 'cases that accept mere temporal proximity ... as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.' ' […]. The Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link." See Maynor v. Dow Chem. Co., 671 F. Supp. 2d 902, 925 (S.D. Tex. 2009). Here, one day is far less than four months, and thus sufficient evidence to prove a causal link.

Based on the foregoing, there exists a genuine issue of material fact as to whether Defendant retaliated against Plaintiff for complaining about wages by reporting the incident after initially deciding not to and subsequently terminating Plaintiff.

**CONCLUSION**

Defendant overstates the record when it characterizes the relevant minimum-wage and separation facts as uncontroverted. The wage & hour claims should proceed to trial because Plaintiff should not be subject to the MCA exemption and NCI's own evidence uses payroll timing instead of proper workweek allocation, places multi-day trip work and breakdown pay in the wrong weeks, does not establish complete weekly compensable hours, acknowledges extensive non-driving work, and contains arithmetic ambiguity as to Week 8. The retaliation claim should

proceed because NCI's own sworn declarations say NCI terminated Plaintiff, directly contradicting the current "voluntary quit" theory—presented candidly alongside, rather than in denial of, Plaintiff's testimony that he intended to quit. Moreover, Defendant retaliated against Plaintiff by reporting an incident to harm his driving record after initially choosing not to do so.

Accordingly, Plaintiff respectfully requests that Defendant's motion for summary judgment be denied.

Dated: Flushing, New York
July 27, 2026

Respectfully submitted,
**CONSUMER ATTORNEYS, PLLC**
*/s/ Emanuel Kataev, Esq.*
Emanuel Kataev, Esq.
*Admitted pro hac vice*
(718) 412-2421 (office)
(718) 489-4155 (facsimile)
ekataev@consumerattorneys.com

*/s/ Moshe O. Boroosan*
Moshe O. Boroosan, NY Bar No. 5429915
6829 Main Street
Flushing, NY 11367
E: mboroosan@consumerattorneys.com

*Attorneys for Plaintiff*
*Darrin James Tiernan*