IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DARRIN JAMES TIERNAN, on behalf of himself and others similarly situated,

Plaintiff,

v.

NATIONAL CARRIERS, INC.,

Defendant.

Case No. 3:25-cv-01249-L-BT

FOR READ AND SIGNING PURPOSES ONLY

THE VIDEOTAPED VIDEOCONFERENCE DISCOVERY DEPOSITION
DARRIN JAMES TIERNAN
APPEARING REMOTELY
PORTER COUNTY, INDIANA
MAY 26, 2026
11:27 A.M. CENTRAL TIME

REPORTED BY: A. Christine Hylton, RPR, CSR

APPEARANCES

EMANUEL KATAEV, ESQ.
OLIVIA COONEY
Sage Legal, LLC and Consumer Attorneys, PLLC
6829 Main Street
Flushing, New York 11367
Ekataev@consumerattorneys.com

Counsel for Plaintiff

ANDREW J. WEISSLER, ESQ.
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
Aj.weisler@hushblackwell.com

FOR READ AND SIGNING PURPOSES ONLY

Counsel for Defendant

Also Present: Andrew McChesney, Videographer

# I N D E X


| EXAMINATION | PAGE |
|---|---|
| By Mr. Weissler | 5 |


## E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 04/02 Tiernan Trip | 108 |
| Exhibit 2 | Driver Handbook | 127 |
| Exhibit 3 | Driver Payroll Recap | 171 |
| Exhibit 4 | Wage Statement | 197 |
| Exhibit 5 | 04/20 Tiernan Trip | 212 |
| Exhibit 6 | 04/05 Tiernan Trip | 225 |
| Exhibit 7 | 04/07 Tiernan Trip | 230 |
| Exhibit 8 | Driver History | 236 |
| Exhibit 9 | Roadteam Staffing Check Stubs | 242 |
| Exhibit 10 | 3/28/23 Memo | 250 |
| Exhibit 11 | Tiernan Information Summary | 252 |
| Exhibit 12 Tiernan | Declaration of Darrin James | 254 |


(Exhibits to be attached to transcript)

FOR READ AND SIGNING PURPOSES ONLY

REPORTED REMOTELY MAY 26, 2026, AT 11:27 A.M.,

THE VIDEOGRAPHER: Good morning. We are going on the record at 11:27 a.m. on May 26th, 2026.

This is Media Unit 1 of the video recorded deposition of Darrin James Tiernan, taken by counsel in the matter of Darrin James Tiernan on behalf of himself and others similarly situated versus National Carriers, Inc.

My name is Andrew McChesney, representing Veritext, and I'm the videographer, and the court reporter is Christine Hylton.

FOR READ AND SIGNING PURPOSES ONLY

Counsel and all present will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. WEISSLER: My name is AJ Weissler, of Husch Blackwell, representing Defendant, National Carriers, Inc.

MR. KATAEV: Emanuel Kataev of Sage Legal, LLC, and Consumer Attorneys, PLLC, representing the Plaintiff, Darrin James Tiernan.

Together with me is my paralegal, Olivia Cooney, awaiting admission to the bar of the State of New York.

Good afternoon.

THE VIDEOGRAPHER: Will the court

reporter please swear in the witness, and then counsel may proceed.

THE COURT REPORTER: Raise your right hand, please.

THE WITNESS: (So doing)

THE COURT REPORTER: Do you solemnly swear or affirm the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

THE COURT REPORTER: Thank you.

DARRIN JAMES TIERNAN,

FOR READ AND SIGNING PURPOSES ONLY

Called as a witness after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WEISSLER:

Q. All right. Hello, Mr. Tiernan. As I just stated for the record, my name is AJ Weissler. I'm an attorney for the Defendant in this case, National Carriers, Inc., and I'm going to be taking your deposition today.

And you and I have not met prior to interacting with this deposition, correct?

A. (Inaudible)

Q. Okay.

THE COURT REPORTER: I'm sorry, I didn't hear anything.

THE WITNESS: Correct.

BY MR. WEISSLER:

Q. So we're going to talk about kind of the proceedings today, and they're going to be a little bit unusual from what -- what you would normally do, because you are by videoconference, everyone is appearing by videoconference.

And one important thing for everyone is that you speak loudly, so that everyone can hear you, and that you give verbal responses to answers; is that okay?

FOR READ AND SIGNING PURPOSES ONLY

A. Okay.

Q. And if -- if I or the court reporter can't hear you, we -- we may ask to you repeat yourself, okay?

A. Okay.

Q. Have you ever been deposed before?

A. Can you repeat that for me again?

Q. Are you having trouble hearing me?

A. They just started vacuuming right next -- I don't know, just right next to the door, but I can hear you, if you repeat it again.

Q. Okay. Are you able to turn up the volume

on your device to help that?

A. All right. My device is turned up.

Q. Okay. I was asking if -- prior to today, if you have ever been deposed before?

A. Deposed, no.

Q. So today you're -- you're having your deposition.

Have you ever sat for a deposition in any other case before?

A. No, sir.

Q. Okay. So we're going to talk a little bit about what a deposition is, and make sure that today goes as smoothly as possible.

FOR READ AND SIGNING PURPOSES ONLY

First thing is that you started this by going under oath, and you understand that that means your testimony carries the same weight as if you were testifying in court, correct?

A. Correct.

Q. Okay. As I mentioned, it's very important that you give verbal answers; we can't just nod our head or shake our head, okay?

A. Okay.

Q. If you don't understand a question, make sure you ask me to either repeat it or to clarify it, okay?

A. Okay.

Q. And if you answer a question, I'm going to assume that means you heard and understood the question, okay?

A. Okay.

Q. You know, it -- it may be a long day today, so if at any point you need to take a break, just let us know, and we can take a break, okay?

A. Okay.

Q. And my only request is that if you need to take a break, that you answer any question that is pending before that break begins, okay?

FOR READ AND SIGNING PURPOSES ONLY

A. Okay.

Q. Have you consumed any medication or alcohol or anything else that would impact your ability to give complete and truthful answers today?

A. No, sir.

Q. Can you think of any other reason that you'd be unable to give complete and truthful answers today?

A. No, sir, there's none.

Q. And where are you currently located?

A. Burns -- Burns Harbor, Indiana.

Q. And you're in a hotel conference room, correct?

A. In -- in, yeah, Comfort Inn Hotel.
Q. Okay. Is there anyone else there with you?
A. No, sir.
Q. All right. During this deposition today, while you're on the record, I'd ask that you identify if anybody comes into the room, okay?
A. Okay.
Q. Because I can't see the whole room, so you'll just need to let me know if somebody opens the door and comes in, okay?
A. Got you.
Q. Okay. And you are using your cellular telephone to join this video deposition, correct?
A. Correct.
Q. Okay. During this deposition, if you -- are you able to like mute notifications, so like text messages, phone calls, things like that, on your phone?
A. Yes, sir.
Q. Okay. Have you already done that?
A. Yeah. My cell phone is on mute, yeah.
Q. Okay. If you receive any phone calls or text messages, I'd ask that you not respond or read them during the deposition, okay?
A. Okay.

FOR READ AND SIGNING PURPOSES ONLY

Q. Have you ever been convicted of a crime?
A. Over ten years ago.
Q. Okay. What were you convicted of over ten years ago?
A. Ah --
MR. KATAEV: Objection --
THE WITNESS: -- I --
MR. KATAEV: -- I instruct the witness not to answer the question.
Under the Federal Rules of Evidence, the limit is ten years.
MR. WEISSLER: Okay. It's -- I'm going to -- You're instructing him not to answer the question?
MR. KATAEV: Correct, based on the Federal Rules of Evidence.
MR. WEISSLER: Okay. And during a deposition, I'm obviously able to ask questions that -- that -- that go to areas that may be relevant, whether the evidence -- whether it's admissible or not, right, is a different -- a different issue; so are you going to continue to instruct your witness not to answer the question?
MR. KATAEV: Correct, or at least that question.

FOR READ AND SIGNING PURPOSES ONLY

MR. WEISSLER: Okay --
MR. KATAEV: If you want --
MR. WEISSLER: -- when were --
MR. KATAEV: -- if you want to ask him whether whatever it was deals with fraud or dis- honesty, I'm okay with that.
MR. WEISSLER: I mean, you -- I understand that you're -- you're trying to limit the -- the testimony; but again, you're using a rule of evidence, not -- not a rule of civil procedure in relevance.
MR. KATAEV: Well, the Rule of Civil Procedure will be Rule 30.

FOR READ AND SIGNING PURPOSES ONLY

I can move for a protective order on it but, you know, why don't we meet and confer on it at the end of the deposition, and see if we can work it out.
MR. WEISSLER: Because you're -- again, you're -- you're instructing the witness not to answer because you believe that the evidence that he's going to -- the testimony he would give would not be admissible.
MR. KATAEV: Correct.
MR. WEISSLER: Okay, and -- and your basis for the protective order would be that the

evidence, you think, would not be admissible?

MR. KATAEV: And harassing, annoying, embarrassing, on the record.

MR. WEISSLER: Well, I -- I obviously would -- would -- you know, would only be asking enough questions to understand whether or not or not, you know, any of the questions, you know -- or sorry, any of the information is actually probative.

But in order to identify whether or not it is, right, we have to address this, you know, the -- the details of the -- of the criminal conduct.

You know, under the rules, I think under rule -- what is it, 6 -- 609, right -- I think it -- it specifically requires examination of the facts and circumstances of the arrest or the conviction.

FOR READ AND SIGNING PURPOSES ONLY

MR. KATAEV: Not for anything more than ten years.

MR. WEISSLER: That's spe -- specifically for -- for convictions over ten years.

MR. KATAEV: Again, I'm okay with you asking him whether whatever the situation was dealt with a crime of dishonesty or fraud, because that's what I think would be relevant; but other than that, I'm instruct him not to answer.

MR. WEISSLER: Okay. Your -- your

opinion as to what you think is relevant or not unfortunately isn't how the rule reads, so I'm going to read to you, Emanuel, Rule -- Rule 609; so 609(b), which I think is the -- is the Federal Rule of Evidence that you're referring to, says that it applies if more than ten years have passed since the conviction or released from confinement, whichever is later, and in that situation evidence of the conviction is admissible only if its probative value supported by specific facts and circumstances substantially outweighs its prejudicial effect, and the proponent of the evidence gives an adverse party reasonable written notice of the intent to use it, so the party has a fair opportunity to contest its use.

FOR READ AND SIGNING PURPOSES ONLY

So you can certainly object at the time that this evidence is ever entered. You can use Rule 609, and we can discuss it; but without -- this is my only opportunity to ask him questions about this on the record, to be able to get the specific facts and circumstances to determine whether it's -- you know, whether it's going to be admissible or not.

This -- this is why we have depositions.

MR. KATAEV: I think, met and conferred on it, and having an opportunity to review Rule 609(b) of the Federal Rules of the Evidence, subject

to my objection of its relevance and to those arguments, you may ask him those questions.

BY MR. WEISSLER:

Q. Okay. All right, thank you.

Mr. Tiernan, going back, what were you convicted of over ten years ago?

A. It's an old domestic charge.

Q. Do you remember specifically when you were convicted of that?

A. It was in 2008, and I can't remember what day.

I just know the year. It was in 2008.

FOR READ AND SIGNING PURPOSES ONLY

Q. Okay. Do you remember the specific crime of which you were convicted?

A. I do remember that I had left the scene, and they -- they -- they charged me with domestic, because I couldn't stand up for myself, and I had did -- did six months, and that was it.

Q. That was six months of confinement, like in prison?

MR. KATAEV: Objection to form.

THE WITNESS: Yes, sir.

BY MR. WEISSLER:

Q. In what state was this conviction?

A. It was in Monroe, Louisiana.

Q. And you're stating that -- that it's your belief that you didn't do anything other than you left the scene, and so you weren't able to give your side of the story?

A. That's --

MR. KATAEV: Objection.

THE WITNESS: -- correct.

BY MR. WEISSLER:

Q. Do you know what you were alleged to have done?

A. It was her story versus my story, so she -- she told the -- she told the police that I had re -- I had touched her in the wrong way, or something like that.

And I wound up leaving, and they put a warrant out.

Q. Who is it that's the -- the woman in this incident?

A. That was my child's mother.

Q. What is her name?

A. Dana Franklin.

Q. And you said you have a child together with Ms. Franklin?

A. Correct.

Q. Do you know if Ms. Franklin has ever worked

FOR READ AND SIGNING PURPOSES ONLY

for National Carriers, Inc.?
A. No, sir.
Q. No, she has not?
A. No, sir.
Q. Has your child with Ms. Franklin ever worked for National Carriers, Inc.?
A. No, sir.
Q. Other than this conviction from 2000 --
Well, let me ask one more question.
Do you know if the crime you were convicted of was a felony or a misdemeanor?
A. No, it was a misdemeanor.

FOR READ AND SIGNING PURPOSES ONLY

Q. Other than this conviction in 2008 for a misdemeanor domestic charge, have you ever been convicted of any other crimes?
A. No, sir.
Q. Have you ever been arrested for any other crimes?
A. No, sir.
Q. After you were confined for the six months, did you have some sort of probation or anything that continued afterwards?
A. No, sir.
Q. Have you ever filed for bankruptcy?
A. No.

Q. Have you ever gone by any names other than Darrin Tiernan?
A. No.
Q. What is your current home address?
A. Current home is 2904 Shamlin Street.
Q. Can you spell the name of the street?
A. S-h-a-m-l-i-n, Street.
Q. And what city is that in?
A. That's in Monroe, Louisiana.
Q. What's the ZIP code?
A. 71202.
Q. How long have you lived at 2904 Shamlin Street?

FOR READ AND SIGNING PURPOSES ONLY

A. I want to say over ten years.
Q. Since at least 2016?
A. Since 2013, yep.
Q. Does anybody else currently live with you at 2904 Shamlin Street?
A. It was my ex-wife, but she -- we split up, so she -- she don't stay there no more.
MR. KATAEV: Objection to relevance on this line of questioning.
BY MR. WEISSLER:
Q. Okay. Anyone else?
A. No, sir.

Q. Okay. And how long ago did your ex-wife move out?
A. About a year-and-a-half ago.
Q. And the name of your ex-wife?
A. Leslie Howard.
Q. For how long were you and Leslie Howard married?
A. I want to say probably -- I got married in 2018, got a divorce.
The divorce -- we was -- we went together for a year-and-a-half, so the divorce was finalized, I want to say, February 2025.

FOR READ AND SIGNING PURPOSES ONLY

Q. Just to make sure I have this correct, you married Leslie Howard in 2018, and you said you were divorced sometime in 2025?
A. Correct, in February.
Q. Did Leslie Howard ever work for National Carriers, Inc.?
A. No.
Q. Other than your marriage to Ms. Howard, have you been married any other times?
A. No.
Q. Other than your child with Dana Franklin, do you have any other children?
A. No.

Q. Do you have an email address that you currently use?
A. Yes.
Q. Okay. What is that email address?
A. It's darrintiernan25@yahoo.com.
Q. How long have you had that email address?
A. It's over five years, I want to say probably since 2020.
Q. Do you currently use any other email addresses?
A. No.
Q. And what is your current phone number?
A. My current phone number is 318-857-0280.
Q. 0280?
A. 0280, 8-0; yeah, correct.
Q. Is that a cell phone?
A. Cell phone, yep.
Q. How long have you had that number?
A. Since last year in October.
Q. Do you remember what your phone number was before this current one?
A. Repeat that for me again. You said --
Q. I'm sorry, you said --
A. -- do I remember?
Q. Yeah. Let me start over.

FOR READ AND SIGNING PURPOSES ONLY

You said you had this number since last October?
A. Yes, sir.
Q. Okay. What was your phone number before last October?
A. 318-348-0214.
Q. How long did you have that phone number?
A. I had that phone number for some years, I want to say around 2019 and '20, one of them two years, since then.
Q. Why did you change your cell phone number last October?

FOR READ AND SIGNING PURPOSES ONLY

A. Because I was switching over my plan, and I needed a new number, because I got a lot of just filling out apps and stuff over the years, and stuff like that. And I was getting a lot of spam and stuff, so I needed a new number, and it was time to upgrade my phone.
Q. Do you still have your old phone that you had prior to last October?
A. Correct.
Q. You still have that phone?
A. Yes, sir.
Q. You just don't use it anymore?
A. Just the Internet on it, but I don't -- I

don't use it as -- as a phone, phone.
Q. Are you currently employed?
A. Yeah. Yes, sir.
Q. Okay. Where are you currently employed?
MR. KATAEV: Objection to relevance.
You can answer.
THE WITNESS: TLI.
BY MR. WEISSLER:
Q. TLI?
A. Yes, sir.
Q. How long have you worked for TLI?
A. Through -- at the end of Feb -- January of this year.
Q. January of 2026?
A. Yes, sir, at the end.
Q. What do you do for TLI?
A. Drive trucks.
Q. And you're currently in Indiana, correct?
A. Correct.
Q. Are you on a trip for TLI?
A. I'm not underneath a load right now.
Q. Okay. What do you mean by that?
A. Like I'm -- I'm waiting.
I -- I told them I needed to take today off from underneath a load so we can do this meeting.

FOR READ AND SIGNING PURPOSES ONLY

Q. And I've never -- never been a truck driver, so I apologize. I'm going to ask some questions today that show that I've never been a truck driver; but what does it mean to be underneath a load?

A. If I was underneath a load, that means I will be -- it will be a time and a delivery date that I have to have that load delivered. And I'm not -- since I'm not underneath a load, I don't have to go deliver nowhere, because I don't -- I'm not underneath a load, like I don't have a load with me.

Q. I see.

FOR READ AND SIGNING PURPOSES ONLY

So there's no trailer attached to your truck right now?

A. Correct.

Q. And that means that -- that this time is sort of yours to do what you need to until you're underneath a load again?

A. Yes, correct.

Q. Do you haul any particular type of load for TLI?

A. No, just mainly scraps and stuff. And, yeah, that's about it, like scraps, yeah, stuff like that, like graphic packaging places, warehouse stuff.

Q. Approximately how much do you make per week

driving for TLI?
A. How much?
It depends on -- depends on how many loads I be doing, so I can average probably a thousand, sometimes it will be underneath a thousand. Depends on if I stay out long, or if I'm going home every weekend, stuff like that.
Q. And do you get to decide whether you stay out long or go home?
A. Sometimes. Sometimes they -- it depends on my destination, like how far am I out from home.
Q. How long have you been away from home on your current trip?
FOR READ AND SIGNING PURPOSES ONLY
A. I want to say about two weeks.
Q. Do you know when you'll be heading back home next?
A. Probably after another week, around another week or so.
MR. KATAEV: I'll make a continued objection to relevance on this line of questioning.
BY MR. WEISSLER:
Q. Prior to TLI, where did you work?
A. Prior to TLI, I want to say I was -- where was I at, man?
I was working for Midwest before I went

to TLI.
Q. Can you spell that for me?
A. It's M-i-d west, w-e-s-t, Midwest Freight Systems.
Q. What did you do for Midwest Freight Systems?
A. The same thing. I was on dedicated routes, OTR routes, delivering car parts and stuff like that.
Q. And you said OTR routes?
A. Yeah, OTR all over, all over the road.
Q. Over the road?
A. Correct.

FOR READ AND SIGNING PURPOSES ONLY

Q. When did you start working for Midwest Freight?
A. I want to say July the 14th of 2025.
Q. And when did you stop working for Midwest Freight?
A. It was around January the 16th, around January the 16th of this year, 2026.
Q. Why did you stop working for Midwest Freight?
A. I was having complications with the mechanic.
I'd tell him something is wrong with the truck.

They wasn't -- he wasn't fixing it, and I kept riding around with an oil leak that needed to be fixed for a couple of weeks.

And I came back to the shop twice to -- to get it fixed, and it -- it wasn't fixed, so I wound up just -- I just wound up letting -- letting them go.

I got something else, which was TLI. I had it lined up, and I decided to get with them, because it was closer to home and, you know, so I don't have to deal with -- with running across an issue with them not fixing the -- the truck that I was driving.

FOR READ AND SIGNING PURPOSES ONLY

Q. Do you remember how much you made per week, approximately, for Midwest Freight?

A. How much I made per week?

Q. Yes.

A. Between 11 to 12, 1100 to 1200 a week.

So it varies. It depends on the distance where I was going.

Q. And for -- for TLI, do you drive a truck that you own, or is it one that TLI owns?

A. It's a company truck.

Q. And were you driving a company truck for Midwest Freight, as well?

A. Correct.
Q. Have you ever owned and operated your own truck?
A. No, no.
Q. Before Midwest Freight, where were you working?
A. Before Midwest Freight I was working at Choice Brands. It was a -- it's a beer company out of Monroe, Louisiana.
Q. What were you doing for Choice Brands?
A. The same thing.
I was delivering locally. I would -- I would deliver beer to stores, and you'll bring in like the alcohol, stock it up on a -- in the stores and stuff, however the -- the stores wanted you to do it.
Q. How long did you do that for Choice Brands?
A. Let me see. I signed up with them since February of 2025.
Q. So from approximately February to July of 2025?
A. To July, yeah, to July -- around July the 1st, the beginning; I mean, the first week.
Q. Do you know how much you were making per week at Choice Brands?

FOR READ AND SIGNING PURPOSES ONLY

A. I was getting paid every two weeks, and it'd be probably 1100 every two weeks, somewhere around there.
Q. And why did you stop working at Choice Brands?
A. Just -- I just needed better -- I mean, because it was -- it was -- it was a lot of work, and I'm getting paid biweekly, and I just -- with my, bills and stuff I had, I just had a lot going on so I had to go find something that was going to be a little bit better than that.
Q. And that's what took you to Midwest Freight?
FOR READ AND SIGNING PURPOSES ONLY
A. Correct, yes.
Q. Before Choice Brands, where did you work?
A. Before Choice Brands, it was (inaudible) Furniture.
THE COURT REPORTER: It was what furniture?
THE WITNESS: Ivan Smith Fur -- Furniture.
BY MR. WEISSLER:
Q. Ivan, I-v-a-n?
A. Yeah, Ivan; Ivan Smith.
Q. And then Smith, S-m-i-t-h?

A. Correct.
Q. What did you do for Ivan Smith Furniture?
A. Drove a delivery truck, Class B trucks.
And I started out as a helper, supposed to be a driver, and we -- we delivered furniture. We set up furniture and beds and stuff like that.
Q. You -- you called it a Class B truck.
What is that?
A. Class B, air brakes trucks, like the little box trucks they'll be moving furniture and stuff in.
Q. Okay. And you said they had air brakes?
A. Yeah, correct.
FOR READ AND SIGNING PURPOSES ONLY
Q. So that's something that you would need like a special license for?
A. Yeah. It can't be a regular license.
Q. But it's a different license than you would need for like the over the road tractors-trailers that you drive otherwise?
A. Correct.
Q. What class of license do you need for that?
A. For to drive over the road?
Q. Yes.
A. Commercial.
And it depends on what kind of -- what kind of vehicle it is.

Q. What license do you currently hold?
A. A Commercial A license.
Q. How long have you had a Commercial A license?
A. Since January '22.
Q. January of 2022?
A. Correct.
Q. Okay. And how long did you work for Ivan Smith?
A. I want to say till -- so I got on with Choice Brands, so that was since November of 2024 to February '25.

FOR READ AND SIGNING PURPOSES ONLY

Q. Do you remember how much you were making for Ivan Smith?
A. It was inconsistent.
Sometimes I -- it's -- it's paid biweekly. Sometimes I bring home like 800, 700, so it -- it -- it was inconsistent.
Q. What would cause the amount to go up or down?
A. I guess because when you're a helper, you don't get paid that much, like the driver.
I started off as a helper, and I was supposed to be a driver; but by the time I came to that point to get a -- a raise, I wound up finding me

a better job that, you know, I didn't have to start out as a helper, so that's why I went to the beer company, but that -- that's the main reason why it was inconsistent with the pay.

Q. Got it.

And where did you work before Ivan Smith?

A. Before Ivan was -- I want to say it was MG Logistics, doing Amazon with a private company, small company.

Q. What do you mean by doing Amazon?

A. It was -- it was commercial. It was CDL A commercial.

FOR READ AND SIGNING PURPOSES ONLY

I started out doing local and out of Dallas Texas. I was doing local for -- out of Austin, Texas, at an Amazon place.

Q. All right. So you were driving, you said it was a CDL A; so this is a --

A. Correct.

Q. -- tractor-trailer?

A. Correct.

Q. And you were driving a tractor-trailer locally out of the Austin, Texas Amazon location?

A. Correct.

Q. You also mentioned Dallas.

Were you also driving out of Dallas?

A. I was, yes. Yes, I was, yeah.
Q. At the time, were you still living in Louisiana?
A. Correct.
Q. So were you staying somewhere in the Dallas or Austin area while you were work for MG Logistics?
A. No --
MR. KATAEV: Objection --
THE WITNESS: -- I was staying in --
MR. KATAEV: -- (inaudible) line of questioning.
THE WITNESS: -- I was staying in his truck.

FOR READ AND SIGNING PURPOSES ONLY

THE COURT REPORTER: Wait. I didn't hear the objection.
MR. KATAEV: Objection to relevance to this line of questioning.
MR. WEISSLER: So occasionally your attorney is going to object, like he just did.
If you understand the question after the objection, you would still answer the question, okay?
MR. KATAEV: Correct. Unless I instruct you not to answer, you should answer.
MR. WEISSLER: Do you understand?
THE WITNESS: Okay, yeah, yes.

BY MR. WEISSLER:
Q. So I'm going to ask the -- the question again, just so we can get a clear response on the record because, again, the court reporter is writing everything we're saying down, so that's why it's so important that we not talk over each other, and we -- and we do that, okay?
A. Okay.
Q. So while you were driving for MG Logistics and living in Louisiana, were you staying somewhere in Dallas or Austin?
A. In -- in -- inside the truck that I was in that -- that the guy I was working for, I was staying in his truck.
Q. For MG Logistics, were you driving just within Texas?
A. Yeah, that's all it was. It was Texas.
Q. Do you remember how much you were making per week for MG Logistics?
A. He had me on like a set pay.
Q. How much was that set pay?
A. Eleven hundred a week.
Q. How long did you work for MG Logistics?
A. I worked there for about a good, I want to say, probably about eight months or so.

FOR READ AND SIGNING PURPOSES ONLY

Q. I'm sorry?

A. It was around eight months or so, on and off, it -- on and off, around eight months.

Q. Do you know approximately when you started with MG Logistics?

A. I want to say it was sometime during -- it was past summertime. It was -- it was sometime past.

Not too far on, I was working from National Carriers, so it was -- I knew it was late 2023, sometime around September, I think, if I'm -- if I'm saying it correctly.

I can't -- I can't too much remember, but it was around that time, though, at the end of 2023 somewhere.

FOR READ AND SIGNING PURPOSES ONLY

Q. And you said you worked there for about eight months?

A. Yeah, on and off.

Q. So that would have gone into sort of the, I guess, summer of 2024?

A. Yeah, to -- to around there, summer of '24, yes, sir.

Q. And when you say on and off, what does that mean?

A. Well, I took breaks, like because I was -- because I was staying at Monroe at the same time, so

it -- it just -- you know, me and him made a deal like, you know, I do a couple of -- a couple of good runs for him out of a month, I come back.

But I need more time off, because I don't -- I be living out of his truck.

So he'll give me like a little extra time off that I needed, and then I'll come back and start back working for him.

Q. And why did you stop working for MG Logistics?

A. Just it was -- it was just kind of like the hassle of trying to -- trying to like live in a truck over there, and I'm -- I got stuff I need to take care of, like with my daughter and stuff, back in Monroe.

And at the time, I just felt like it was just a little complicated, so I just couldn't keep doing it like that.

Q. When you left MG -- MG Logistics, did you go straight to working for Ivan Smith?

A. Yeah -- well, I ain't going to say straight to work.

I think I had did -- I went to some temp services. It was a temp service that I went through, and I was working for them for a little while.

FOR READ AND SIGNING PURPOSES ONLY

And then that's where I saw Ivan Smith Furniture, and I got on at Ivan Smith Furniture.
Q. So after working for MG Logistics, you worked for a temp service?
A. Correct, it was a temp service.
Q. Do you remember the name of the temp service?
A. People Ready. It was -- it was a few of them. I know I did People Ready and, yeah, People Ready.
What's the other one? It was -- it was another one. I can't think of it.

FOR READ AND SIGNING PURPOSES ONLY

Q. Okay.
A. They was sending me job alerts and stuff, and, you know, it was back and forth between People Ready and the other one I was doing.
Q. And there -- there will be times like this where you can't remember the name of something during the deposition, which is normal.
If at some point during the deposition you remember the name of the other temp agency, will you tell me?
A. Yes, sir. Yeah, I'll -- I'll tell you, if I can remember.
Q. Thank you.

A. I'll tell you.
Q. So in between the time that you worked for MG Logistics and the time that you worked for Ivan Smith, you worked some temp jobs through People Ready and another temp service?
A. Correct.
Q. And where did you work before MG Logistics?
A. Before was National Carriers.
Q. Did you work anywhere between National Carriers and MG Logistics?
A. Not together, no, not together.
Q. What do you mean, not together?
FOR READ AND SIGNING PURPOSES ONLY
A. Can -- can you repeat that question for me?
Q. Yeah, let me -- So when your employment with National Carriers ended --
A. Uh-huh.
Q. -- did you work anywhere else after that time, and before you started working for MG Logistics?
A. No.
Q. Between the time your employment with National Carriers ended and when you started working for MG Logistics, did you apply anywhere else?
A. I have. I applied at several jobs. There was --

Q. Okay.
A. -- there was several of them that turned me down.
Q. Okay. Where did you apply?
A. I know Schneider was one of them.
PS -- PS was one of them, a flatbed company; they turned me down.
It -- it -- it was -- it was Stephenson, they -- they kind of backed off me, Stephenson Transport.
I even tried to do some local jobs, and they wound up turning me down.

FOR READ AND SIGNING PURPOSES ONLY

Q. Do you remember what local -- what local jobs those were?
A. Lasersp -- well, one of them was a freight -- freight, Southern Freight out of Monroe, and they wound up turning me down.
But yeah, I had a few of them that turned me down, yeah.
Q. Just -- just trying to make sure we have a list here.
So after your employment with National Carriers ended, you applied to Schneider Transport?
A. Yeah. Yes, sir.
Q. And you said something called PS, a flatbed

company?
A. It's a flatbed company, correct.
Q. And you also applied to Stephenson Transport?
A. Stephenson Transport, correct.
Q. And to some local jobs, one of which was called Southern Freight?
A. Southeastern Fright.
Q. Okay. Do you remember the names of any other companies that you applied to during that time?
A. I kind of -- kind of gave up for the big companies. I kind of gave up, because -- because of what -- what, I don't know, it was stuff that National Carriers was saying about me and stuff, and what they put on my DOT, and it was preventing me from -- from getting those jobs, so I stopped.
And then I found the private -- that's why I found the private company, the one that I -- I was telling you about with Amazon --
Q. Okay. You said you gave up--
A. -- they gave me a chance.
Q. -- sorry.
You said you gave up on the big companies because of what National Carriers was saying about you?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.
Q. Okay. What was it that they were saying about you?
A. They was saying I caused damage, which wasn't true, to the -- to the -- the trailers, or something, trailer, and they just was preventing me from -- when jobs would call them, getting ready to hire me, they -- they'll just, whatever they was saying; but I do remember it was -- it was Schneider telling me they said, well, they said something about the trailer drop, and the electrical damage work that you caused.

FOR READ AND SIGNING PURPOSES ONLY

But none of this was a reason -- I didn't get fired, or none of that. I had quit, and they was making it seem like I caused -- I caused -- I don't know, caused some type of damage; and the company, along with the drop trailer, and the companies wouldn't hire me.

They was telling me to reach back out in 12 months.
Q. Okay. So just to make sure I understand, somebody at Schneider told you that National Carrier had told them that you had damaged a trailer?
A. It was a recruiter; but correct.
Q. Okay. Who's the recruiter?

A. I can't remember her name at the time.
Q. And she was a recruiter for Schneider?
A. Correct.
Q. Do you know who she spoke to at National Carrier?
A. That's a good question.
I don't -- I don't know who they called.
When they call, they just call, and they'll ask about my -- me, and I guess whatever else they ask about, so I -- I really don't know who she talked to at National Carriers, for them to say that.
Q. And she was letting you know that -- that Schneider was not going to be hiring you; and did she say it was because of what National Carrier had told her?
A. Correct.
Q. And you mentioned that it was damage caused by a dropped trailer?
A. Correct.
Q. What is a dropped trailer?
A. Drop trailer is -- well, it was -- it was -- it was issues that I had with National Carriers.
I never got fired for this.
I went to hook up to a trailer, and I

FOR READ AND SIGNING PURPOSES ONLY

checked it. I did my truck test. Everything was working. My wheels was spinning, so I -- I was hooked up to it.

So I got ready to do my nex -- my normal procedures. I hooked up my (inaudible) and everything --

THE COURT REPORTER: You hooked up your what?

THE WITNESS: My gladhands. I hook up my gladhands, the air brakes, the brakes, like my emergency brakes and my -- my blue brakes, the electricity brakes.

FOR READ AND SIGNING PURPOSES ONLY

So I hooked everything up.

And once I started proceeding out the yard, the trailer had dropped.

So I wound up getting the trailer back up with their yarddog. It's the yard person with the -- they'll move the trailers around the yard, and stuff like that.

So we got the trailer up, and I was told to bring the tractor to the shop, to get it checked out.

So the next day I brought it to the shop, and the mechanic told me, he said, "I know why you had the accident." He said, "Your fifth wheel is

completely worn out. Your locking jaws are not locking properly." He said, "that's -- that's why you had the trailer drop."

And that's -- that's the -- that was -- they put that on my DOT.

BY MR. WEISSLER:

Q. And when you say on your DOT, what do you mean by that?

A. They put it on my record to -- well, when you go get a job or anything, other trucking companies can -- can look that up and see that you've got, you know, an accident or something.

FOR READ AND SIGNING PURPOSES ONLY

It's a non-preventable accident, but when the companies will go call, that's when they say something else was like -- like damaged, like elec -- electrical work and damage.

Q. So when you're saying on your DOT, is that DOT, like Department of Transportation?

A. Correct.

Q. And so on your official DOT record, there was the dropped trailer accident?

A. It was non-preventable.

Q. Did it say -- it said non-preventable?

A. It -- it says not -- non-prevent -- preventable.

Q. Okay. And non-preventable means there was nothing you could have done about it?

A. It is, correct.

Q. And do you know why NCI re -- reported that dropped trailer?

A. I think that -- I really don't know. I really don't know at the time why they reported it like that.

The shop, I know the shop -- the shop told them, you know, what was going on with the fifth wheel and everything, so I -- I don't know.

I think it's -- it's personal. It's what they -- what they want to put it, because like I said, we -- I was out there with the yard person, and we got the trailer up, so it -- they didn't need a crane. So they didn't need a crane to get the trailer up.

We got the trailer back up, so I don't know --

Q. Do you know who --

A. -- I think it was just personal.

Q. Do you know who reported it from NCI?

A. I have no clue.

MR. KATAEV: Objection to form.

BY MR. WEISSLER:

FOR READ AND SIGNING PURPOSES ONLY

Q. And I just want to -- making sure I'm not confused by something you said earlier, so I apologize if some of this feels repetitive; but you said it was a -- it was a non-preventable accident, correct?
A. Non-preventable accident, correct.
Q. And your record shows it as a non-prevent- able accent -- accident?
A. On my HireRight record, which is my DOT, yes, it does; it shows it.
Q. And there is such a thing as a preventable accident, also?
FOR READ AND SIGNING PURPOSES ONLY
A. Yeah. Yes, sir, correct.
Q. Like -- like that's a different category of accident?
A. Preventable is when you could have pre- vented it from happening.
Q. So on your DOT, somebody at NCI reported that a trailer dropped off of your truck in a way that you could not have prevented?
A. Correct.
Q. Okay. Was any -- Is that not accurate?
A. Clarify what you're saying.
Q. Yeah, no, it was a bad question. Let me try again.

You're saying that you believe somebody put it onto your DOT at NCI for personal reasons, correct?
A. I -- Correct.
Q. And are you saying that they should not have reported it at all?
A. I mean, we got the trailer up, and they -- they never told me anything about no -- no damages of wires or anything on the trailer.
Q. And --
A. They didn't -- they didn't -- they didn't tell me nothing about no damage.
FOR READ AND SIGNING PURPOSES ONLY
Q. And the report that they gave did say it was -- it was a non-preventable accident, correct?
A. Correct.
Q. So the -- the report from NCI did not blame you for the accident, correct?
A. They -- they did blame me. They did blame me.
That's -- that's -- that was preventing me from getting the jobs that will call them.
Q. So you're saying that -- that Schneider couldn't hire you because you had a non-preventable trailer drop?
A. That, and they added some stuff to it.

The recruiter told me, personally, on the phone, on the telephone, the recruiter told me, because I was supposed to go to west Memphis for my orientation, the recruiter told me, she said, "They said something about a trailer drop and damage to a trailer."

Q. And --

A. They added that.

Q. They added -- what did they add; sorry?

A. They -- they added that they said I had damage to a trailer.

Q. And that was not in your DOT report?

FOR READ AND SIGNING PURPOSES ONLY

A. No. No, not at all.

Q. All right. Let me make sure that I -- so this is -- is this is my understanding, and making sure it's the right one -- on your official DOT report is a record of a dropped trailer that was a non-preventable accident, correct?

A. Correct.

Q. And it is true that while driving for NCI you had a dropped trailer in a non-preventable accident, correct?

A. Correct.

Q. And you also believe, from talking to the recruiter at Schneider, that somebody at NCI added

that that dropped trailer caused damage to the
trailer?
A. Correct.
Q. And at the time it happened, nobody at NCI told you about damage to the trailer?
A. Nobody.
Q. Do you know if there was damage to the trailer?
A. I don't think there was, because they would have said something to me about it.
Q. Did you inspect the trailer for damage?
A. When I inspected the trailer, when the trailer was dropped, like on -- on the day the trailer was dropped, I remember the gladhands just being stretched out, but that was to the tractor.
And there wasn't nothing wrong with the gladhands, because the mechanic would have told me what all would have been wrong with it.
And the trailer, like I said, it was just the gladhands that were stretched, and it cranked up and everything, like from the -- the legs was working properly, and I didn't -- I didn't see no damage on the trailer.
Q. Okay. So your belief that there was no damage to the trailer was based on the fact that you

FOR READ AND SIGNING PURPOSES ONLY

did not observe any damage, correct --
A. Correct.
Q. -- and the fact that it cranked up correctly?
A. Correct.
Q. And the fact that -- that nobody at NCI or the mechanic told you that there was damage at the time?
A. Correct.
Q. Okay. Was your belief that there was no damage to the trailer based on anything else?
A. It --

FOR READ AND SIGNING PURPOSES ONLY

Q. Did you say no?
A. I -- I believe there wasn't nothing on it, no.
Q. I understand you believe that.
I'm just trying to understand like what -- you know, what -- what's that based -- what's that's based on.
So it sounds like it's based on the fact that -- that you did not see any damage, correct --
A. Correct.
Q. -- and that it cranked up correctly?
A. Yeah. The legs was working properly and everything, like it -- it -- even where you hook up

to the trailer from the tractor, none of it seemed like it was -- all it was was just stretched --

Q. Okay.

A. -- but it -- it didn't damage none of it where the gladhands go in.

Q. Do you know if NCI is required to report accidents to the Department of Transportation?

A. I'm quite -- quite sure everybody is.

Q. Do you know what types of accidents they're required to report?

A. I'm not sure. I'm not really sure, like, I'm not sure what.

FOR READ AND SIGNING PURPOSES ONLY

I just know that that the companies can -- from what I was told, the companies can put whatever they want to put on -- on their stuff --

Q. And who told you that?

A. -- involving --

Q. You said -- you said that's what you were told.

And I'm unsure. Like who told you that they can put whatever they want?

A. Like the HireRight people, when I tried fight it, so I can get a job as soon as I left National Carriers, they told me that the company has the right to put whatever they want on their report

about a driver.

Q. You said HireRight?

A. HireRight.

Q. And did -- did HireRight tell you anything else about that report by NCI?

A. They said that pretty much ain't nothing they can do about it --

THE COURT REPORTER: Keep your voice up.

THE WITNESS: -- and they just wished me luck, because I told them I was trying to get it off, or something, so I can -- so some people -- somebody can hire me.

FOR READ AND SIGNING PURPOSES ONLY

BY MR. WEISSLER:

Q. When you mentioned that you were having trouble getting a job, you said that you learned from Schneider that it was because of this report of the trailer drop, correct?

A. Correct.

Q. And your belief that -- that someone at NCI also said that the trailer drop resulted in damage to the trailer, correct?

A. Correct.

Q. Was there anything else that you believe NCI said or did to prevent you from getting a job?

A. At this point, I really don't know what

they was saying. I just know it was just -- I couldn't get a job after I had left there.
Q. And this was some -- there was a recruiter at Schneider who was telling you about the discussion with NCI, correct?
A. Correct.
Q. What about P & S? Did you ever hear anything from them about why you weren't hired there?
A. No, they just -- they saw that on my record, and they -- they made -- I think they made phone calls, too. And then they saw that on my record, and then though just didn't want to hire me.
Q. Okay. Did they tell you that they didn't want to hire you because of your record?
A. Yeah, they -- they -- they told me. They called me and told me.
Q. What -- what did they tell you, specific- ally?
A. They told me that they -- well, we can't -- you got the trailer drop.
And I said -- I told them it was a non-preventable.
And he said, "Well, there ain't nothing we can do, because it is on your record at DOT." He said just pretty much what everybody else was saying,

FOR READ AND SIGNING PURPOSES ONLY

try again in -- in a year or so.
Q. Do things like that stay on your record for a certain amount of time?
A. It's -- it's -- I think it's always going to be on my record.
Q. Have you had any other accidents or reportable accidents during your time driving trucks?
A. No. That's the only one.
Q. And you said earlier that -- that you were not discharged from NCI because of that incident, correct?
A. Correct.

FOR READ AND SIGNING PURPOSES ONLY

Q. And that you -- you chose to quit from NCI?
A. I -- I quit.
Q. Okay. When did you quit working for NCI?
A. I had a load in Newnan, Georgia. I finished a load. I was waiting on a load.
He sent me to -- to go pick up a load, and this was like the second week that I wasn't really getting paid.
So once I woke up, I saw that I wasn't -- I didn't have no money in my bank account. I had -- I turned my phone down, and basically quit.
I just drove -- drove that truck to the house so I can take my stuff and remove my things, my

belongings out of the truck.

And I called dispatch, because they was wondering what was going on, and it was like they -- the -- the lady was just -- I don't know, she was just the Operation Manager at the time, was trying to see what was going on.

And I was telling her like the issues with the -- the dispatcher, or whatever, I was just having. I'm not -- I'm not getting paid. I told her I wasn't getting paid.

So at this point, I just continue to take my stuff out of the truck, and -- and that's when James called me, James White. He said, "Bring the truck back."

FOR READ AND SIGNING PURPOSES ONLY

And that's when I agreed. I said, "Yeah, I'm going to bring the truck back, because I'm -- I'm done," you know. So I -- I wound up quitting that day.

Q. Okay. And who is James White?

A. Some type of manager for -- for National Carriers, at the time that I was there.

MR. KATAEV: Sorry, AJ.

Can we take a quick two-minute break?

MR. WEISSLER: All right. Let me just generally just unpack a little bit of what he just

said, and then we can take a break, so it just will be a real -- real short stretch.

So we -- You said James White was the person who you talked to when you told him that you were returning the truck, that you were done driving for NCI?

THE WITNESS: Yeah, correct.

BY MR. WEISSLER:

Q. And prior to that, you said you had talked to an Operations Manager as well?

A. Correct.

Q. Do you -- and do you remember who that person's name was?

FOR READ AND SIGNING PURPOSES ONLY

A. It was a woman. I don't remember her name, but it -- it was a woman.

Q. Okay.

A. She was over all the dispatchers.

Q. She was in charge of the dispatchers?

A. Correct.

Q. So you talked to a woman in charge of the dispatchers, and told her that you were having issues with dispatch, and that you weren't getting paid?

A. Correct.

Q. And so as a result of that, you drove home from Georgia, rather than take the load that you had

been assigned, correct?
A. No, I -- I wasn't -- I didn't -- that's the thing. I wasn't -- when -- when I dropped off that load in Newnan, Georgia, he didn't -- I didn't accept that new load.
When I saw -- When I woke up, I wasn't attached to a load. I saw -- I looked in my bank account, and it -- I didn't get paid, and I didn't accept no load, and I -- I -- I bobtailed all the way, because I quit. I was done. I was bringing their truck back. I quit.
Q. I see.

FOR READ AND SIGNING PURPOSES ONLY

A. I didn't -- I didn't accept no load that day.
Q. Okay. So bobtail, that's drive a truck without a trailer on it?
A. Correct.
Q. So you finished a load, and dispatch tried to give you another one, but you did not accept it, correct?
A. Tried. I -- I have no clue, because I didn't answer my phone for them.
Q. I see.
A. My phone was -- my phone was off.
I wasn't -- when -- when I saw I didn't get

paid, I quit. My mind, I quit.
Q. That was it. Okay.
A. Yeah, there wasn't no more loads. I -- I wasn't doing no more loads, because I didn't get paid.
MR. WEISSLER: Okay. All right, yeah, we'll -- we'll take a break here, so we'll go off the record.
THE VIDEOGRAPHER: The time -- the time is 12:33 p.m. We are now off the record.
(Recess taken)
THE VIDEOGRAPHER: We are back on the record. The time is 12:46 p.m.

FOR READ AND SIGNING PURPOSES ONLY

DIRECT EXAMINATION CONTINUED
BY MR. WEISSLER:
Q. All right, Mr. Tiernan, we are back on the record after a short break.
And even though you won't be sworn in each time, you understand that you are still under oath?
A. Correct.
Q. Okay, so we -- we -- before the break, we were just talking about the end of your employment with NCI, but I want to kind of start -- start over a bit, and just talk generally about your time there,

and what you did; so let's start with when did you start working for NCI?
A. March 27th, 2023.
Q. And what was your job with NCI?
A. Delivery driver, OTR, over-the-road truck driver for them.
Q. And how did you get that job? Did you apply?
A. Yes, I applied.
Q. Did you like submit like an online application?
A. Correct.
FOR READ AND SIGNING PURPOSES ONLY
Q. Were you interviewed for the job?
A. No.
Q. How did you know that you had been hired?
A. A recruiter reached out to me --
Q. Do you remember who --
A. -- and she told me.
Q. -- was?
I'm sorry. Go ahead.
A. You said what?
Excuse me, you said what did --
Q. No, no. Go ahead and finish your answer, and I can ask another question.
So you were saying she said?

A. Yeah, she reached out to me and said we can put you on a training program, because I didn't have enough commercial experience for them, or something like that; and she told me that -- that they'll -- they'll put me in their little program for about a month with a trainer, and I can, you know, basically be hired with them, and stuff like that.
Q. Do you remember the name of that recruiter who called you?
A. Not to the best of my knowledge.
Q. Okay. Other than submit your application and then hear from the recruiter, did you have to do anything else, when you were applying for the job?
FOR READ AND SIGNING PURPOSES ONLY
A. Nothing else.
Q. And you mentioned that at the time, that you could be hired into what -- what you called a training program, correct?
A. Correct.
Q. And that's because you said you did not have enough commercial experience?
A. Correct.
Q. What kind of commercial driving experience did you have before NCI?
A. Before, it was scattered, like it was basically like I didn't go over the road that much.

It was with a trainer, so I -- I didn't have much of a resume to be by myself in a truck.
Q. Where were you working before you worked for NCI?
A. Before NCI, I was doing like construction work.
Q. Were you driving a truck --
A. No.
Q. -- for that job?
A. No.
Q. Was that construction work in Monroe?
A. Correct, yes. Yes, it was.
FOR READ AND SIGNING PURPOSES ONLY
Q. And why did you apply for a job at NCI?
A. Trying to use my CDL, trying to -- I was trying to get started, with hopes of finding a long-term working career, something similar to it.
Q. Was NCI your first full-time job as a commercial driver?
A. No, it wasn't.
Q. Okay. Where had you worked as a full-time commercial driver before that?
A. I tried to work -- it was a company out of Tennessee, out of Chattanooga. I worked with them for 30 days.
Q. Do you remember the name of that company?

A. Covington Transport.
THE COURT REPORTER: Did you say Covington?
THE WITNESS: Correct.
THE COURT REPORTER: Thank you.
BY MR. WEISSLER:
Q. And you said you tried to work there, and you worked there for 30 days, correct?
A. Correct.
Q. Okay. Why did your work with Covington Transport end?
A. Because it's -- it's a teaming job. They don't -- they don't hire you on solo, like you got to be a pair. You got -- you got to have like somebody with you with CDL, or that's the only way for -- for them to hire you, because it's a teaming job.
Q. Did you have a --
A. I --
Q. Oh, sorry. Go ahead.
A. Go ahead. Go ahead. I'm sorry.
Q. I didn't -- didn't mean to cut you off.
Did you have somebody who you were teamed with while you were working at Covington?
A. We wasn't prepared.
We met while we was out there, and it

FOR READ AND SIGNING PURPOSES ONLY

really wasn't a match, and I decided that I didn't want to do that. I didn't want to match up with people out here or, you know, try to wait on somebody on their time, so I wound up just not coming back.

Q. Then did you go from driving for Covington to working construction?

A. Yeah. That's the only job I could get, because I was trying to take off of with my license, like get on with -- with a company.

So I knew I could do construction, so that's what I was doing to -- to make ends meet and pay my bills and stuff.

FOR READ AND SIGNING PURPOSES ONLY

Q. When you applied to work for NCI, did you also apply to any other transport companies?

A. No, not at the moment, no.

Q. Did you know anyone who worked for NCI before you started working there?

A. No.

Q. When you started working for NCI, you were hired into the training program as a driver, correct?

A. Correct.

Q. How did that training program work?

A. I think it worked, it was -- it was -- I guess it was good, because I was with a trainer, and they give the trainer money loads, so we was con-

stantly delivering and going to different cities back to back.
Q. So you were assigned to a trainer?
A. Correct.
Q. And you would -- Would you drive while the trainer like observed you?
A. Correct.
Q. And so NCI would assign a load to the trainer, and then you would drive that load while the trainer observed, correct?
A. Correct, we'll --
Well, we basically take turns because, I mean, he -- he was the trainer and, I don't know, we take turns.

FOR READ AND SIGNING PURPOSES ONLY

I have a clock. He got a clock, and he showed me how to do paperwork, and stuff like that, and how to get to my appointments on time and stuff.
Q. Do you remember the name of your trainer?
A. I don't know how to pronounce it, so I'll just -- I can just say I think what it is, Amia Leu, something like that. It was a foreign name, Amia Leu. Everybody called him Leu.
Q. Do you know how to spell it?
A. No, sir. No, sir. No, sir.
Q. So you were riding with a trainer named

something Leu, and you would take turns driving the loads, because you each had a clock as to how much driving you could do?

A. Correct.

Q. Prior to the work with the trainer, did you have to do any kind of like new hire paperwork, or orientation, or anything like that?

A. Well, for the process to get in, yeah, I had a to do, you know, little paperwork and stuff they had us do the classroom and --

Q. Where --

A. -- stuff like that.

FOR READ AND SIGNING PURPOSES ONLY

Q. -- where did you do that paperwork in that time in the classroom?

A. It was in Irving, Texas, at one of their -- at the Irving, Texas facility they got.

Q. When you drove for NCI, were you based out of a particular location?

A. Repeat that for me again.

Q. Sure.

When you -- when you drove for NCI, were you -- you were still working in --

Or sorry. Let me start that whole question over.

When you worked for NCI, you were still

living in Monroe, Louisiana, correct?
A. Correct.
Q. Did they have a location in Monroe, Louisiana?
A. No.
Q. Okay. Did you work for them out of a different location?
A. No.
Q. And so you still worked from home, effectively, but you would drive to wherever the loads were in your area; is that correct?
A. No.

FOR READ AND SIGNING PURPOSES ONLY

Q. Okay. Tell me how your -- how -- how did you work there, like where -- where did you report for work, when you were working for NCI?
A. It's -- I -- I went from -- okay, they -- they -- they put me on a plane. I went to their facility. They put me in a room until I got ready for the trainer, went on -- went on the road with a trainer for 30 days, and after 30 days, they let you come home.
They -- well, they -- they book you a load to go home to grab your things, and stuff like that, for the road, so that's -- that's the only time you go home.

But it was supposed to be for three weeks out, and then come home for about two to three days.

Q. I see.

So this job, because it was an over-the-road driver, right, you would -- you would leave Monroe, be on the road for three weeks doing routes for them, and eventually get back to Monroe?

A. Correct.

Q. And then you would be home for a few days, and then start that whole process again?

A. Correct.

Q. So like there wasn't some office building where like you and all the other drivers showed up every morning and went home from every night, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. No, sir.

Q. It was just wherever your route took you, versus wherever all the other drivers were going on their routes, correct?

A. Correct.

Q. Other than your trainer, did you ever drive or ride with any other NCI drivers?

A. No.

Q. And during your training trip, was that also like a three-week period where you were out with

him on a training stretch?
A. No, that was 30 days.
Q. Oh, it was longer than three weeks?
A. Yeah, it was longer than three weeks.
Q. Did you meet up with your trainer in Irving, Texas, after the orientation was done?
A. Yeah, after -- after the orientation, we met up at the -- the hotel that I was staying in from the company.
Q. When you were done with the training, that's when they -- you came back to Texas, and then you were able to go home to Monroe to gather your things, correct?
FOR READ AND SIGNING PURPOSES ONLY
A. Not immediately.
Q. Okay.
A. They -- they -- they gave me some loads. They gave me a few loads to get me to Shreveport, close as possible to Monroe.
Q. I see.
So you started in Texas, got loads until you got to Shreveport, and then you were able to take a break and go home?
A. Correct.
Q. And at that point, you were driving a vehicle that was owned by NCI, correct?

A. Correct.
Q. All right. So I want to talk little bit kind of just the -- the process of your job.
So I -- again, I've not -- I've never been an over-the-road trucker, so I apologize that I probably don't know all the terminology, but we've been talking a lot about loads, correct?
A. Correct.
Q. So your job is to pick up and drop-off loads of something, correct?
A. Correct.
Q. What kind of things were you picking up and dropping off for NCI?
FOR READ AND SIGNING PURPOSES ONLY
A. It will be like stuff like food products, like mayonnaise.
One of their num -- number one foods that they deliver is beef, so I -- I did quite a few of beef.
It will be -- I know they -- they deliv -- they'll pick up and deliver beer, alcohol beverages, and stuff like that. It'd be stuff similar to that, food products and stuff, and beverages.
Q. Were you driving like a refrigerated trailer most of the time?

A. Correct.
Q. Was it always a refrigerated trailer?
A. Yes. Yes.
Well, it might be refrigerated, but sometimes you didn't need the refrigerator on, stuff like that; but yeah, basically refrigerated truck, yeah.
Q. I see.
The trailer was always one that could be refrigerated, but sometimes the product wouldn't require it to be on?
A. Correct.

FOR READ AND SIGNING PURPOSES ONLY

Q. So if I'm an over-the-road truck driver, how do I find out like what -- what load I'm picking up and where? Like how does that information get to me?
A. They send you the -- the dispatch supposed to send you a -- a load, supposed to be able to accept or decline.
And if you accept the load, then you got to preplan for it, and you write down the addresses, and where it's -- what city it's in, you know, work on getting your route, what -- what highways you might be capable of taking to get there; and most importantly, make sure you get your timing down, so

you'll know if you're going to be able to deliver it or not.

If not then, you know, you've got to communicate with them, with your dispatch and stuff, and let them know you're not -- you're not going to make it, or you are going to make it.

Q. So dispatch starts by sending you a load --
A. Uh-huh.
Q. -- and then you said you have to accept or decline, correct?
A. Accept or decline.
Q. When you were working for NCI, were there like, you know, an expectation that you always accept? Could you decline? Like how -- how would you make that decision?
A. Well, they send you something, or he'll -- he might call. It depends on -- he might call with -- with NCI, but most -- most likely, he'll just -- he'll -- they'll type it in, send it to you, and you'll accept it, like you -- you start on your preplan. You start preplanning your route and everything.
Q. What would happen if you declined it?
A. Well, my terms, it would have been I didn't want that -- that, to me, that's money, that's --

FOR READ AND SIGNING PURPOSES ONLY

that's going to help me pay my bills and stuff, so if I decline it, that means I didn't want to -- to do it, or something like that.

Q. Were you allowed to decline them?

A. I can't remember if I was allowed or not, but I used to -- I used to accept all of my -- all of my loads that they give me. I used to accept all of them.

Q. So they would send you the information, you could accept or decline; and if you accepted, then you started doing the -- the preplan for how to go about completing the -- the route?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.

Q. And that included figuring out the timing of how to get to the pickup time on time, and how to get to the drop-off location on time, correct?

A. Correct.

Q. And how would this information be sent to you, the route information?

A. Through the -- through the tablet.

They have truck -- or tablets installed in the trucks, like most companies, and all the information will pop up on the tablet.

And once it pops up like, you know, you're going to accept it or not, or you call your

dispatch, let them know, hey, I ain't fixing to take it.

It pops up on the tablet, and then you -- you write everything down, what you're going to use the information for, because you have to write it on a piece of paper and stuff to -- when you fill out your receipts, and stuff like that, so you have to write it down, but it comes in through a tablet.

Q. So dispatch could get ahold of you through this tablet; they could send you information that way?

A. Correct.

FOR READ AND SIGNING PURPOSES ONLY

Q. And they could also, I assume, call you on the phone?

A. Correct.

Q. Was there any other way that dispatch would communicate with you?

A. No, tablet, on the phone; that's it.

Q. Was there a particular dispatcher who would communicate with you, or was it -- was it different dispatchers, you know, depending on the day?

A. Well, it's different at night, and -- and during the week, you get your assigned dispatcher.

When I was on my own, I had my assigned one. My assigned one was Robert, and at night, it

will be a mixture of different people at one time.
So you won't be talking to the same one if you need some help at night; it will be different people.
Q. Got it.
You said your assigned dispatcher during the day was named Robert?
A. Correct.
Q. Do you remember Robert's last name?
A. No, I don't remember Robert's last name.
Q. Do you know how Robert would decide what loads to assign to you?

FOR READ AND SIGNING PURPOSES ONLY

A. Repeat that for me one more time.
Q. Sure.
Do you know how Robert would decide what loads to assign to you?
A. No, I don't -- I don't -- I ain't understand how he was doing loads for me, because it -- it started out like he kept -- they kept me around Texas when -- when he first was my dispatch, and he slowly started trying to get me going different places.
Q. Do you know why he chose to keep you around Texas to begin with?
A. Not -- well, probably -- I don't know. Probably had something to do with training, or

probably had something to do to see if I was going to successfully complete some loads first, and then move on to -- to the long stretches.

Q. Are you -- is that an assumption on why he was doing it that way?

A. No, just, overall, just not sure what he was --

Q. Yeah.

A. -- doing.

Q. Yeah. Did you ever ask him why he was assigning them to you certain ways?

A. I ain't -- I ain't never asked him that, no. No, sir.

FOR READ AND SIGNING PURPOSES ONLY

Q. And then you said eventually you started doing routes that took you farther away than Texas?

A. Correct.

Q. And as a -- an over-the-road driver, was there like a limit to how far you could go?

A. No. It was supposed to be in all 48 states.

Q. So obviously not driving a truck to Hawaii, and not Alaska, either?

A. Yeah, we ain't go in them places, or we ain't going to Canada; it's just United States.

Q. Got it.

Do you know where the other drivers for NCI were driving their routes?
A. No, not that I know of.
Q. Was there any way for you to like track where other drivers were at any time?
A. No, not unless I seen them on the highway.
If I -- sometimes I do. I see them on the highway, but they'll probably be at a truck stop, or the same direction I'm going, or going in the opposite direction.
Q. So if you just happened to pass somebody on the highway, you would see another truck, another NCI truck, correct?
A. Correct, that, yeah, that -- that would happen.
Q. But that was just -- and so would you know somebody was there, just because you happened to see them there, but you wouldn't know where they were going or where they had come from, correct?
A. Yeah, correct.
Q. Other than your trainer who you drove with, did you get to know any of the other drivers?
A. No, none that was close to me.
Q. What do you mean by close to you?
A. Like because we -- we go to the facilities

FOR READ AND SIGNING PURPOSES ONLY

and stuff, too. Like they had me picking up loads at facilities, so I just never really -- I mean, you'll meet -- you'll see people in there, but you won't, you know, won't be kind of like be friends, or something like that, because you'll be waiting on a load or something, trying to get some rest, or warming up some food so you can go eat, and then get ready to leave.

So I used to see -- I see them at facilities, but I never like got close to meet them, like --

Q. So -- and that makes sense, right? I mean you're -- you're not driving with a team with NCI, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct. It was solo.

Q. So it's just you out on the road, and occasionally you'd see somebody else who worked for NCI; but I imagine you see lots of truck drivers from lots of companies all over the place, right?

A. Correct.

Q. Do you remain in contact with anybody from NCI, like now?

A. Not at the moment.

Q. What do you mean by not at the moment?

A. Like, no, none at all.

Q. Have you talked to anybody at NCI since your employment with NCI ended?
A. None, no, sir.
Q. And after you -- so let's go back to kind of the process.
So after you get a load, and you kind of go through the -- the -- the planning stage, you then drive to wherever you're supposed to pick up, correct?
A. Yeah, correct.
Q. And you'll have like a -- a -- a time at which you have to be there?
FOR READ AND SIGNING PURPOSES ONLY
A. Yeah. Sometimes it will be a day early, or sometimes it will be probably just -- I don't know. Sometimes you -- you've got to wait. It's just -- and sometimes it's a long wait. It depends on the delivery.
Q. So kind of help -- help me understand that.
So if I -- if I get assigned a load, is it going to say, be at this place in Texas at a certain time, or does it give me like a window of time to arrive?
A. Yes, it's like -- most loads are like certain times, because you can get there -- you can get there --

Like working with National Carriers, a lot of times I got there, but it still -- I had to wait, because I don't -- I mean, it's -- it's reefers, so it takes -- I guess it takes time for them to get the -- get the lumper fees, and all that there together to unload the trailer, so you -- you're going to have to wait, even if you do get there on time.

THE COURT REPORTER: Who unloads the trailer?

THE WITNESS: Ma'am?

FOR READ AND SIGNING PURPOSES ONLY

THE COURT REPORTER: Who unloads the trailer?

THE WITNESS: The warehouses do that -- that we -- we deliver at.

BY MR. WEISSLER:

Q. Oh, I think so when -- when -- when Ms. Hylton asks you questions, she's asking you to repeat what you said, because she just -- she just didn't hear it.

I think -- I think the word you used was lumper?

A. Yeah, lumper fees.

THE COURT REPORTER: Thank you.

THE WITNESS: Repeat that again.

BY MR. WEISSLER:
Q. No. She said thank you, so we're -- we're back. We're good.
All right. So just to make sure I understand.
Before you picked up a load, so you have a -- you have -- you have -- or let me ask, you start over.
Do you always have a trailer attached to your truck?
A. Yeah, doing OTR, yeah, yes, sir.
Q. So sometimes that trailer is empty, correct?
A. Correct.
Q. And so when you arrive at the pick-up location, you have to get people to load whatever product it is that you're going to be transporting onto your trailer?
A. Correct.
Q. And are those the people that you called lumpers?
A. Well, loading we normally don't have that problem. The -- the lumper fees normally don't -- don't take the toll until you deliver, and then you've got to -- the company got to pay for them to

FOR READ AND SIGNING PURPOSES ONLY

take the load off the trailer --
Q. I see.
A. -- so that's called a lumper fee.
Q. Okay, so let's -- let's focus on -- I know it's -- it's kind of mixed up, but let's -- let's kind of think like the sequence of a -- of a load.
So when I -- I have an empty trailer, and I'm told to go pick up a load somewhere, am I told a specific time to arrive to pick it up, or do I have like a window of time to arrive to pick it up?
A. A certain time to pick it up, or sometimes it depends on the -- how dispatch booked the load for you to have a window to pick it up.
FOR READ AND SIGNING PURPOSES ONLY
Q. So it could be, be there at 5:00 p.m., or it could be, be there -- what would be a typical window; like how much time?
A. Probably just -- probably just enough to get there. Like probably -- I -- I can't remember with -- with -- with National Carriers.
Q. Okay.
A. Yeah, I can't -- I can't remember the window.
I -- I just know it wasn't -- sometimes I had -- I knew it was a lot of waiting, a lot of -- some -- some days the routes would be short, but some

dates, it'd be -- it'd be long. That's -- that's all I remember with that.
Q. So you're told some kind of arrival time, and sometimes when you get there, you have to wait a while before your trailer gets loaded?
A. Correct.
Q. Do you know what would make you have to wait? Like what was going on?
A. It depends on what they -- it depends on the pickup, like what you're picking up: Frozen food, stuff like that, ice cream, or whatever.
It depends on, you know, what you -- what you're about to get.
FOR READ AND SIGNING PURPOSES ONLY
Like I said, the time, like everything is mostly appointment time.
Q. So you arrive at the -- at the pickup space. You said typically you didn't have to worry about lumpers there, so the -- you know, whoever you were -- the customer, right, was -- was able to load it at the first stop for you, so they would load your trailer wherever you were picking up?
A. Correct.
Q. And then you would drive with a loaded trailer to the destination for the drop-off?
A. Correct.

Q. And for the drop-off, would you have a specific time you had to drop-off, or was it like a -- like a deadline? How did the timing work for drop-offs?

A. It'll be -- it will be appointment time.

If anything past appointment, I know -- I know that they do do late fees, and stuff like that, so everything -- yeah, it's around appointment time.

Q. And when you say appointment time, is that like a specific time, like 10:00 p.m. on a Tuesday, or would it be like a window? How would that work?

A. Correct. Sometimes it will be in the PMs, it will be late night, early morning.

FOR READ AND SIGNING PURPOSES ONLY

Q. And it would be like a very specific time to be there?

A. Yeah, like 1:00, 2 o'clock in the morning, stuff like that.

It -- it -- it varies. It will be all different times of the day.

Q. Could you drop off early, like could you get there before your appointment time?

A. That I can remember, I don't think a lot of them would do that, because I think because it's reefer, and it's food product, so you -- you have to -- they want it on time, so they can unload it

without -- you know, I guess they have somebody to unload it and put it up, because it's food product.

Q. And -- and by reefer, you mean a refrigerated trailer --

A. Correct.

Q. -- correct?

A. Correct.

Q. For people who don't deal with trucks, reefer has a different meaning.

We want to make it clear that we're not referring to marijuana every time we say reefer.

A. Yes. Yes, sir. Yes, sir, that's what they call it, reefer --

FOR READ AND SIGNING PURPOSES ONLY

Q. Yeah.

A. -- reefer trucks.

Q. And that's the -- the name --

A. The trailers, I mean.

Q. Yeah, and that's the -- the name for the -- again, it just means it's refrigerated.

That could be frozen, or it could be like a refrigerator temperature, correct?

A. Yeah, mainly just food products and stuff, beverages and stuff like that; yeah, yes, sir.

Q. And so after you drop off a load, and it gets unloaded, at that point, sometimes you're having

to pay for a lumper to help unload the truck for you?
A. Yes.
Q. Or the trailer, I should say the trailer.
If you aren't able to get a lumper, do you have to unload it?
A. No, it's always going to be somebody; but you have to -- most of them recommend you -- recommend the company pay, pay the lumper fee before they unload, but I -- I never have to unload it.
Q. You were just the driver?
A. Correct.
Q. And what happened, kind of places where you -- were you unloading at? Were these like warehouses? Were these stores? Like where -- like where were you taking these products?
A. Warehouses, yeah, all of them --
Q. And then who --
A. -- was warehouses.
Q. And then who -- who were you paying the lumper fee to?
A. You will pay it to the warehouse that you're delivering to.
Q. And then the warehouse would provide the -- the personnel to unload the trailer?
A. Correct.

FOR READ AND SIGNING PURPOSES ONLY

Q. If it was an NCI location, would you need to use a lumper fee?

A. No, normally -- normally, when I deliver at a N -- at National Carriers, it's -- it's mainly like a trailer drop, so -- so I'll go in, and I drop the trailer, and I pick up an empty or something, and I keep going.

Q. I see.

Sometimes, if you're going to an NCI, like a terminal for them, there would be multiple trailers there, and for whatever reason you would drop off a trailer and pick up a different trailer?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.

Q. After you completed a trip, you would then wait to be assigned another load?

A. Correct.

Q. How long would it usually take after you completed a trip before you were assigned another load?

A. Sometimes it wouldn't take -- sometimes it wouldn't take long.

By the time that I know -- like if I -- if I deliver like something probably in the middle of the night, and then I'm empty, so I go in the sleeper, get ten hours, and then my dispatch being

off, he'll say he already had one ready for me, and stuff like that.

Q. Would you need to like tell dispatch that you were ready for another load?

A. No, he'll -- he'll know, because I guess the -- the computer, whenever you finish a load, you've got to put it in the tablet, you know, basically; and your paperwork, you've got to scan your paperwork, so it's something I guess they can see it on the tablet that you're finished with that load, and that's how.

So when he come in, he'll be able to look on it.

FOR READ AND SIGNING PURPOSES ONLY

And when he check me out, because he'll see I'm in the sleeper, and I'm getting ready to come out, you know, see if I'm still on that load or not, and he should be able to see that I'm -- I don't -- I'm empty, so I need a load.

Q. What do you mean by in a sleeper?

A. Rest, ten-hour break that you're required for that day.

Q. So would you make some sort of indication that you were taking your ten-hour break?

A. No, no, not necessarily.

Q. So he -- he would -- he can just tell --

A. I could just say I don't have --
Q. -- that?
A. I'm sorry. So ahead.
Q. No, you, please.
A. If I don't have a load, like once I -- I deliver, then it -- and I've already been driving for hours and -- and all day.
Then I just go ahead and shut down, and I -- I -- I wait until I come ready off my break, off my ten-hour break, and that's how I normally, it was kind of like set up with my dispatcher and stuff at the time.

FOR READ AND SIGNING PURPOSES ONLY

Q. And these -- the tractor that you were driving, it had like a sleeping area in it?
A. Correct.
Q. In between the time that you were -- that you dropped off a load, and before you were assigned another load, were you free to do whatever you wanted during that time?
A. Talking about between a load?
Q. Yes.
A. I won't say do whatever, because you can't -- it depends on if I needed something, or if I needed to go somewhere, like do a little grocery shopping or something for some food; but pretty much,

yeah, you were -- I mean, if you ain't -- if you ain't -- if you're off duty, if I was off duty, and I didn't have to deliver or nothing, yes, I could do -- go wherever -- not wherever but, you know, like in a little small radius, if I needed something.

Q. How -- When you say small radius, like what -- what do you mean by that?

A. Like to go to a nearby Walmart, or a grocery store, or something that, if I need some food or something. Or if I needed something for the truck to go grab -- if it was in like close by me, I could do it, probably.

FOR READ AND SIGNING PURPOSES ONLY

Q. Okay. How -- how far could you travel like in that -- in that situation?

A. PC, just some -- just not, you know, somewhere not too far than 25 miles, or something like that, just in a small circle.

Q. Was that -- the 25-mile limit, is that some thing that you're sort of saying now as an estimate, or was that like the specific range you were given when you were working for NCI?

A. No, they didn't give me a -- they didn't never gave me a range on the PC, on the personal conveyance.

It just -- I was always -- the trainer

used to say, if it's close by or something, because he used to do it -- you know, if it was close, then we could do it, you know.

When we got done with a load, he'll -- he'll PC, and we'll go to close by store, a Walmart.

Q. And -- and PC is what you -- is -- is the description for traveling in your truck that's not sort of like for NCI travel?

A. Correct, it's -- yeah, it's off-duty, off-duty personal conveyance.

Q. And so there was some limit as to like how far you could drive their truck and trailer for -- for your purposes, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.

Q. But also, during that time when you weren't under a load, like you could -- you could choose to use the time -- you could you rest, you could watch TV, you could be on the phone, correct?

A. Correct.

Q. Were there any other limits other than not being able to travel too far with their truck that were on you when you were on your own time?

A. None that I can remember.

Q. And then I've heard the phrase like a -- like layover, in the trucking world.

Is -- what does layover refer to, like layover time?

A. It's supposed to be the wait time.

So if -- if I'm somewhere waiting, and I make it on time and it -- it takes me forever to get unloaded, or something, it's supposed to -- it's supposed to be extra pay.

Q. Do you know how pay for layover worked at NCI?

A. I was still learning the system at the time, so to the best of my knowledge, I wasn't quite sure.

FOR READ AND SIGNING PURPOSES ONLY

I just know I never got it, you know.

All the wait time that I've done and everything, I know I never received it, so I wasn't sure how -- how -- how did they operate with it or work with it.

Q. Did you ever ask anybody how that would work?

A. No, sir.

Q. When you were working for NCI, would you have like a schedule for how many days you were sort of on duty versus off duty, that you could, you know, kind of schedule around; like I know I'm going to be working for three weeks, then home for, you know, a

certain number of days?
A. No, it wasn't -- it wasn't a schedule.
He never would like -- he wouldn't never book them, like -- like when I was with my trainer, he wouldn't never book them like back to back, back to back, so it was more likely one at a time.
He did -- he always did me one at a time, one at a time.
Q. So you have -- you would know one trip where you were going to pick up, and where you were going to drop off, and you wouldn't know the next one until after that trip was done?
FOR READ AND SIGNING PURPOSES ONLY
A. Correct.
Q. And I understand that -- that we talked about D-O-T, or DOT, already, the Department of Transportation. And as an over-the-road truck driver, you were subject to DOT regulations, correct?
A. Correct.
Q. And there's limits on how much you can drive, correct?
A. Correct.
Q. What are those limits?
A. Limits are, they don't want you driving when you're fatigued. They don't want you driving if you've got -- if -- if you've got medical issues, or

something like that, and you've got 11 hours to basically drive.

Q. Eleven hours in a day?

A. Correct.

Q. Is that like from when you start driving to when you finish driving, or if you take a break, does that count against your 11 hours?

A. No. You're recommended a break every eight hours. Every -- every eight hours, you've got to have a 30 minute, or you'll go on violation, so it -- it don't count. The break is -- is -- is with the 11- hour driving period.

FOR READ AND SIGNING PURPOSES ONLY

Q. So. And just to make sure I understand, so I can drive for eight hours, take a 30-minute break, and then I can drive for three more hours, to hit my 11 for the day?

A. I ain't going to say drive three more hours; but basically, yeah, you can drive three more hours, because traffic have been done -- made the clock run out, so -- but, yeah, basically, yes, sir.

Q. Okay. So the break time does not count as part of the 11 hours for my day?

A. Yeah, no, you -- you -- basically it's counted in there, because --

Q. Oh, okay.

A. Yeah, because you got -- you got to take your 30, so it's a break.
Q. So I drive for eight hours, I take 30 minutes off, I've only go two-and-a-half hours left on my 11 hours for the day?
A. Correct.
Q. Okay.
A. It depends on -- it depends on if you take more than one break, and stuff like that, and pulling over and stopping. You know, everything adds up.
Q. Did you have to keep track of how much you've driving, like personally?
FOR READ AND SIGNING PURPOSES ONLY
A. Personally --
Q. Like is there like a log that you're making notes in, or how are you doing that?
A. Well, by the miles. I was going by the miles.
Q. And are there -- are there any like weekly limits on how much you could drive?
A. Seventy hours in a week.
Q. Like seventy hours in -- in seven days?
A. Correct.
Q. Is there a mandated break between driving sessions? Like -- like my 11 hour day, how long do I have to wait before I can start my next 11-hour day?

A. You have ten-hour breaks, so after your 11-hour clock is -- is -- is completely gone, you -- you normally take, that's where you take a ten-hour break, a ten-hour break and --

Q. That's what you called your sleeper, earlier?

A. Correct.

Q. And then what about the weekly limit? Is there a -- like after I've driven my 70 hours, is there a certain amount of time I have to be off before I can start my next week's time?

A. Yeah, you're supposed to do -- supposed to do a 30 -- supposed to do a 34 reset, but National Carriers didn't want you to do that.

FOR READ AND SIGNING PURPOSES ONLY

Q. What do you mean?

A. They normally didn't want you to take a 34.

They wanted you to stay running, so you -- you managed to try to drive less than eight hours -- well, not less than eight hours, but less than 11 hours, just so your clock won't always go over the 70-hour limit for that week.

Q. I see.

So the -- the -- the reset was hit if you hit 70 hours; so as long as you stayed below 70 hours, that 34-hour reset wasn't triggered?

A. Yeah, pretty much.

Q. Was that something that did you have to track how many hours you had worked, to know if you were hitting 70, or was somebody else doing that for you?

A. No, it was -- I tried to do their -- their plan where -- because my trainer does it, too. He just -- to keep from rolling, that's how we was rolling. Like we didn't take a 34 --

Q. Okay.

A. -- with my trainer.

I don't even remember taking a 34 with my trainer, so it was -- it's somewhere below the 11-hour driving day period that we shut down early, and it keeps us from -- from having to take a 34 break.

FOR READ AND SIGNING PURPOSES ONLY

Q. And -- and your -- your trainer told you that -- that NCI did not want you to take a 34?

A. Well, that's what -- that's what they was recommending.

They said no, to keep you all from doing a break, to keep you all rolling, so --

Q. Who -- who told you that?

A. -- you drive probably eight, nine hours a day --

Q. Who -- who told you to --
A. -- and --
Q. -- to drive less, to avoid the 34-hour break?
A. Excuse me. You said, who told us?
Q. Yeah, who -- who at NCI told you that's what NCI wanted?
A. They had like people, veterans, people that had been working for the company, and they'll have them come in there and talk to us in orientation.
And they'll tell us like drive eight hours, nine hours, and it -- it's -- it does something to the clock, to keep you rolling, to keep you from having to do a 34.

FOR READ AND SIGNING PURPOSES ONLY

Q. And would you have preferred to drive more, and then take a 34?
A. Well, at the time, I was still feeling it out, like I was still learning, still learning, you know, system, their OTR system, the company, what the company requires from me, so it -- it really didn't matter.
Like I was just -- because I was trying to do -- obey by what they wanted from me to -- to give them what they wanted.
Q. Did you ever complain to anybody about not

being able to drive more each day, and then take a 34- hour break?

A. No, I never complained.

Q. Do you know if the way that NCI -- or sorry, let me start that over.

Do you know if the way that you understood NCI's sort of, you know, preferred plan, this don't have a 34-hour breakdown, do you know if that was in compliance with the DOT regulations?

A. From -- from -- from what my trainer showed me when I -- when I was doing it with him, because they would book him the loads, and I'm just -- basically, he's guiding me, showing me what he do, and how he do it, and letting me drive for, you know, more than eight hours, nine hours a day.

From what he was showing me, it was -- because he never took a 34, so I was trying to do it that way, so -- but it wasn't -- it didn't seem like it was against the rules, because he did it.

Q. Okay. Do you have any reason to believe it was against the rules?

A. Not -- not to the best of my knowledge, I don't.

Q. When you were out on the road, you mentioned things like going grocery shopping.

FOR READ AND SIGNING PURPOSES ONLY

Like were you responsible for your own expenses for things like food and -- and drink?
A. Correct.
Q. And did you ever have to get like a hotel, or were you able always to stay in your truck?
A. I got a hotel one time, that was -- that was when that incident happened, that non-preventable incident happened --
Q. So --
A. -- and I had to get the hotel to get reimbursed, but I didn't really -- I didn't really see the reimbursement, after turning in the receipt, so --
Q. So when you had the incident with the trailer drop, you had to get a hotel, because you didn't have access to your truck while it was being repaired --
A. -- correct.
Q. -- and you said you turned in a receipt, but you don't think it was reimbursed?
A. No.
Q. No -- no, you don't think it was reimbursed, or, no, what I said was not correct?
A. I don't think it was reimbursed, because it would have -- it -- I should have saw it on my check

FOR READ AND SIGNING PURPOSES ONLY

stub, and I don't remember seeing it.
It didn't say nothing about reimbursement or nothing on -- on my check stub, so I don't think --
Q. Did --
A. -- when I scanned it and everything, and turned it in, they didn't reimburse me.
Q. Did you ever ask anybody about that reimbursement?
A. At that time, I haven't, no. I didn't ask nobody about it.
Q. Okay. Why not?

FOR READ AND SIGNING PURPOSES ONLY

A. At that point, the non-preventable accident, I was kind of getting frustrated with them, because it -- it shouldn't never happened.
I shouldn't have been in an owner-operator truck. I -- you know, they told me the longer you do -- they was talking about the days, 90 day -- 90 days. If you do 90 days good in this truck, then we'll get you a -- a better truck.
So he did verify it before he even put me in that truck, but I was just frustrated with it, and confused at the time, so it wound up being I didn't ask about it.
Q. And the reason you were frustrated at the

time -- Let me start that over.
You didn't ask about the reimbursement because you were frustrated about the incident with the drop trailer, correct?
A. Correct.
Q. And the reason you were frustrated is because you believe that the drop trailer was the result of the -- of the truck being, I guess, inadequate, and you had been promised a better truck if you had driven that one successfully long enough?
A. Correct.
Q. Did you ever get a different truck?
FOR READ AND SIGNING PURPOSES ONLY
A. No.
Q. How long was your truck being repaired during the time that you had that incident?
A. I want to say about two days.
Q. Do you remember where you were when that was happening?
A. Kansas, Dodge City, at a hotel.
Q. And then during the time that you were in the hotel in Dodge City, and your truck was being repaired, were you able to work at all?
A. No, I wasn't, not --
Q. You --
A. -- until the truck got done.

Q. You had to wait for the truck to be repaired, correct?
A. Correct.
Q. Were you paid at all for the time that you had to wait for the truck to be repaired?
A. No, sir, I don't think I was paid.
No, no breakdown pay.
Q. You just referred to something called breakdown pay.
Is that something that's paid to drivers who are affected by a breakdown?
A. At certain companies.
FOR READ AND SIGNING PURPOSES ONLY
Q. Do you know if NCI had a breakdown pay policy?
A. I -- at the time, because I was still learning it, learning companies, and learning still trucking, that is something I never crossed a bridge even to ask with my trainer, because I never had that situation, never had that problem; so I didn't know to ask for it, or was it something they do.
I don't even recall looking at it through the orientation papers.
Q. When you were at orientation, did they give you a copy of like a handbook, or something like that?

A. Yeah, I do recall a handbook.
Q. Is that something you kept with you while you were out on the road?
A. I can't remember if I kept it, or if I left it home, so I can't remember if I have or not -- if I did or not.
Q. And that was -- you mentioned something that did not come up during your training period, because I assume that there was never a time where that person's truck, your trainer's truck, broke down, correct?
A. Correct.
FOR READ AND SIGNING PURPOSES ONLY
Q. And as an over-the-road truck driver, and you were paid by the mile, correct?
A. Correct.
Q. And your pay would be, in part, sort of based on how many miles you drove with an empty trailer to pick up, correct?
A. Correct.
Q. And then however many miles you drove with a full trailer to drop-off, correct?
A. Correct.
Q. And then in addition to that per mile rate, we've talked about a couple of things.
We talked about breakdown pay, which

you're not sure if NCI had, correct?
A. Correct.
Q. And I think we also talked about some sort of pay where if you were delayed waiting on a customer, or waiting on a drop-off, that there might be additional pay then, too, correct?
A. Correct.
Q. But you don't believe you received that pay, and you're not sure if NCI had that pay, either, correct?
MR. KATAEV: Objection --
THE WITNESS: (Inaudible)
FOR READ AND SIGNING PURPOSES ONLY
MR. KATAEV: -- to form.
THE COURT REPORTER: What was the answer?
MR. KATAEV: Correct.
BY MR. WEISSLER:
Q. Do you know if NCI had any other types of payments that driver could receive other than their per mile rate?
A. It was something to do about loads.
I do understand that one of the -- the drivers who was working with them for a long time, he used to tell us like since we was new, like be trying to get them to -- to give you beef loads.
The beef loads was supposed to be the

highest paid loads that's available that they have.
Q. Some sort of premium rate if you're driving beef?
A. Correct.
Q. Was that like an increase in the mileage rates, or was that an amount in addition to the mileage rate, if you were driving a beef load?
A. I -- I don't understand.
I didn't understand it, so if I'm not mistaken, it's -- it's got something to do probably with a mixture of the -- the mileage and the delivery, because it's -- it's -- that's their main source of the company, the beef, because that's -- that's what they mainly delivered in the ports and everywhere else across the United States.
Q. Did -- did you drive beef loads while you were working for NCI?
A. I -- I drove a couple of them.
Q. And do you believe you got paid some sort of premium amount when you were driving those?
A. No, probably with the trainer.
But I had a set pay then; but when I was solo, and I delivered a couple of them, it -- no.
Q. So you mentioned set pay during the train- ing.

FOR READ AND SIGNING PURPOSES ONLY

How were you paid during training?
A. Five hundred flat.
Q. Like $500 a week?
MR. KATAEV: He froze.
MR. WEISSLER: Oh, did you freeze?
Mr. Tiernan?
Let's go off the record.
THE VIDEOGRAPHER: The time is 1:48 p.m. We are now off the record.
(Recess taken)
THE VIDEOGRAPHER: We are back on the record. The time is 3:02 p.m.

FOR READ AND SIGNING PURPOSES ONLY

DIRECT EXAMINATION CONTINUED
BY MR. WEISSLER:
Q. Before our break just now, there was a question pending.
I'll refresh you on kind of what we were talking about, and then we can get back to that question.
I had asked about how you were paid during the training time, and you said -- I believe you said it was a $500 flat fee.
And then my next question was, was that $500 per week?
A. Yes, it was.

Q. And during training, did you receive any pay other than the flat $500 per week amount?
A. Yeah, that was all, pretty much all, through the training.
Q. Do you know how you were paid for orientation?
A. Orientation was 2 or $300 for the couple of days.
Q. And that was also a flat fee?
A. Yes, sir, yeah.
Q. And then after orientation, and after training, when you were driving solo, we talked about you were paid by the mile, correct?
A. Correct.
Q. And then we talked about some additional pay that you could receive, or that -- that might be possible.
We'll talk about some more of that in a little bit, but -- but other than -- or do you know what the by-the-mile amount was meant to pay you for?
MR. KATAEV: Objection --
THE WITNESS: Ah --
MR. KATAEV: -- you can answer.
Go ahead.
MR. WEISSLER: Yeah. If you understood

FOR READ AND SIGNING PURPOSES ONLY

the question, you can answer.

THE WITNESS: Some of it -- some of it was -- it's -- it's -- it's -- it was supposed to be a mixture of mile and delivery, from my understanding.

BY MR. WEISSLER:

Q. Like it paid you for the time that you were driving the truck, but also the time that you were delivering the -- the product?

A. Yes, sir, it was supposed to be, yeah, between the miles and the -- the delivery.

Q. Was it meant to pay for anything else, or do you know?

FOR READ AND SIGNING PURPOSES ONLY

A. Not -- not that I know of.

Q. You are currently an over-the-road driver, correct?

A. Correct.

Q. Do you get paid by the mile right now?

MR. KATAEV: Objection to relevance.

THE WITNESS: Yes.

THE COURT REPORTER: That was yes? Was your answer yes, sir?

MR. KATAEV: She's confirming your answer.

Did you just say yes?

THE WITNESS: Yes. Yes.

BY MR. WEISSLER:

Q. I don't know if it's just on my end, but it seems like there's a delay that's causing us to talk over each other.

I don't know if you're experiencing that, Mr. Tiernan?

A. No, I'm not experiencing it.

Q. Okay. We'll continue.

We're going to start by looking at some exhibits.

So I mentioned previously that I'm going to share documents that you'll need to look at on your device there.

FOR READ AND SIGNING PURPOSES ONLY

Once it's been displayed, you know, confirm that you've had a chance -- that you can see it, and then if you want to review any part of the document, if you need me to advance pages, or -- or change what I'm looking at, just let me know, and I can do that for you, okay?

A. Okay.

MR. WEISSLER: When we refer to the exhibits, we're going to refer to them by number; so this first one will be Exhibit 1, if I click on the right thing. Here it comes.

(Exhibit 1 marked.)
BY MR. WEISSLER:
Q. Okay. Do you see the document that's being shared as Exhibit 1?
A. Yes.
Q. It's a single page document. And if you look at the bottom right corner of it, there is three letters, NCI, and then some numbers afterwards. Do you see that?
A. You said at the bottom, NCI?
Q. NCI, and then some numbers.
I can zoom in on it, so you can see a little bit better. Did I -- there we go.
So down there, can you see that (indicating)?
A. It's MCI, you said?
Q. N, as in National, C-I.
A. Oh, N.
Q. And I'm highlighting it on the scr -- it should be highlighted on your screen in the bottom right.
A. Okay, I see it. I see it down there at the bottom.
Q. Okay. So that is what we call a Bates label, and it's numbers that we put on documents

FOR READ AND SIGNING PURPOSES ONLY

during litigation, just so we can -- we all know that we're looking at the same thing.

So when I put in an exhibit like this one in Exhibit 1, we'll often refer to in in the record by its Bates label.

So this document begins on Bates label NCI 88, and that way, we know we're looking at the same document, okay?

A. Correct.

Q. I'm going to zoom back out, so you can see more of the Exhibit 1, first page.

FOR READ AND SIGNING PURPOSES ONLY

Do you recognize the document that is Exhibit 1?

A. I recognize Buckhead Beef, the address, Dodge City, Florida.

Q. So you recognize parts of this document?

A. Parts of it.

Q. When you were working for NCI, do you recall seeing any documents that looked like this?

A. I can't say I do, it's -- it's been so many.

I done looked at a lot of different things, paperwork, and stuff like that. I can't -- I can't really remember what it exactly looked like --

Q. Okay.

A. -- but it -- it -- it seems like something I had before with National Carriers.

Q. Okay. In the top left of the first page of Exhibit 1, there -- it says Order #, and then there's a seven-digit number. Do you see that?

A. I see the Order #.

Q. When you were working for NCI, were loads sort of identified by numbers like this?

A. I want to say it was a different process, that we used to write them down, and then I was receiving them in.

I'm -- I'm not sure, because it -- it -- I don't remember it being all bunched up like this, but not -- not -- not necessarily --

FOR READ AND SIGNING PURPOSES ONLY

Q. Meaning --

A. -- to the best of my knowledge, I remember.

Q. So you don't -- meaning you don't remember seeing information about a -- an order or a load that looked like the information you're seeing in Exhibit 1?

A. Well, not like the Order #, like the areas to where I went to, and my pickups and stuff.

Like probably some of the dates, like if it was in the morning, or something like that, the cities, but I don't remember which order, like orders

that -- that it was sent to me in -- in that way.
Q. I see.
So when you saw the -- this similar information about where to pick up and where to drop off and order information, it -- it came to you in a different format than this?
A. I just -- it's -- it's been so many.
After that job, I had so many paperwork, documents, and stuff to look at, and tablets. Different companies have tablets.
I just -- like I say, I just don't remember it being bunched up, like because I used to write it down and everything, too, when I used to receive it on the tablet.
Q. Okay. Did you ever see like what the -- the screens looked like, or what the information looked like, the dispatchers were looking at when they were working with you at NCI?
A. I used to look at the screen and stuff on the tablet.
Q. And that was the information that was provided to you as a driver, correct, that you could see on the tablet?
A. Yeah, it -- it looked like some information I had.

FOR READ AND SIGNING PURPOSES ONLY

Q. Okay. Well, let's -- let's take a look at some other page here.

So just for the record, the Order # that's listed in the top left of the first page of Exhibit 1 is 3642214, and that's the same number that's on the page -- the first and the second page.

I should say, 3642214 are on these first two pages.

It looks like between the two first pages of Exhibit 1, the only thing that changes is information in the middle of the screen.

FOR READ AND SIGNING PURPOSES ONLY

On the first page of Exhibit 1 it starts with 0402, the middle section, where it says --

Do you see where someone has written, loaded call? Do you see that?

A. Loaded call, yeah.

Q. So that information changes from the first to the second page.

Now, there's different numbers, and it says empty call. Do you see that?

MR. KATAEV: Objection to form.

THE WITNESS: Yes.

BY MR. WEISSLER:

Q. Okay. Do you know what -- do you know what loaded call refers to?

A. Supposed to be a -- a -- a pre-loaded trailer.
Well, that -- that's when you let them know you're loaded, and you're in the process.
Q. Okay. And do you know what an empty call means?
A. That means when you're done delivering. It's -- it's empty, you're empty.
Q. Okay. Below, over on the second page of Exhibit 1 right now, below where it says empty call, there's a -- a line that says DISP Date/Time. Do you see that?

FOR READ AND SIGNING PURPOSES ONLY

A. Yes.
Q. And then it says 0402 1325.
Do you know what -- or do you know how to read that dispatch date and time?
A. I know they use military time, so if I'm -- if I'm saying it right, it's the -- the 0402 is the date, and the 1325 is military time within that order.
Q. Okay. And then below that, on the next line, it says DR 1, and then it says LEUA. Do you see that?
A. Correct, yes.
Q. Then after that, this says what it appears

to be a name, Amia Leu, A-m-i-a, and then L-e-u. Do you see that?

A. Yes.

Q. Is that the name of the trainer that you were mentioning earlier today?

A. Yes, that's -- that's the trainer that I was with.

Q. And then to the right of the trainer's name it says DR 2, and then it says TIEDA. Do you see that?

A. Yes.

FOR READ AND SIGNING PURPOSES ONLY

Q. And then after that it says your name, correct?

A. Correct.

Q. So it looks like on this load, your trainer was listed as Driver 1, and you were listed as Driver 2, correct?

A. Correct.

Q. If we go to the next page of Exhibit 1 -- this is Bates label -- I'm going to scroll to the bottom, so we can find it -- Bates label 90, NCI 90 down here, correct?

A. Correct.

Q. Okay. Do you recognize the document that is the third page of Exhibit 1?

A. It was a lumper fee receipt that we --
we -- he taught me how to -- my trainer taught me how to write down for the lumper fees.

Q. Okay, so this is a -- a document that's got some -- some barcodes on it, and then it says National Carriers, Inc., and then there's some fields that are -- are handwritten and filled out, correct --

A. Correct.

Q. -- including a trip number, a truck number, and a trailer number, correct?

A. Correct.

FOR READ AND SIGNING PURPOSES ONLY

Q. And there's also a date that's written there, as well, and that is April 2nd, 2023, correct?

A. Correct.

Q. Do you recall filling out forms like this when you were working for NCI?

A. Yes, for the lumper fees and stuff like that, I had to.

Q. And so -- and this is -- it's listed under Reimbursements, at the bottom, where it says Description, and then there's some pre-filled items, including Lumper, and then next to that, this says Amount, correct?

A. Correct.

Q. And that's where somebody has written $324?
A. Correct.
Q. Do you recognize the handwriting that's on the third page of Exhibit 1?
A. Not necessarily, but I'm assuming that it's my -- it was my trainer's handwriting.
Q. And the -- there is a Driver Name there, and the trainer's name is written on the driver name line name, correct?
A. Correct.
Q. Were drivers expected to fill this form out after completing a trip?

FOR READ AND SIGNING PURPOSES ONLY

A. Yes.
Q. There's also a line where it says Origin, do you see that?
A. Yes.
Q. Do you recognize what NBP Dodge City, Kansas, refers to?
A. I want to say that's the -- the origin was always where we picked it up from.
Q. Okay. And do you know what NBP means?
A. NBP, I never -- no, I ain't never understood that.
Q. Okay. And then underneath that, there's a line that says Destination, correct?

A. Correct.
Q. And is that where you typic -- is that -- is that where you would list where the load was dropped off?
A. Yes, in Florida.
In Florida. I remember that day.
Q. So -- so you remember this trip with -- with your trainer from Kansas to Florida?
A. From Kansas, because we had the -- what we picked up out of Dodge City was beef.
Q. And then you drove that beef from Dodge City, Kansas to Auburndale, Florida?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.
Q. Also on this form there's a line where it says Starting Odometer, correct?
A. Correct.
Q. And on the starting odometer line, it says 45,419.
I assume that's how many miles were showing on the truck odometer at the beginning of the trip?
A. Yes, supposed to be, yes.
Q. And on the next line, it says Ending, and then there's a number 46,573, correct?
A. Correct.

Q. And so that -- I assume that's the odometer at the drop-off at the end of the trip?
A. At the end of the trip, yes.
Q. I'm not able to do the math completely, but it basically shows that the truck drove, you know, a little over a thousand miles during that trip, correct?
A. Correct.
Q. The next line says Settlement Clerk, and then there's what appear to be the initials TL. Do you see that?
A. Yes.

FOR READ AND SIGNING PURPOSES ONLY

Q. Do you know what the settlement clerk is, or who that is?
A. Not necessarily.
We used to always -- we -- he just told me to always put the TL.
Q. And then you see where it says Dispatcher?
A. Yeah, and the abbreviation for your dispatcher --
Q. Okay.
A. -- what he used to tell me to write down.
Q. So like the initials of whoever your dispatcher was for the trip?
A. Correct.

Q. And we mentioned already the Reimbursement section that's below that. And this one is filled out for reimbursement for a lumper fee, but there's other possible reimbursements, including there's reefer fuel, correct?
MR. KATAEV: Objection to form.
THE WITNESS: Correct.
BY MR. WEISSLER:
Q. And it says washout, underneath it, as well.
Do you know what reefer fuel is referring to?

FOR READ AND SIGNING PURPOSES ONLY

A. The reefer fuel is the -- the trailer, the fuel for that trailer.
Q. Because the -- the tractor or the truck would require fuel to drive, but the reefer needed a separate fuel source to keep the refrigerator running?
A. Correct.
Q. And what about washout? Do you know what that refers to?
A. The washouts, yes, sir.
Q. Okay. What is that?
A. The trailer had -- the trailer washouts, we would -- it was supposed to be mandatory, when you

get done with a load, you've got to wash it out, because you can't go pick up any food product without it being washed out.
Q. And that was if you needed to be reimbursed for the cost that of washout, you would fill it on here?
A. Correct.
Q. The next line is Tolls, which I assume are like -- like highway tolls?
A. Correct.
Q. And then next it's Scales; and is that for weighing the truck?

FOR READ AND SIGNING PURPOSES ONLY

A. Yes.
Q. And the next line is Motel, is if you had to get a motel, you would turn in the reimbursement here?
A. Yes.
Q. And then there's two lines for Other.
Do you remember any other types of reimbursements that you could seek using this form?
A. Probably just normal stuff, probably like if you buy something for the truck, or anything like that, then they -- they supposed to reimburse you.
Q. And when you were buying things, like paying lumper fees or -- or paying for a washout, or

reefer fuel, were you using like a personal credit card to pay for those things, or how would you pay for them?

A. I -- I never used my own money for lumper fees, but I used to sometimes -- sometimes I pay for the scales, and I -- I -- I use my -- my bank card.

I didn't use a credit card.

Q. Like your -- your -- your personal bank card, or was it a company card?

A. I want to say company.

Yeah, I used the company card for those, yeah, we -- because we did, we had -- we had a company card. I used the company card.

FOR READ AND SIGNING PURPOSES ONLY

Q. And so if you paid for something like a lumper fee with the company card, you would use this form to fill out like, you know, presumably attach a receipt, to make sure that that got paid for?

A. I can't necessarily remember how I did it, but I remember it used to be the -- the pay go to, if I'm not mistaken, my phone, because they asked us our phone numbers when we get there to deliver, and they asked us for our numbers, and they send us the lumper fee receipt, and it was a process that we did through our phones.

So when it went through the phones, it --

we -- we paid it with the -- with the company, something with the company, a code or something that we get from the company, and they send us a receipt, and that's the receipt would be on our phones.

But some of them were different. Some of them, they give you a receipt. It depends on the warehouse, and what type of delivery, and if they're going to give you a receipt or not.

Q. The next page of this, of Exhibit 1, is NCI 91, and it is labeled as Straight Bill of Lading.

Do you know what a Bill of Lading is?

A. Yes.

FOR READ AND SIGNING PURPOSES ONLY

Q. What is the Bill of Lading?

A. The Bill of Lading is what -- basically what you're hauling and everything, and like pieces and stuff, and basically what you got.

Q. So it's a document that shows like when you pick up from the origin of your trip, basically what you picked up.

Like this one does show that you were picking up something called packing house products, 277 packages of packing house products?

MR. KATAEV: Objection to form.

MR. WEISSLER: Is that -- sorry. We can zoom in.

Is that what that -- is that what that says?

THE WITNESS: Yes, it's the package, the weight, and the stuff like that.

BY MR. WEISSLER:

Q. So for example, on -- on this page of Exhibit 1, where it says -- in the middle of the page, Description of Articles, Special Marks, Exceptions, and then below that it says 277 packing house products, correct?

A. Correct.

Q. And I think earlier you said that that was beef, or you -- or that's what you remember bringing there?

FOR READ AND SIGNING PURPOSES ONLY

A. If this is the -- the one going to Florida, it was beef.

Q. Yeah. If you look right above, it says Consigned to Destination, and it says Buckhead Beef in Auburndale Florida, correct?

A. Yeah, correct.

Q. So would you get the Bill of Lading when you picked up the product?

A. Yes.

Q. On the second page -- or sorry, on the next page of Exhibit 1 -- it's actually the fifth page of

Exhibit 1 -- this page is Bates label 92. We see a document that's called a Delivery Receipt. Do you see that?

A. Yes.

Q. Okay. Do you recognize this document?

A. Not the Delivery Receipt.

Q. You don't recognize this?

A. No, because when I was with my trainer, he -- he -- he took control of most of it, and just so he can get in and get out.

That's pretty much how he used to write that stuff, so I saw most of the stuff he did, but not all of it.

FOR READ AND SIGNING PURPOSES ONLY

Q. When you were driving by yourself, without a trainer, were you expected to, you know, deal with things like the Delivery Receipt?

A. Yes, most -- most of the time.

It depends on what I was hauling. It's different receipts for different products and stuff that you -- you was -- I was delivering.

Q. Okay. We're going to go to the -- to the last page of Exhibit 1, which is the sixth page. I'm going to rotate it, so it's easier for you to see.

This one is Bates labeled 93. You can see it now. It's on the bottom left, because we

rotated it; but this document, it's called Eclipse Advantage Inc. Receipt.
Do you know what this receipt is?
A. Not necessarily.
Q. Okay. It's for $324; and if we go back to the first page of Exhibit 1 -- or sorry, actually the third page of Exhibit 1 -- we'll see that that's how much the lumper fee was. Do you see that?
A. Yes.
Q. So going back to the sixth page of Exhibit 1, do you know if this is the receipt for the lumper fee that was mentioned on the third page?

FOR READ AND SIGNING PURPOSES ONLY

A. Yes, the same receipt, yeah.
Q. And there's -- there's sort of options for how it's paid, and -- and the one that's circled is check.
Were you able to pay by check for expenses?
A. I want to say some things was by a check, yes, it's -- I can't remember if it (inaudible) --
THE COURT REPORTER: I'm sorry, you broke up.
I can't remember --
MR. WEISSLER: Yeah.
THE WITNESS: Some of them --

THE COURT REPORTER: You broke up --
THE WITNESS: Yeah, some of them was paid by EF.
Can you all hear me?
MR. WEISSLER: Yes, now, we can.
THE WITNESS: Yeah, some of it was paid by EFS check.
BY MR. WEISSLER:
Q. What's an EFS check?
A. It's the company will send a code, and I have to put the -- I had to write down and use my license, and put their code on a check for it, to cash out, to like pay for it, pay for things.
Q. So you could request a code to authorize a --
A. Yeah.
Q. -- some sort of electronic check that you then paid?
Was there -- was there -- was there a hard copy check, or an electronic check that you used with the code?
A. It was more like a -- I don't -- I don't know what you call it. I just know companies use it.
They send a code. I write it down on the EFS check, and I put my information: The date, the

FOR READ AND SIGNING PURPOSES ONLY

time, and it -- it goes through, for me to get it.
MR. WEISSLER: Okay. All right. I'm going to stop sharing Exhibit 1.
We're going to get Exhibit 2 pulled up; one moment.
(Exhibit 2 marked.)
BY MR. WEISSLER:
Q. On your screen now should be Exhibit 2, which is a document that is labeled Driver Handbook, and it states -- or Bates label in the lower right-hand corner is NCI 1. I can --
A. Correct.
FOR READ AND SIGNING PURPOSES ONLY
Q. -- I can zoom in on that.
Do you see NCI 1?
A. Yes.
Q. Okay. And this is an 61-page document.
Do you recognize this handbook?
A. Yes.
Q. Is this a copy, or is this similar to the handbook you remember receiving when you did the orientation for NCI?
A. Similar, yes.
Q. I understand that you don't have a -- a whole copy of it in front of you, so if at any point during the questioning, if you want to look at a

particular part of it or, you know, go through it, just let me know, okay?
A. Okay.
Q. And we're going to look at particular sections of it.
I apologize. I'll try not to make you too ill clicking through pages, but I want to start with Section -- labeled Section 1, Blue Tree HOS, and that starts on Bates label NCI 7.
Do you know what Blue Tree HOS is?
A. Not to the best of my knowledge, I don't.
Q. Okay. On the second page of the Blue Tree HOS section there is a section labeled On-Duty Status Explanation --
A. Yes.
Q. -- do you see that?
A. On-duty Status. Yes, I see it.
Q. Okay. Earlier you mentioned the phrase off-duty. At least once you mentioned when you're off-duty, and you're using a vehicle, I think for PC. You referred to it as personal conveyance, these are on-duty.
What's the difference between on-duty and off-duty?
A. On-duty, your clock is running. You're

FOR READ AND SIGNING PURPOSES ONLY

getting loaded or getting unloaded or -- and you -- you checking in, moving the trailer around or some-thing, still being on-duty.

Off-duty is when you're probably -- you're not behind the wheel. You -- you step out of the truck. You're taking a break. You're either restroom, or using the bathroom, or you're buying something to eat, or doing something that's not involving being on-duty.

Q. In looking at some of these on-duty status explanations, the first one is -- it's just labeled on, and then it says, use that only if your activity isn't listed as on option, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.

Q. So that's sort of the generic on-duty code, on this list, anyway, and then there are others.

So the one right below it refers to performing a pre-trip inspection.

Did you have to do pre-trip inspections when you worked for NCI?

A. Yes, every day.

Q. What is a pre-trip inspection?

A. I had to inspect the tractor and the trailer, make sure that everything was safe for me to drive and make my delivery.

Q. How long would it typically take to do a pre-trip inspection?
A. Anywhere around probably 15, 20 minutes.
Q. The next one is post or performing a post-trip inspection.
Did you have to do those, as well?
A. Yes, every day.
Q. And how long would a post-trip inspection take?
A. Around probably like ten minutes.
Q. And you mentioned doing these every day; so if you had a trip that lasted multiple days, you were expected to do a pre-trip and a post-trip inspection at the beginning and end of every travel time on every day, or would you just do it once at the beginning of the trip and once at the end?
A. No, it's supposed -- it's every day, every day.
Q. The next one is labeled load, and it's described as being loaded at the shipper.
Do you know what that refers to?
A. Yes.
Q. So at the time that you are at the shipper location, and your trailer is being loaded by the shipper?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.

Q. How long would it typically take to load a trailer?

A. It depends on if they're working, because sometimes they -- they -- they be taking their time, or they just still working on somebody else's trailer, or they just waiting on a -- on a time, a certain time to -- to load your trailer up.

Sometimes -- sometimes you can be there on your appointment, and it takes longer than your appointment for them to load it. It -- it depends.

FOR READ AND SIGNING PURPOSES ONLY

Q. What would be the -- what would be like -- what would be sort of a typical amount of time, assuming that they started when you got there, for them to load your trailer?

A. I'm going to say probably after some of them go home, like if you make it to the warehouse somewhere after 5:00 or 6:00, that's normally when other people from the day shift go home, and then it's -- it's -- it's ready for the night shift.

So if you're probably coming in somewhere around that time, you'll probably be there longer than your appointment time, because you've got to wait on -- wait on them to get settled in to -- to start working.

Q. Okay. So I understand you're -- you're identifying situations that would cause it to take longer.

I'm saying a baseline, like what's --

Maybe let's ask it this way:

What's sort of like the minimum amount of time it would take to load the trailer, if everything went well?

A. If everything went well, it shouldn't take longer than -- it shouldn't take longer than 30 minutes. I'll say somewhere underneath 30 minutes.

Q. And then if -- if things went badly, so people aren't there, they're not ready, you're having to wait, like what's -- what's the upper end of sort of the, you know, of the load time? Is it, you know, an hour, two hours?

FOR READ AND SIGNING PURPOSES ONLY

A. Sometimes it can be longer than both of them, both of them, hour and two hours.

Sometimes you can be there about five hours.

Q. Okay.

A. It depends.

Q. And if you were there for five hours, I assume that's not five hours of active loading time; so presumably that's five hours where a lot of it is

waiting for the truck to be loaded?

A. Yes.

Q. Okay. Below load it says, not unsurprising, unload or UNLD.

How long -- let's start with everything goes well. How long would an unload take, typically?

A. Pretty much -- pretty much not that long.

Q. Can you --

A. Normally, it depends on, I guess, the day, like how -- how it is when you get there. Will they -- will they be ready for when you get there, because sometimes it takes them a minute to get ready to really start unloading your trailer.

FOR READ AND SIGNING PURPOSES ONLY

Q. Once they start unloading a trailer, how long would it typically take to unload the trailer?

A. Depends on the warehouse, and where you go.

Some -- some -- some people likes to work, so they like to unload it, and get you out -- in and out.

Some com -- some places you go, they take their time, or they just don't -- they take forever getting to it.

Q. So it's going to vary, warehouse by warehouse, and load by load, as to how long that takes?

A. Correct.
Q. Assuming it's a hard-working crew, and like what would -- is it ten minutes to unload; is it 30?
A. It should -- should be close about 30.
The same with just loading it up, if you're just organized and loading it up.
Q. So it could be -- if things went well, and it was a motivated crew, as little as 30 minutes of unloading time?
A. Correct.
Q. And I assume similar to loading, that if you're delayed, and it's not a hard-working crew, it could take longer, like five hours?
MR. KATAEV: Objection to form.
That assumes facts not in evidence, hypothetical.
BY MR. WEISSLER:
Q. Can you -- can you estimate how long it would take for like a -- like a long unload process?
A. A long unload process would be two to three hours.
It depends on if you make it on your appointment on time, so if I might not make it on my appointment on time, or if -- if I don't make my appointment on time, they'll probably make me wait,

FOR READ AND SIGNING PURPOSES ONLY

because they're unloading other trucks.
If I make it on time, it -- it depends. It depends on the warehouse, like if -- if -- if they are motivated and stuff, and trying to get me in and out.
Q. So the range for unloading times sounds like it'd be roughly 30 minutes to three hours, somewhere in there?
A. Yeah, some -- somewhere in there.
Q. The next code is fuel; and that's the time spent for fueling the tractor or reefer, correct?
A. Correct.
FOR READ AND SIGNING PURPOSES ONLY
Q. How often would you have to fuel the tractor, or the reefer?
A. Almost every fuel stop.
You're supposed to keep the reefer full at all times, so normally, whenever I -- I do a fuel stop, I make sure I put fuel in the reefer.
Q. How long would it take to fuel the reefer --
A. To fuel.
Q. -- or the tractor?
A. Probably around -- depending on if there ain't no -- a lot of trucks get fuel, so they keep you waiting; but if I can fuel, it's less --

somewhere less than ten minutes for diesel, def, and fuel for the trailer.
Q. The next codes are on the right, the one that's ACC, which refers to if you are in an accident and have to remain at the scene. I assume that's a code that you would use -- or sorry. Let me start over.
Do you remember having -- ever having to use that code when you were working for NCI?
A. I ain't never used that code.
Q. Okay. The next one is DOTI, which refers to an active DOT inspection.
FOR READ AND SIGNING PURPOSES ONLY
Do you know what that's referring to?
A. Yes, sir.
Q. Okay. What is that?
A. The active DOT inspection, so if -- if I'm probably passing through a scale or something, and they want to do a -- an active DOT inspection on me, something like that.
Q. Do you recall that happening when you were working for NCI?
A. No.
Q. And the next one is labeled drug, which is while you are taking a DOT drug screen.
Do you know what that's referring to?

A. A drug where you're taking?
I don't know what you mean.
Q. Were you ever -- Were you subject to drug testing while you worked for NCI?
A. Oh, yes, sir, yeah.
Q. And did you ever have to do a -- a DOT drug test while you were working for NCI?
A. No.
Q. Okay. The next one, I think it's -- it got kind of screwed up, because there's a code called HZMT, which it says it's performing a HAZMAT ti -- tire check.

FOR READ AND SIGNING PURPOSES ONLY

Do you know what that's referring to?
A. No.
Q. Did you ever drive hazardous materials for NCI?
A. No.
Q. The next one is labeled YARD, y-a-r-d, and it says performing a movement while on private property that should not be considered on-duty driving.
Do you know what that is referring to?
A. Yes.
Q. Okay. What is that?
A. Supposed to be what you're supposed to use

for -- instead of on-duty, it -- you're supposed to use the yard movement, if you're moving around the yard.

Q. I think earlier you referred to somebody as a yard dog --

A. Yeah.

Q. -- do you recall that?

A. Yes.

Q. And that's a -- that's like a truck that's used to move trailers around on -- on a single site, correct?

A. Correct.

FOR READ AND SIGNING PURPOSES ONLY

Q. Did you ever have to do any yard movements of trailers when you were working for NCI?

A. As far as just moving and getting a trailer, no, I -- I ain't never. I don't recall moving trailers for them.

If anything, it was getting an empty from a yard that I needed to go make a delivery and to go do a pickup.

Q. But you were -- there you were picking it up from the yard, and then taking it to the pickup, rather than taking it on the yard and moving it to a different place in the yard, correct?

A. Correct.

Q. If we scroll a little bit down -- this is on Exhibit 2 in the handbook -- we'll see there's -- it says, two options for off-duty. It says off-duty or PC, and we talked about PC earlier.

That's personal conveyance, correct?

A. Correct.

Q. And that's when you're driving the truck, but you're not doing -- it's not driving that's meant to like further the load or, you know, move -- move the trailer farther along on the path, correct?

A. Right.

Q. So that's like if you need to go to the store, or do something like a personal errand, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.

Q. And then the rest of the time that you're not driving a personal conveyance, the off-duty task is just off-duty, correct?

A. Yes, correct.

Q. And so you would use -- Do you recall using some sort of software to report what your status was while you were driving?

A. I can't remember how their -- how their tableting (sic) system was set up basically, but I -- I do recall myself trying to use the proper way,

because it was the way that the trainer was -- showed me.
Everything that I was doing was because of what I saw the trainer do.
Q. The bottom of the page, the last item -- this is page NCI 8 of Exhibit 2 -- it says lastly, I can assume in for you -- lastly, the sleeper berth option.
And you referred to a sleeper earlier, correct?
A. Correct.
Q. And that's when you are taking your -- your ten hours, or however many hours of rest, correct?
A. Correct.
Q. Do you recall reporting when you were taking your sleeper berth time?
A. Yes, all the -- all the time that I was -- if I was in the sleeper, I -- I made sure I put it down on the tablet that I'm in the sleeper.
Q. Just I'm going slow, so as to avoid causing too much --
All right. We've moved to page 21 of the handbook. It's labeled NCI 21, and this is Section 3, Paperwork. Do you see that?
A. Yes.

FOR READ AND SIGNING PURPOSES ONLY

Q. And 3.1 is labeled Trip Envelope. I'll zoom in a bit.
And this looks like a -- a very similar document to what we looked at as part of Exhibit 1, correct?
A. Correct.
Q. Do you remember the name Trip Envelope, to describe this document?
A. Yes, I remember Trip Envelope.
Q. Okay. And at the top, there's a -- it's a, you know, numbered sections to label things.
No. 1 is the envelope number, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.
Q. And then under that is -- again, that form is very similar to the one that we looked at for your training trip in Exhibit 1 -- excuse me, and then each one, each section is labeled, correct?
A. Correct.
Q. You'll notice that the labels match up with how you described them earlier.
We'll go to No. 13 where it says All Reimbursements. Do you see that?
A. Yes.
Q. Then under that, it says National Carriers' paperwork is meant to be as simple as possible. Most

items such as truck and trailer number are self-explanatory. That's what it says, correct?
A. Correct.
MR. WEISSLER: It might -- I'm going to just real quickly -- it might be just on my end.
I don't know if Andrew is seeing it, too, but it looks like the video is moving inconsistently, all of the sudden.
THE VIDEOGRAPHER: Just -- just a slight bit. Nothing too crazy on my end, but I am monitoring that, yes.
MR. WEISSLER: Okay. Yeah, thank you.
FOR READ AND SIGNING PURPOSES ONLY
Okay. So do you agree that National Carriers' paperwork was as simple as possible?
THE WITNESS: Not necessarily, not -- not on my behalf, from what I experienced.
BY MR. WEISSLER:
Q. Okay. Why not?
A. Because I -- I seem like when I got done with the trainer, everything that he basically taught me, it just -- it really wasn't working for me.
I don't know if it was my dispatcher, or just the -- the system that was set up that I tried to learn, but it -- it -- it seemed like it wasn't working for me.

Q. Do you remember anything specific about the paperwork that was not working for you?
A. I don't think it was the paperwork.
It was -- I think it was just probably the dispatcher and stuff, and the system and just couldn't -- like because I was doing -- I was doing from my -- from my best knowledge, I was doing everything that I was taught, so I don't think it had nothing to do with the paperwork.
There probably was a few things I -- I didn't -- I probably would forget, because I was still trying to catch on, but I don't think it was the paperwork.

FOR READ AND SIGNING PURPOSES ONLY

Q. Okay. So I apologize.
Just to repeat the question I asked you earlier, and just make sure that I get the right answer here, that -- that you said want you meant --
I asked if you agreed that the paperwork was a simple as possible. That's the statement that we see here in Exhibit 2.
MR. KATAEV: Objection to form and opinion testimony.
You can answer.
THE WITNESS: Well, everything is labeled.

It's -- it's -- it's basically, if you read it, it will tell you everything, so it's -- it's, yeah, it's simple --

BY MR. WEISSLER:

Q. Do you recall --

A. -- if you read it.

Q. Sorry. Go ahead.

A. No, I said -- no, I was saying if you -- if you read it and everything, it -- it seemed like it's simple.

Q. Do you ever recall going back to the handbook or any other reference when trying to fill out paperwork?

FOR READ AND SIGNING PURPOSES ONLY

A. No. I used to call, when I -- if I have a problem with something to -- to write it down, I called my trainer.

He will -- he still left his phone available for me to call.

So he said he would help me out, even if he's with another student. He said he'll -- student driver, so I used to call him and ask him questions.

Q. Do you remember any of the specific things that you called him about?

A. Just situations with -- yeah, I did call him a few times for the paperwork and everything.

Probably called him about preplanning, if I -- if I went somewhere out of Texas for a delivery or something.

I can't tell you exactly what it was, because I really don't remember that.

I remember I had a few phone calls with him about stuff that I was trying to find out about.

Q. Do you remember if when you called him, he was able to give you the information that you needed?

A. Yes, ev -- every time.

Q. Going back to the paragraph that we were looking at in Exhibit 2, NCI 21, the sentence after self-explanatory begins, however, all reimbursable expenses must have a receipt with them. Do you see that?

A. Yes.

Q. Was it your understanding at the time that you had to turn in a receipt in order to have reimbursable expenses reimbursed?

A. I thought when I was working there, we -- the way it was was if you buy it out-of-pocket, if you buy something, you -- you make sure you keep the receipt, and if you -- if you use the card, too, if I used the company card, I was supposed to, for the receipt.

FOR READ AND SIGNING PURPOSES ONLY

Q. Okay. And it says that receipt must show how it was paid. You will not be reimbursed for scales or other items purchased with points, correct?
A. Correct.
Q. Do you know what -- what it means by purchased with points?
A. I'm thinking -- I'm thinking they're talking about like if -- if I go to a truck stop, and what we -- points is the points you get off a truck stop.
Q. Oh, like loyalty points, for going --
A. Yeah, like -- yeah, like loyalty points.
FOR READ AND SIGNING PURPOSES ONLY
Q. Okay. The next line says if you have any questions about what will or will not be reimbursed, call before, and discuss it with your Driver Manager, correct?
A. Correct.
Q. Who was your Driver Manager while you were driving for NCI?
A. RJ. His first name was Robert. I forgot his last name.
Q. Do you recall talking with RJ about any reimbursable expenses?
A. No.
Q. Do you see at the bottom of that page, it

says settlement clerk assignments are based on the first letter of your last name; and then on the left, it says Company Drivers. On the right, it says Contractors and WFA Drivers.

Do you know what the difference between those groups of drivers was?

A. The difference is company is -- company has got to use the company name, and I guess the contractors got to use different names.

Q. You were a company driver, correct?

A. Correct.

Q. And your last name starts with a T, so it indicates that your settlement clerk was Amy Lancaster; does that sound right?

FOR READ AND SIGNING PURPOSES ONLY

A. AL, yes, correct.

Q. Do you remember Amy Lancaster?

A. Not at all.

Q. Would you have direct contact with settlement clerks?

A. I ain't never spoke with one. I don't -- I don't recall.

Q. Do you remember ever trying to call Amy or any other settlement clerk to talk about any of your settlement receipts or statements?

A. Not at all.

Q. Okay. The bottom of the page, in bold and italics, it says, remember to scan this page first when scanning your paperwork in. Do you see that?
A. Yes.
Q. When you were submitting reimbursements and this envelope, you were scanning it with your -- with a device of some kind?
A. The tablet.
Q. And you would use that tablet to then scan in this page, and then any other documents that you were submitting with your envelope?
A. Correct.
FOR READ AND SIGNING PURPOSES ONLY
Q. If we look at Exhibit 2, page 22, we see that there's an example of a Delivery Receipt. Do you see that?
A. Yes.
Q. And this looks similar to the Delivery Receipt we looked at in Exhibit 1, correct?
A. Correct.
Q. But you didn't remember dealing with this specific type of Delivery Receipt, correct?
A. Correct.
Q. At the bottom of page 23 of Exhibit 2, there's some discussion about paying lumpers; and we talked about lumpers are the people who at a

warehouse help unload your truck, correct?
A. Correct.
Q. Did you have discretion as to whether to hire a lumper or not?
A. You ain't got no option. That's -- they recommend that, a -- a list.
I don't know, like I heard some people will -- owner-operators might have something like a pallet jack or something, a pallet something back there, and do it theirself; but most people pay -- most companies pay the lumper fee --
Q. Got it.
FOR READ AND SIGNING PURPOSES ONLY
A. -- to get it unloaded.
Q. So you, as a company driver, you -- you had no way to unload a truck, so you had to pay the lumper fee, if there was nobody else there to -- to unload the truck for you?
A. Yes, you -- we always had to pay.
Q. On page 25 of Exhibit 2 of the handbook, this is NCI 25, there's a section labeled 3.4 Comcheks. Do you see that?
A. Yes.
Q. Earlier you talked about a check that you needed to get a code to authorize it, and then once you got that code, you could then use the check to

pay for things, correct?
A. Correct.
Q. I think you referred to them a, like an EF check before.
Is that the same as a Comchek?
A. I want to say similar, but not similar.
It's just different checks, different systems that they use to pay.
Q. Okay. Did National Carriers, when you were working for them, use both systems, or did they just use Comcheks, and you used those other systems somewhere else?

FOR READ AND SIGNING PURPOSES ONLY

A. I can't remember what they use.
It could have been a Comdata check, but I can't -- to be honest with you, I can't remember, because it -- we used to pay -- like I said, most of the time, I didn't use a check.
I mean sometimes, it was -- it was rare that I used a check; but mostly if it was something, they sent it to me on the phone, but yeah, I don't -- I don't remember how -- how -- what their checks and stuff was.
Q. Okay, so you -- you may have used Comcheks while you were working there, but you don't remember specifically using this -- this type?

A. Yes, because I ain't used that check in forever, if I used it.
Q. And by forever, you mean since you worked for NCI in 2023?
A. Probably so. That's why I don't remember it.
Q. And so the bottom of this form, or the bottom of this document, on page NCI 25 of Exhibit 2, it describes like how to get the codes, and where to request them, including, they call them Express Codes.
Do you recall requesting codes from managers or dispatchers to authorize these kinds of payments?

FOR READ AND SIGNING PURPOSES ONLY

A. Yes, I -- I -- yes.
Q. And it uses examples of things like a hotel room, or a trailer worsh -- wash, that kind of thing?
A. Yeah, trailer wash and, yeah, and deliveries and stuff, yeah.
Q. Sorry. One more page.
On page NCI 35 of Exhibit 2, there's a section labeled 6.2 Stop Pay. Do you see that?
A. Yes.
Q. Okay. Do you know what stop pay is?
A. Stop pay, I'm thinking is supposed to be --

it was -- it got something to do with the stops, stops that with multiple stops, or stops that we were supposed to be getting a little extra pay, or some-thing like that.

Q. Do you know if you ever got paid stop pay while you were working for NCI?

A. I don't think I have.

I don't know. I couldn't tell the difference, because my checks was -- my checks wasn't -- I don't know. My checks wasn't the way I used -- I thought they was going to be, so it just -- I don't -- I don't recall.

FOR READ AND SIGNING PURPOSES ONLY

Q. Do you ever recall a time where you thought you should have gotten a stop pay, but did not?

A. Several times I thought I was -- yeah, I thought I was supposed to get some type of boost on my check from the stops, the distance that I was delivering.

Q. And it says under Stop Pay in the handbook here in Exhibit 2, it says company drivers are to be paid $20 per stop, with the exception of the shipper and the final stop, correct?

A. Correct.

Q. And then there's different rules for contractors; but those wouldn't have applied to you,

correct?

A. Correct.

Q. Under 6.3 below that, it says Detention Pay.

Okay. Do you recognize, or do you -- do you know what detention pay is?

A. Yes.

Q. Okay. What is detention pay?

A. If your arrival time -- you should get detention pay if they take a certain -- if they take longer than a few hours of a certain amount of time to unload, and you arrived on time, you're supposed to get a certain amount of pay added to your check.

FOR READ AND SIGNING PURPOSES ONLY

Q. And it says for company drivers, the detention pay is supposed to be $10 an hour, correct?

A. Correct.

Q. And that starts after two hours of delay at the customer?

A. Correct.

Q. Do you recall ever receiving detention pay?

A. I don't recall seeing it on my check stubs; like when -- when I look at my check, I don't -- I don't recall seeing none of it on my check.

Q. Do you recall ever requesting detention pay?

A. Not necessarily.
Q. Underneath this is something called layover pay, and I think actually you referenced layover pay earlier in the deposition today, correct?
A. Correct.
MR. KATAEV: AJ, when you're ready, I'd like a two- minute break.
MR. WEISSLER: Sure. There's a question pending right now, so let's -- let's do a couple more, then we'll take a break.
MR. KATAEV: Sure.
THE WITNESS: Repeat that question for me again.
FOR READ AND SIGNING PURPOSES ONLY
MR. WEISSLER: Sure.
We talked about layovers earlier during the deposition, correct?
THE WITNESS: Correct.
BY MR. WEISSLER:
Q. And I think earlier, the way you described layover pay or layover time, upon looking at the handbook, it sounded more like what would be called detention pay.
I think you described it as when you arrive at a customer, and you're delayed, and not able to leave right away. Do you recall that

testimony?
A. Yes.
Q. So in the handbook, at least, that's referred to as detention pay.
And then we have layover pay, which is if you are -- have more than 24 hours between loads, correct?
A. Correct.
Q. So that would be a situation where you complete a load, and for whatever reason, you're not assigned another load for more than 24 hours, correct?
FOR READ AND SIGNING PURPOSES ONLY
A. Correct.
Q. And then you get, during that time, $10 an hour, up to $50 per day, where you're not assigned a load, correct?
A. Correct.
Q. Do you recall ever receiving layover pay?
A. Not -- not to the best of my knowledge, I haven't.
Q. Okay. Do you recall ever having a time where you went more than 24 hours without being assigned a load?
A. Not necessarily, no.
MR. WEISSLER: Okay. All right, we can

take a break there.

MR. KATAEV: Thank you.

I'll be right back.

THE VIDEOGRAPHER: The time is 4:14 p.m.

We are now off the record.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record. The time is 4:27 p.m.

DIRECT EXAMINATION CONTINUED

BY MR. WEISSLER:

Q. Before our break we were looking at Exhibit 2, which is the Driver Handbook. We're going to go back to that.

FOR READ AND SIGNING PURPOSES ONLY

Can you see Exhibit 2 on your screen again, Darrin?

A. Yes, I can see it.

Q. Okay. We were looking at page NCI 35 in Exhibit 2, and we looked at layover pay and detention pay.

Below is something called HAZMAT Pay.

You said did you not do haz -- hazard material, driving for NCI, correct?

A. Correct.

Q. There's also something called Intercity Pay, which is an additional amount paid for shuttling

trailers within a city, and I believe you said you didn't do any of that, either, correct?
A. Correct.
Q. Going to NCI 36, there was a -- for company drivers, there's a $50 fee for delivering into New York City.
Do you recall ever doing that?
A. No.
Q. It mentions tolls as being something that was paid through like an EZ pass or a PrePass, correct?
A. Correct.

FOR READ AND SIGNING PURPOSES ONLY

Q. Do you recall ever having to pay for a toll and being reimbursed for it?
A. I don't think I ever paid for a toll.
Q. Below that there's a Section 6.10 called Home Time. Do you see that?
A. Yes.
Q. Okay. What is home time?
A. Home time was when we -- I was scheduled to be home, when you're scheduled to be home.
Q. Was home time paid time, or was it just time off at your like home location?
A. Time off at your home location.
Q. There's also a reference to rider and dog

pay or not pay, sorry, Rider Policy and Dog Policy.
Did you ever have passenger or a dog with you when you were driving for NCI?
A. No.
Q. Skipping ahead in the handbook to NCI 43 of Exhibit 2, there's a section called 6.19 HOS Quick Reference. Do you see that?
A. Yes.
Q. And I believe HOS here is referring to hours of service, correct?
A. Correct.
Q. And we talked about the hours of service rules that applied to you as a driver for NCI earlier, correct?
A. Correct.
Q. And those are the -- the Department of Transportation regulations?
A. Yes.
Q. Okay. Just take a moment to review the quick reference here, and then let me know if -- if anything you -- you said earlier about the hours of service that apply is inconsistent with -- with this handbook policy.
MR. WEISSLER: What happened?
MR. KATAEV: Nothing. Forgive us.

FOR READ AND SIGNING PURPOSES ONLY

Please continue.
MR. WEISSLER: Okay.
THE WITNESS: All right. Repeat the question for me again.
MR. WEISSLER: Yeah, sorry. I got momentarily distracted by a noise.
So earlier we talked about the -- the rules around driving and the hours of service; so my question is just the -- you know, is any of this, you know, different than or inconsistent with what we talked about earlier?
THE WITNESS: Yes, it's -- it's -- yes, it's consistent with it.

FOR READ AND SIGNING PURPOSES ONLY

BY MR. WEISSLER:
Q. Okay. There is an mention of the -- of a 14-hour rule here.
I don't think we talked about that one specifically earlier, and that is that you cannot drive beyond the 14th consecutive hour after coming on duty, following ten consecutive hours off duty, correct?
A. Correct.
Q. Meaning after your ten-hour sleeper time, if you're -- all the driving that you have to do the next day has to be done within 14 hours, correct?

A. Correct.
Q. Below, there's another reference to personal conveyance that we talked about earlier, and it says that you are allowed the use of personal conveyance while employed with National Carriers, and then it says any misuse or abuse will result in suspension of this privilege, correct?
A. Correct.
Q. And that misuse or abuse would be what you were talking about earlier, which would be driving too far outside of sort of the radius on some personal errand, correct?
FOR READ AND SIGNING PURPOSES ONLY
A. Correct.
Q. At the bottom of page NCI 43 of Exhibit 2, there's a reference to something called a referral bonus. Do you see that?
A. Yes.
Q. Did you ever qualify for or receive a referral bonus while you were working for NCI?
MR. KATAEV: Objection to relevance.
You can answer.
THE WITNESS: (Inaudible)
THE COURT REPORTER: I'm sorry?
THE WITNESS: None at all, no.
THE COURT REPORTER: Thank you.

BY MR. WEISSLER:
Q. The next page of Exhibit 2, NCI 44, is labeled 6.22 Settlements. Do you see that?
A. Yes.
Q. Do you know what a settlement is?
A. The pay.
Q. So this is a sample of a document that would be used to describe your pay?
A. (Inaudible)
Q. Did you receive settlement sheets while you were working for NCI?
THE COURT REPORTER: I didn't hear an answer on the last question.

FOR READ AND SIGNING PURPOSES ONLY

MR. WEISSLER: Oh, I'm sorry.
THE COURT REPORTER: What was the answer on the last question?
MR. WEISSLER: I heard him say yes, but maybe I -- maybe I misheard.
THE WITNESS: What -- what was the last question?
(Court reporter read back question.)
THE WITNESS: Yes.
THE COURT REPORTER: Thank you.
THE WITNESS: Yes, ma'am.
BY MR. WEISSLER:

Q. And then did you receive settlement sheets like this while you were working for NCI?
A. I don't recall any settlement sheets like this.
Q. Do you know if a settlement sheet like this was available to you?
A. No.
Q. No, you don't know, or, no, they were not available to you?
A. No, I don't know.
I ain't never saw this before.
Q. When you were working for NCI, you had, you believe, a copy of the handbook, correct?
A. Correct.
Q. And do you recall ever looking through the handbook for information like -- like this in 6.22 describing settlements?
A. I saw -- I think I saw settlements on there, but it -- it -- it didn't come, to my knowledge, to use it because, I mean, I was already looking at my check stub, and determining what -- what my pay should be and stuff, but I didn't -- I didn't use it for -- for -- for settlements and stuff like that.
Q. If we look at this sample of a settlement

FOR READ AND SIGNING PURPOSES ONLY

sheet, it has on the top part it's labeled, or it says, you know, Check Dated, and this -- this example has April 8th, 2011, correct?

A. Correct.

Q. And then below that there are rows of data that start on the left with the Date to Pay, and then it says Unit Number. Do you see that?

A. Yes.

Q. Any idea what unit number is referring to?

A. No, I don't.

Q. Okay. And then next to that, it says Order #. Do you see that?

FOR READ AND SIGNING PURPOSES ONLY

A. Yeah, I see Order #.

Q. And I think we've been -- we've seen some documents that have Order #, being like a trip number.

A. Right, trip number, so --

Q. And then there's information about a dispatch number and a dispatch date.

Do you know what the dispatch number refers to?

A. No.

Q. Okay. Do you know what the dispatch date refers to?

A. No.

Q. And there's another row or column that says Empty Date.
Do you know what that refers to?
A. No.
Q. And the next column says Type of Pay, and if you look down that column, it says trip pay a number of times, and then it says stop pay at the bottom.
I can zoom in more, if it helps.
Do you see that?
A. Yes.
Q. Okay. Do you know what trip pay refers to?
A. The -- the pay of the trip that was done.
Q. And that appurs -- that appears to be based on miles, and then a rate per mile, correct?
A. Correct.
Q. And then the stop pay below appears to be in $20 increments, which would be consistent with that stop pay policy we looked at previously, correct?
A. Correct.
Q. And then at the bottom of that first section there's a yellow label that says Total Gross. Do you see that?
A. Yes.

FOR READ AND SIGNING PURPOSES ONLY

Q. And then there's a -- if I scroll a little bit to the right, do you see there's a number there, and they -- they covered it -- I think they covered it up with a yellow area, but it would be presumably the total gross pay to which the person or what -- what the person earned for that statement, correct?

A. Correct.

Q. And then there's a middle section that says Taxes. Do you see that?

A. Yes.

Q. Do you recall taxes being deducted from your pay?

FOR READ AND SIGNING PURPOSES ONLY

A. Yes.

Q. Next we have something called Travel Allowance, and there's a per diem.

Were you entitled a per diem, while you were working for NCI?

A. I can't remember.

I want to say, probably so.

Q. This looks like it's $.10 per mile for this per diem.

Do you remember if you received a $.10 per mile per diem?

A. Ah, I can't -- I can't remember, because I used to look at just all the -- the check stubs.

It's probably the way the check stubs was coming out, that's probably why, because some companies got it organized, you'll see a per diem, the -- whatever allow -- allowance, the reimbursements, and all that be on your check stubs.
Q. Okay, but you don't re -- do you recall whether the check stubs for NCI had all that on there?
A. No.
Q. No, you don't recall?
A. No.
Q. Sorry. Just to be clear, it was a bad question, so I'm asking, do you remember if it had that on there, or are you saying it did --
A. No.
Q. -- not have it on there?
A. No, it -- it didn't.
It didn't have it on there, not that I saw on my check stubs.
Q. Okay. If we keep going, there's a section called Reimbursements. Do you see that?
A. Yes.
Q. And there's a number of reimbursements labeled Comdata fees, and it says 2.05.
Do you know what that would refer to?

FOR READ AND SIGNING PURPOSES ONLY

A. No.
Q. Okay. Then it says company driver meat, $190.
Do you know what that refers to?
A. No.
Q. Okay. If we keep going down, there's -- there's other reimbursements, but they have similar labels.
If you keep going down one, there's one that's called load/unload, and says $50.
Do you have any idea what that would refer to?
FOR READ AND SIGNING PURPOSES ONLY
A. Load/unload?
Q. Yeah, right --
A. No, I don't.
Q. Yeah, okay. I can highlight them. That's load/unload right there.
All right. Going down there's a next section called Deductions. Do you see that?
A. Yes, I see it.
Q. Okay. And these deductions, a number of them are listed as advance to com.
Do you know what that's referring to?
A. Advance to com, no.
Q. When you were driving for NCI, could you

use either a company card or those Comcheks that we talked about, to get advance payments for things?

A. I think you can use the card; but the last time I recall, I think you got to ask, so if -- if I did an advance, I -- I -- if I did an advance, I had to ask, if I'm not mistaken, before they can guarantee it and let me issue -- and issue it to me so I can take it off the card.

Q. So as a driver, right, when you go out on a trip, you get paid at the end of the trip, correct?

A. You get paid at the end of the week, but that -- from the end of the trip, it goes on your paycheck.

FOR READ AND SIGNING PURPOSES ONLY

Q. Meaning you're -- you're not paid anything for a trip before the trip, correct?

A. Correct.

Q. You're paid afterwards, like when the trip is complete?

A. Correct.

Q. And so if you have expenses during the trip, but before you get paid, you're able to request and have some of those approved to be paid for through this advance process?

A. Yes, if I ask for it.

Q. And that's -- you mentioned before, they

would have to give you like a code or something that would -- you could put on a check to get, you know, one of those things approved, so they would pay out from the company, you know, a Comchek, or whatever data, or EF check process?

A. Yeah, it depends on what -- what it was.

If -- if I'm trying to purchase something or, you know, personally, it -- it probably be on a card where I can just go to an ATM, or something like that.

Q. And then if it was a -- a business expense that you used the card or one of those checks for, you would turn in, you know, the -- the receipts, and then it would be, you know, listed as an reimbursement, or reimbursed to you, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.

Q. But if it was a personal expense, so not a business expense, it wouldn't be reimbursed, it would just be deducted from the pay you got after the trip, correct?

A. Correct.

Q. Do you recall whether you took out any advanced payments from NCI while you were working there?

A. I took out -- I started out taking out some

load -- some load money, and it was a few times I took out some more.

I know I took some with my trainer. I took out a small amount, probably, because my checks was coming out small.

Q. And did you have -- or did you keep track of the amounts that were being advanced, and review, anything like the type of statement we're looking at in the handbook here in Exhibit 2?

A. Yeah, because it was -- I was trying to -- I was trying to get a rhythm going, see if I can get my checks to come out better than what they was looking, so I -- I do remember I had stopped taking advances out.

And I want to say that was somewhere probably by the end of April, somewhere around there, of 2023.

Q. Okay. Going back to Exhibit 2, there's sort of a Total Charge section at the bottom, after the Total Reimbursement section -- sorry, and that's at the end of that settlement sheet.

I'll zoom out, so you can see the whole thing, but you don't recall -- you don't specifically recall seeing a settlement sheet like this while you were working for NCI?

FOR READ AND SIGNING PURPOSES ONLY

A. No. No, I don't.
MR. WEISSLER: That's the end of the -- we're going to stop share this. That's the end of Exhibit 2.
I'm going to pull up Exhibit 3; one moment.
(Exhibit 3 marked.)
MR. KATAEV: AJ, can we go off the record for a second to discuss something?
MR. WEISSLER: Sure.
THE VIDEOGRAPHER: The time is 4:48 p.m. We are now off the record.
(Recess taken)
THE VIDEOGRAPHER: We are back on the record. The time is 4:50 p.m.
DIRECT EXAMINATION CONTINUED
BY MR. WEISSLER:
Q. I'm going to share Exhibit 3 with you now.
Exhibit 3 is a 14-page document that begins at what is Bates labeled MCI 250 in the bottom right hand of the corner or by the right hand of the screen. I'll zoom in on it, just a second.
It starts at NCI 250, correct?
A. Correct.
Q. Okay. I'm zooming back up so you can see

FOR READ AND SIGNING PURPOSES ONLY

the document itself.

This is a -- a settlement document like similar to the one we were just looking at, but this one is for employee Darrin Tiernan, correct?

A. Correct.

Q. Okay. And it says it's for a check dated April 7th, sorry, 2023, correct?

A. Correct.

Q. Okay. Earlier you testified that you don't recall seeing anything like this while you were working for NCI, correct?

A. Correct.

FOR READ AND SIGNING PURPOSES ONLY

Q. Okay. After looking at Exhibit 3, the first page, does this refresh your memory that you received or had access to anything like this while you were working there?

A. Mine was a little bit different.

I don't know -- I don't know if it was because of the website or something on my phone, but that's probably why it was different.

Q. Do you -- do you believe you had some access to this information, just in a different format?

A. The one that I used to look at, yes, sir, the one I used to look at.

Q. What do you mean by the one you used to look at?
A. Like my check stubs, and everything and how my rate and all that came out, my taxes and every- thing.
Q. So this document in Exhibit 3 shows that you have pay in the form of trip pay, although the rate is like a thousandth of a penny. Do you see that?
A. Yes.
Q. Which I assume is because when you were doing training, you didn't get paid by the mile, correct?
A. Correct.
Q. Instead you have orientation weekly pay that shows up as $250, and training pay that was $400. Do you see that?
A. Yes.
Q. So for that first week, part of the week was spent in orientation, and you estimated that you got about 200 or $300 earlier, which was a very good estimate, since it's 250, and you received training pay for $400, correct?
A. Correct.
Q. And then we see where the taxes were taken

FOR READ AND SIGNING PURPOSES ONLY

out in the middle section, and then there's another section called Deductions. Do you see that?

A. Correct, yes.

Q. And there's four -- four deductions, and they're all labeled advance to com, correct?

A. Correct.

Q. Okay. Do you know what those deductions were for?

A. Four deductions for com, I think it was the advance that I took, because if -- if I had -- if I was getting training pay, I was taking out advances, too.

FOR READ AND SIGNING PURPOSES ONLY

Q. So this is where you were using that system where you could request money out on the road to get -- to pay for personal expenses?

A. Correct.

Q. And I notice there's a -- sort of a consistent charge, that $1.50 charge that you see twice on there.

Do you know if that is the charge for how much the actual like cost was, like the basically like the administrative fee, or that check fee?

A. I'll say probably the check fee --

Q. So each of those --

A. Yeah.

Q. -- checks costs money for them to authorize them, so that was added into the amount that you owed?

A. Yes, sir.

Q. Okay. And then the last section says Net Earned, and there's a number 367.64, correct?

A. Correct.

Q. So for the week, your gross pay was $650 and one penny, and then after the taxes and deductions, you were paid out 367.64, correct?

A. Correct.

Q. And this includes, I believe, your first training trip that we talked about, where you ended up in Auburndale, Florida, and went, you know, over a thousand miles, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.

Q. Okay. If we go to the next page of Exhibit 3, this is for a check dated April 14th, 2023, correct?

A. Correct.

Q. This one again shows training pay.

This time, it's in the amount of $700. Do you see that?

A. Correct.

Q. Okay. Is it possible that your training

pay was -- I think you estimated it was $500 a week.
Is it possible it was a hundred dollars per day?
A. I'm just -- it -- it was -- it was 4 or 500, I can't -- I can't really remember, but I thought it was 500.
I was mistaken. I thought it was 500.
Q. Okay. I mean, it looks like on this check, anyway, that -- that you were credited for, this settlement statement you were credited with $700, but it doesn't say, you know, whether that was per day or per week; and then you have $.3 in -- in trip pay for this week.
I guess they had to put something into the trip pay field, so you ended up with a total gross pay of $700.03, correct?
MR. KATAEV: Objection to form and foundation.
You can answer.
THE WITNESS: To be honest with you, I -- I don't recall a $700 check from National Carriers, because my highest check was 600 and like $20.
BY MR. WEISSLER:
Q. Okay. Well, this was -- the gross number was $700, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Yeah, the gross. The gross, yeah --
Q. So if we --
A. Correct.
Q. Because then there were deductions for taxes, correct?
A. Correct.
Q. And then if we go down a little further, there were deductions for another advance pay, as well, correct?
A. Correct.
Q. And then that shows at the bottom, a net earned of 512.54, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.
Q. So you mentioned you don't -- don't recall receiving a check for $700, but here, according to this document, you would have received a check for $512. Does that sound correct?
A. Yeah, that sounds, yeah, that sounds like -- the $512 seems correct.
Q. And this was for your second week working there, which was a full week of training, correct?
A. Correct.
Q. And going to the next document -- or next page, I should say -- of Exhibit 3, this is for a check dated April -- oh, sorry, I went -- went to the

wrong one.
Here we go. This is for a check dated April 21st, correct?
A. Correct.
Q. And again it lists training pay in the amount of $700, and then trip pay with $.03, correct?
A. Correct.
Q. So gross pay for that week of $700.03, minus deductions and advances, resulting in 512.54, correct?
A. Correct.
Q. The next page of Exhibit 3 refers to a check dated April 28th, '23. Do you see that?

FOR READ AND SIGNING PURPOSES ONLY

A. Yes.
Q. And this time again we have training pay, but it's in the amount of $400, correct?
A. Correct.
Q. And we have trip pay for one trip, with 91 empty miles and 217 loaded miles, resulting in a total non-tax -- sorry, a total earnings of 523.20; is that correct?
A. Correct.
Q. And that first trip, according to this, started in Irving, Texas, and ended in Sulfur Springs and to Conroe, Texas, correct?

A. Correct.
Q. And you mentioned at the beginning that you were driving mostly around Texas or -- or near Texas, right?
A. Correct.
Q. Okay. If we go down, we see where you have the taxes deducted, but now we do see a new line for travel allowance, which includes a $.10 per mile per diem. Do you see that?
A. Yes, I see it.
Q. And earlier you weren't sure if you received a per diem.

FOR READ AND SIGNING PURPOSES ONLY

At least according to this settlement statement, it would show that you were getting one at -- at that amount of $.10 per mile, correct?
A. Correct.
Q. And then we see at the next line, where there is an advanced payment, this one is $10.99 and $2.05, and it's a total of 13.04, correct?
A. Correct.
Q. Okay. Do you know what -- any idea what those advanced payments were, like any memory of what you were -- what you were taking $11 out for?
A. I can't -- I can't remember back then.
Q. Yeah, it's under -- I mean, it's $11, and

it's, you know, three years ago, so understandable.
The next one, next page of Exhibit 3 is for a check labeled or dated May 5th, 2023. This one is similar in some ways, but it does have something referred to as breakdown or impasse pay at the top. Do you see that?
A. Breakdown/impasse pay, yes.
Q. Okay. Do you know what breakdown or impasse pay was?
A. I know what a breakdown is supposed to be; but impasse, I don't.
Q. Okay. What's breakdown pay?
A. It's supposed to be if you -- you get paid if you're broken down.
Q. Do you know how much you were supposed to get paid if you were broken down?
A. Not necessarily.
Q. You mentioned at some point during one of your trips that you did have a breakdown with a -- where your truck had to go into the shop and be serviced, correct?
A. Correct.
Q. Do you know if that was during this time period?
A. Possibly.

FOR READ AND SIGNING PURPOSES ONLY

Q. And the -- the amount or the rate for that says $150, correct?
A. Correct.
MR. KATAEV: I'm here, everyone.
MR. WEISSLER: Oh, there's Emanuel.
All right, we can see you, Emanuel. Thank you.
And do you know what -- do you have any idea how that $150 was calculated?
THE WITNESS: I -- I don't have no idea if it was calculated.
BY MR. WEISSLER:
FOR READ AND SIGNING PURPOSES ONLY
Q. Between the breakdown/impasse pay and then your trip pay for this check, it was $415.60, minus taxes, and then there's some per diem on there, as well, correct?
A. Correct.
MR. KATAEV: Objection, compound.
BY MR. WEISSLER:
Q. Okay. And then lower we get to a Reimbursement section. Do you see that?
A. Yes.
Q. So first there's a load/unload reimbursement, and it says lumper for $210, correct?
A. Correct.

Q. And then there's paperwork fee of $2.05, correct?
A. Correct.
Q. Okay. And we go down on the page, we'll see that there's a deduction that's also $210 that's labeled advance to com. And then if we go to the next page, we'll see another deduction that's advance to com for $2.05. Do you see that?
A. Yes.
Q. So on this paycheck for May 5th, your deductions are equal to your reimbursements, $212.05 for both, correct?
FOR READ AND SIGNING PURPOSES ONLY
A. Correct.
Q. So for this check for 5 -- for May 5th, 2023, it appears as if all of your advance expenses were reimbursable and then were reimbursed on this check, correct?
A. You said they was reimbursed.
Repeat that for me again.
Q. Sure, yeah.
So on -- on this check for May 5th, 2023, it appears that all of your advances or deductions were reimbursable and were reimbursed on this check?
A. It looks like it.
Q. Because we have -- under the Reimbursement

section, we have a -- an addition of $212.05 that's on this page 5 of Exhibit 3; and on the next page, page 6 of Exhibit 3, we have a -- a subtraction of the same amount, $212.05, correct?
A. Correct.
Q. Meaning your reimbursements and your deductions on this check, you know, equaled each other, so they had no affect on how much you were actually paid, correct?
A. Correct.
Q. Going to page 7 of Exhibit 3, for the record, it's NCI 256. This is for a check dated May 12th, 2023, and it shows trip pay with empty and loaded miles, and it shows stop pay, correct?
FOR READ AND SIGNING PURPOSES ONLY
A. Correct.
Q. And earlier you weren't sure if you had received stop pay or not, but at least according to Exhibit 3, on your check dated May 12th, 2023, you were credited with $20 of stop pay, correct?
A. Correct.
Q. But you don't -- you're not -- obviously without -- you don't know for sure whether that happened, but that's at least what Exhibit 3 says, correct?
A. Correct.

Q. Then we have our tax deductions, and we have travel allowance, which is the $.10 per mile, correct?

A. Correct.

Q. And this check, after all the per diem and the taxes, you were paid $620.95, correct?

A. Correct.

Q. And earlier you mentioned that that was about how much -- that was the largest check you received while working for NCI, correct?

A. Correct.

Q. And going to page 8 of Exhibit 3, this is for a check dated May 19th, 2023, and it shows trip pay for two trips with empty and loaded miles for each of them, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.

Q. And you received a taxable earnings for trip pay of $468, correct?

A. Correct.

Q. I'm scrolling down.

We'll see where there's taxes, and then per diem; and then below that, in the Reimbursement section there are three items: The first is a load/unload amount for $270. Do you see that?

A. Two hundred seventy, yep.

Q. And then below that is the paperwork fee, which I think is that -- that check fee for $2.05, correct?
A. Correct.
Q. And below that is a line item called prior week DEF, and it's 534.30.
Do you know what that is?
A. Not to the best of my knowledge.
Q. Okay. In this case, the total reimbursements listed is $806.35.
If we go to the next page of Exhibit 3, it will continue this statement, and we're going to see a number of deductions. Do you see those?
A. Yes.
Q. And this time we're going to start from the bottom, and we have a deduction for $270 and a deduction for $2.05 that are both dated May 9th, 2023, correct?
A. Correct.
Q. And if we go back to the -- to the previous page of Exhibit 3, $270 and 2.05 on May 9th, 2023, matches up with the reimbursements, correct?
A. Correct.
Q. So those two items were deductions that were then lined up with reimbursements, but all of

FOR READ AND SIGNING PURPOSES ONLY

the rest of these do not; and we have expenses on dates from April 27th to May 7th, none of which show up on the Reimbursement section, correct?

A. Correct.

MR. KATAEV: Objection, compound. Objection, compound, assumes facts not in evidence.

BY MR. WEISSLER:

Q. Okay. Do you have any idea what these other deductions are on page 2 for your check dated May 19th, 2023?

A. I have no clue.

I just know that some things probably was getting taken out of my check that I had no knowledge of. It's just -- because I -- I wouldn't take advances, like I wasn't -- I ended up stop taking the advances, so I -- I really don't -- don't -- I don't know, because that's a lot of deductions.

Q. It is.

And the total deductions for this paycheck is listed as $1,323.32, and it resulted in a net check of zero dollars, so you did not receive any pay for this check.

Do you recall receiving a check for zero dollars?

A. Two checks.

FOR READ AND SIGNING PURPOSES ONLY

Q. Okay. So this was the first of your checks for zero dollars?
A. Yeah, there was -- there was one I was working on before I quit.
Q. So this one on --
A. And there --
Q. Sorry. Go ahead.
A. And there was one the day that I had quit because I woke up, so they didn't pay me for that, and I was already -- I done a couple of those, and I didn't get paid for them, either.
Q. So you recall receiving a check where you didn't receive any pay, or a week where you didn't receive any pay, and --
A. Correct.
Q. -- according to this document, right, there was -- it was due to these advance payments being deducted from your pay, and you're not sure what -- what those advance payments were?
A. No. Like the 415, I have no clue about that.
The 235, the 155, because when I took advances, it was never big. It was never really over -- I don't recall borrowing over a hundred dollars at all, and both -- all of them are large.

FOR READ AND SIGNING PURPOSES ONLY

Q. Okay. Do you know if any of these were expenses that should have been reimbursed?
A. Not -- not that I know of, because I never -- not -- not that I know of. To the best of my knowledge, I don't.
Q. Do you know if there were any advance payments that should have been reimbursed that you didn't report on your -- the Trip Envelope?
A. On the trip, normally if it was anything that I had, like with lumper fees, and stuff like that, I -- I made sure I had tried to -- I made sure I had -- like did my little report to pay the lumper fees; so that's what I'm saying, I don't remember if -- even if it was, I don't -- I didn't see myself getting to pay a fee, or anything that I was supposed to, because I was mainly doing what I was told by the trainer.
Q. And you -- and you have on these pages, even this -- this check, right, you -- there was a reimbursement for a lumper fee, for this load/unload fee $270. And we saw that on an earlier one where you had a reimbursement for a lumper fee, so you don't -- obviously you knew how to do that.
You don't have any memory, though, as to what these additional charges could be?

FOR READ AND SIGNING PURPOSES ONLY

A. I -- I just know it was deductions coming out of my check that I didn't see it -- it really was supposed to be -- I mean, I didn't see a reason for it.

Q. When you received this check for zero dollars May 19th, 2023, did you do anything in response to it?

A. I told -- when I talked to the Operation Manager, I told her, I said I didn't -- I'm not getting paid, when she was asking me why did I leave Newnan, Georgia.

I said, I'm not even getting paid, so I'm going to continue doing what I'm doing.

FOR READ AND SIGNING PURPOSES ONLY

She knew I was cleaning out my truck. They knew I was cleaning out the truck, and I wanted a solution to -- to my money; but it just -- at that point, I was done, so I was like, you know what, like you all took my money, and I ain't making money, and my checks have been coming out funny and small, so I was just quitting at that moment.

But I did ask her, I asked her about the money. Even James. James, I said, "Man, I ain't -- I ain't getting paid."

And he just told me to bring the truck back.

Q. And that was on your -- that was the -- when you left, turned off your phone, drove back, is when you talked to the manager and Mr. James?
A. Yeah, correct. When I made it to the house, when I was getting ready to bring them their truck.
Q. Did you talk to either of them before then about this?
A. No.
Q. Did you talk to anybody else about your pay prior to that day?
A. No.
FOR READ AND SIGNING PURPOSES ONLY
Q. Okay. Going to the next page of Exhibit 3, this is for a check date May 26th, 2023. It shows trip pay with empty miles and loaded miles, and it also shows stop pay of $20, correct?
A. Correct.
Q. And that's for a total gross $546?
A. Correct.
Q. And then there are tax deductions and a travel allowance, correct?
A. Correct.
Q. And then below there's reimbursement which includes $200 for load and unload. Do you see that?
A. Yes.

Q. And then it says $466.80, and that's that prior week DEF again, correct?
A. Correct.
Q. The -- I'll represent to you, the prior week DEF refers to prior week deficit, meaning an amount that was underpaid, or amount -- an amount that had been advanced but not reimbursed previously.
Do you have any reason to believe that's not correct?
A. On -- on the 23rd of April, what's the -- what's the date of it again? Can -- can you --
Q. This check -- this check is May 26th, 2023.
A. Oh, May 26th, '23 -- no.
Q. Okay. If you look at the bottom --
A. (Inaudible)
THE COURT REPORTER: I'm sorry.
What was the last part you said?
MR. WEISSLER: Yeah.
THE WITNESS: I don't -- I don't believe that's right.
BY MR. WEISSLER:
Q. You don't believe the prior week DEF refers to a prior week deficit?
A. If it was, I don't know how it -- how it was possible to even get it, when I was trying to do

FOR READ AND SIGNING PURPOSES ONLY

my best with the company.

Q. What -- what do you mean by that?

A. Like everything I was taught, what I was supposed to do, trying -- trying to complete my loads when -- when with my (inaudible) loads.

THE COURT REPORTER: I'm sorry, you broke up.

Trying to keep my loads --

THE WITNESS: Yeah, trying to complete my loads that the dispatchers would -- that my dis- patcher would patch me to -- to get a load.

I was trained -- I was doing everything I was taught, so I don't -- I don't understand how the prior week deficit come about.

FOR READ AND SIGNING PURPOSES ONLY

Q. So if we look at the -- at page 10 of Exhibit 3, there's a line under deductions, where the first one says prior week DEF, and it's 534.30. Do you see that?

A. Yes.

Q. And if we go back to the previous check on page 8 of Exhibit 3, you'll see the prior week DEF is also 534.30, correct?

A. Correct.

Q. So it appears as if that was listed as a reimbursement on one check, and then carried over as

a deduction to the next check, meaning it was an amount that, at least according to NCI's accounting, you still owed after you got a zero dollar check, correct?

A. I'm getting -- I'm thinking correct, I guess.

Q. Meaning at least at this point, according to their records, you had taken advances out that exceeded the amount that you were being -- that you were earning, correct?

A. No, because it was a -- I -- I stopped. I ended up stopped taking advances out.

FOR READ AND SIGNING PURPOSES ONLY

I don't know how them advances was coming out in May like that.

Then at the end of April 2023, around there, I can't -- I forgot which date, but I started -- stopped -- slowly stopped taking advances out.

Q. So for --if we go back to page -- if we go back to page 8, this is the check for May 19th of Exhibit 3.

If we go to page 9 of Exhibit 3, those advances, the ones that -- that we were talking about, at $415, $235, and $155, at least two of those are dated April, correct?

A. Correct.
Q. Is it possible that those advances were taken out when you were still taking advances, before you stopped?
A. Yeah, it's -- it's a strong possibility, because like I said, the numbers, I didn't -- I never took nothing big out. I never took nothing big out, nothing like over a hundred. I didn't take large amounts out.
Q. Okay. Do you know if you had reimbursable expenses that -- that -- I think I've asked that question already.
Let me go to the next one. I'll ask it about this.
So on your paycheck for May 26th, under the deductions, there's the carryover number, and then there's a charge for $420 and a charge for $300. Do you see those?
A. Yes.
Q. Do you have any idea what those charges for 420 and 300 were?
A. I have no clue.
Q. Do you know if those were expenses that could have been reimbursed, but were not reimbursed?
A. Not to my knowledge, I don't.

FOR READ AND SIGNING PURPOSES ONLY

Q. And this paycheck, which goes on to the next page, had a net earnings of -- of zero dollars again, correct?
A. Correct.
Q. And I think we talked about this earlier.
You don't remember seeing settlement statements like this while you were working for NCI, correct?
A. Correct.
Q. Have you ever seen numbers like this that showed these deductions or these reimbursements?
A. No.

FOR READ AND SIGNING PURPOSES ONLY

Q. Did you ever ask anyone to provide an accounting for how your pay was calculated for the two checks where you received zero dollars?
A. I thought that was the right -- the right way they did it, because I wasn't familiar with the -- with looking at check stubs like that, or did they have another like settlement things, (inaudible) with those things.
THE COURT REPORTER: Wait a minute --
THE WITNESS: I was only familiar with the check stubs --
THE COURT REPORTER: -- stop. Stop.
You broke up again. I'm so sorry.

Have another like settlement things?

MR. KATAEV: Just repeat what you said, word for word.

THE WITNESS: All right. I wouldn't -- I -- they didn't -- I didn't know nothing about the settlements, or nothing like that, so I was just used to the chick stubs showing me what they was going to deduct out of my check stubs, and I -- I don't recall seeing none of them big fees or the per week DEF on my check, so I had no knowledge of the deductions that they was doing out of my paychecks.

BY MR. WEISSLER:

FOR READ AND SIGNING PURPOSES ONLY

Q. Okay. Going to page 12 of Exhibit 3, this is a check dated June 2nd, 2023, which shows additional charges and, again, a net -- a net earning of zero.

There's also no -- no work performed during this time, or at least no pay for this work, correct?

A. Correct.

Q. And this would have been after the time period where you stopped working?

A. After what? What was the date?

Q. This -- this check is -- this check is for June 2nd --

A. June 2nd.
Q. -- 2023.
A. June 2nd. Yeah, that's after.
Q. Is this after you stopped, or after you quit?
A. Yeah. Yeah, I -- I -- I quit May the 19th, '23.
Q. And it was on May the 19th is when you talked to the two managers and said that the reason that you were quitting is because you weren't being paid?
A. Correct.
Q. Here's another check for zero dollars listed for June 9th, and then another one for June 16th, again showing zero dollars; and this one shows, under reimbursement, something called transfer to BA for $804.81, correct?
A. Correct.
Q. Do you have any idea what transfer to BA means?
A. Not at all, I --
MR. WEISSLER: Okay. We're going to stop with Exhibit 3, and we're going to pull up Exhibit 4. It should just take a second.
(Exhibit 4 marked.)

FOR READ AND SIGNING PURPOSES ONLY

BY MR. WEISSLER:
Q. Oops. Okay. Exhibit 4 should be on your screen now. Do you see that?
A. Yes.
Q. Okay. Exhibit 4 is a -- an eight-page document, and at the bottom right you'll see that it is labeled with a P and then the No. 12. Do you see that? Do you see the P12 on the bottom right?
A. Yeah, P12. Yep, I see it.
Q. Okay. So I'll represent to that you P12 means this was a document that was provided by your counsel to NCI during this litigation, the P standing for Plaintiff, meaning it came from you.
And as I zoom back out, do you recognize the -- the first page in Exhibit 4?
A. Yes.
Q. Okay. And what is the first page of Exhibit 4?
A. The first page, talking about the date, the Wage Statements?
Q. Yes. So the first page of Exhibit 4 is a Wage Statement for the pay date of April 7th, 2023, correct?
A. Correct.
Q. And it's from National Carriers, and it's

FOR READ AND SIGNING PURPOSES ONLY

to you, Darrin Tiernan, correct?
A. Correct.
Q. Oh, I think they actually have a typo in your name, and end it with an M on this document, correct?
A. Yeah, they messed -- yeah, the last name.
Q. And if we look at this Wage Statement, there's something called the Wage Statement Summary that's at the top right. Do you see that?
A. Correct.
Q. It lists the total gross pay of $650.01, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.
Q. Then it lists total taxes in this case, $109.97?
A. Correct.
Q. And it says total after-tax deductions of 172.40?
A. Correct.
Q. And then net pay of 367.64?
A. Correct.
Q. Okay. We're going to go back to Exhibit 3 just for a moment, and we're going to go to the very first page of Exhibit 3, which was the settlement statement for that same check, and the net earnings

on the settlement statement is 367.64, correct?
A. Correct.
Q. And that's the same as the net earnings on the Wage Statement in Exhibit 4, correct?
A. Correct.
Q. In the left-hand side, towards the bottom of Exhibit 4, the first page, there's a section labeled After-Tax Deductions. Do you see that?
A. Yes.
Q. And it's got a description called advances, correct?
A. Correct.

FOR READ AND SIGNING PURPOSES ONLY

Q. And there's an amount there of 172.40, correct?
A. Correct.
Q. If we go to Exhibit 3, the first page of Exhibit 3 has a list of deductions that are all labeled advance to com, and they equal 172.40, correct?
A. Correct.
Q. And that's the same amount that's listed under the advances in Exhibit 4, correct?
A. Correct.
Q. If we go to the next page of Exhibit 4, we have another Wage Statement, this time for a pay date

of April 14th, 2023, correct?
A. Correct.
Q. And this time, in the After-Tax Deduction section in the bottom-left corner, it says advances, and it says 65.95, correct?
A. Correct.
Q. We're going to skip ahead.
This is your Wage Statement for your check pay date of May 19th, 2023. This is page 7 of Exhibit 4, correct?
A. Correct.
Q. And this one, the net pay for the current check is zero dollars, correct?
A. Correct.
Q. And this one lists After-Tax Deductions in the lower section of 300, current of $399.97, correct?
A. Correct.
Q. Do you recall receiving this Wage Statement when you -- when you were paid zero dollars on May 19th, 2023?
A. I remember seeing zero dollars, but the wage -- you said the Wage Statements?
Q. This document that we're looking at --
A. Yeah.

FOR READ AND SIGNING PURPOSES ONLY

Q. -- in page -- page 7 of Exhibit 4, do you remember receiving this?

A. Yeah, I remember receiving it.

Q. Okay. And when -- when you received this, you were surprised to be paid zero dollars?

A. Yes.

Q. Did you review it at that time?

A. What you mean, review it?

Q. Did -- did you look at it, to try to figure out why you had been paid zero dollars?

A. Did I look at it?

It wasn't no way. I -- I, like I say, I called them and told them when -- when I didn't get paid, and I didn't -- I wasn't able to get my check stubs until after I had wound up quitting.

I had no source of forms. I had to call just to get this, for them to deliver it to my house.

Q. So when you received zero dollars, at that time, you were not at home, correct?

A. No, correct.

Q. You were out on the road?

A. Correct.

Q. And so you received zero dollars.

You then drove home and turned your phone off, and eventually you talked to them and said that

FOR READ AND SIGNING PURPOSES ONLY

you were quitting because you hadn't been paid any money?
A. Yeah, I told them, yeah.
Q. And at that point, did you have a copy of this by the time -- when you got home, or when did you receive this document in Exhibit 4?
A. I had that. I asked them for it.
It was after I had brought the truck back and came back to my house, I had called up there to ask them for my check stubs.
Q. How long after you brought your truck back did you ask for your check stubs?
FOR READ AND SIGNING PURPOSES ONLY
A. That same week.
Q. Do you remember who you spoke to?
A. Payroll, somebody in payroll.
Q. And did they mail you a copy of all of your check stubs at that time?
A. Yes.
Q. So when we're looking at Exhibit 4, which is eight check stubs, you received all of those in 2023, when you requested them?
A. Most of them.
Q. Did you have some of them already?
A. Yes.
Q. And were those -- had those been mailed to

you prior to then?
A. I can't recall how I had them, whether I printed them out from the phone. It was -- because it was a website that I was going in there, looking at -- at it, too.
Q. And did you have access to your web -- Wage Statements from your phone?
A. I did, at one point.
Q. At what point was that?
A. As I was working there.
Q. So while you were still employed by NCI, you had some way of getting your Wage Statements on your phone?
FOR READ AND SIGNING PURPOSES ONLY
A. Yes.
Q. And then after you quit, you called payroll to ask them to send you copies of your Wage Statements?
A. Correct.
Q. And they did send them?
A. Correct, yes.
Q. After you received your Wage Statements in the mail from payroll, did you review them at that time?
A. Yes.
Q. At that time, did you see the section

labeled After-Tax Deductions and Advances?
A. Yes, and none of it -- I didn't see how none of it appeared where it was supposed to appear anyway.
Q. Okay. And did you do anything else to figure out what was going on with your pay after you received your Wage Statements?
A. Didn't know who to call, because once they -- once -- once I told them I wasn't getting paid, they actually -- they acted on the phone like they just wasn't going to acknowledge it, so it -- it led me not to -- not to know who to call, because they were both managers, so I'm like, you know, I remember having a conversation with the payload -- payroll lady, and when I told her about the incident, you know, I used for National Carriers, this is what happened to me, can I please get some of my payroll -- paycheck stubs, she didn't even tell me nothing about it, about what else can I do, either, so --
Q. Did you ask her what else you could do?
A. No, I didn't.
Q. So when you first called your managers on the day that you quit, it was to complain that you weren't getting paid, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.
Q. And you said that they indicated they weren't even going to acknowledge it?
A. They just shut -- they didn't tell me nothing.
They just was like -- well, the Operations Manager, she just acted like -- she -- she -- she didn't say nothing about it when I brought it to her attention.
And I said, "Well, I'm going to continue to clean out the truck real quick, so you all can have that back."
FOR READ AND SIGNING PURPOSES ONLY
And James called, the other manager of Irving facility, and he was like, yeah, just -- just -- we can give you some gas to put in the truck, you know, and you can just bring it back to the facility.
And I told him, I said, "I ain't even getting paid, man."
And he -- he didn't say nothing about it, so --
Q. Did you ask him anything specific about it?
A. Besides what I -- the work that I put in, that I told him I wasn't getting paid for work I put in, that was it.

Q. But I mean, did you ask -- did you say, like why not?

A. I mean, I told -- I told the Operation Manager that, like why not.

Q. And -- and did she say anything in response to asking why not?

A. She was just -- no, she was just -- I don't know. She was just going on a rant, trying to -- trying to take up after the dispatcher, when I was bringing up that he wasn't answering the phone and stuff, and I'm bringing the truck back, so she was going on a rant.

FOR READ AND SIGNING PURPOSES ONLY

Q. She was ranting at you for -- for not communicating with the dispatcher?

A. Not answering the phone, too; and with the dispatcher, not accepting a load.

THE COURT REPORTER: Not accepting a load?

THE WITNESS: Not accepting a load.

THE COURT REPORTER: Thank you.

BY MR. WEISSLER:

Q. I see.

So when you spoke to the Operations Manager, she was -- she was complaining to you about the fact that you had not accepted a load, weren't

communicating with the dispatcher, and then weren't answering your phone?

A. Yes.

Q. And during that, you said that you were quitting because you weren't being paid, and you asked her why you weren't being paid, and she didn't respond to your request about why you weren't getting paid?

A. She -- yeah, she didn't respond to my request about not getting paid.

Q. Other than asking her why you weren't getting paid, did you ask or say anything else about your pay to her?

FOR READ AND SIGNING PURPOSES ONLY

A. No. At that point, I -- that's what James -- I got -- she just --

I don't know. She called me to call her back; I never did.

James called, and when James called, that's when I had the conversation with James.

Q. So the Operations Manager told you to call her back, but you didn't, because you spoke to James first?

A. Yeah. When I spoke to James, he just told me everything I needed to know.

Q. Okay. What did he tell you?

A. Just we're going to put some gas in the truck.
And we had a conversation. I -- I told him about not getting paid, and he didn't say nothing, too much about it. He just said, we're going to put gas in the truck. Just bring the truck back to our facility; and that, basically, was it.
Q. And after you talked to James, you brought the truck back?
A. Yeah, I brought it back to the facility where I picked it up from.
Q. And then did you talk to James ever again?

FOR READ AND SIGNING PURPOSES ONLY

A. No.
Q. And after your first call with the Operations Manager, did you ever talk to her again?
A. No.
Q. And after you brought the truck back, you had one conversation with the payroll employee, in which you requested copies of your pay stubs?
A. Yes.
Q. Okay. Other than that conversation with the payroll employee, did you have any other conversations with anyone from NCI after you quit?
A. No. That was it.
Q. And prior to May 19th, when you received

your zero dollar paycheck, I believe you testified earlier you had not spoken to anyone about your pay before that date, correct?

A. So prior to the 19th?

Q. That's right.

A. No.

Q. No, you had not spoken to anyone?

A. No.

Q. Just to keep the record clear, I'll ask the question differently.

Did you speak to anyone about your pay prior to May 19th?

FOR READ AND SIGNING PURPOSES ONLY

A. Oh, prior to the 19th?

Friends, and people who I was close to about it; that's it.

Q. How about anyone at NCI?

A. No one at NCI.

Q. Okay. Looking again at the last -- looking at the last page of Exhibit 4, again, this is the Wage Statement that is for your paycheck May 26th.

This one is again a zero dollar payout, and it includes an After-Tax Deduction section that says advances $460.10, correct?

A. Correct.

Q. Do you remember receiving your -- these

Wage Statements, and reviewing that section that said that there were advances equaling $460.10?

A. I ain't do no advances.

Q. I understand you --

A. I remember --

Q. -- I understand you don't believe that there where advances in that amount; but I'm saying do you remember receiving this document and reviewing that section of it?

A. I mean, I looked over there at it and everything, but I just -- like I say, I couldn't -- I mean, I didn't know who to talk to, so --

FOR READ AND SIGNING PURPOSES ONLY

Q. What do you mean by you didn't know who to talk to?

A. Because I tried to talk to the -- basically I was telling them I didn't get paid, and they acted like they couldn't -- they didn't understand me, like they just didn't care; so that's what, you know --

Q. And -- and the -- and you're talking about the payroll person, when you say they didn't care?

A. No, not the payroll, the managers.

But the payroll person, when I explained to her what happened, she just -- I guess she didn't have no words either for it. But I did tell her like what happened and stuff, like I -- I just didn't get

paid and, you know, I just need my check stubs.

And she just agreed to send them to me, and verified my address.

MR. WEISSLER: Okay. I'll stop sharing Exhibit 4.

I'm going to share on my screen Exhibit 5.

(Exhibit 5 marked.)

BY MR. WEISSLER:

Q. Exhibit 5 is a 22-page document that begins on NCI 157. If you look in the bottom right-hand corner, I'll zoom in so you can see it. Do you see that?

FOR READ AND SIGNING PURPOSES ONLY

A. Right.

Q. It's 157.

A. One fifty-seven.

Q. Is that correct?

A. Yeah, that's correct.

Q. I just have to, for the record, sort of establish -- make sure we're looking at the same thing.

Going back up to the first page of Exhibit 5, you'll see that this is for an order that's, it says No. 3646054, correct?

A. Correct.

Q. And this looks similar to a document we looked at in Exhibit 1, in that it's a bunch of dispatching information for a trip, correct?
A. Correct.
Q. And most of the way down you'll see there's a line that starts with DR 1. Do you see that?
A. Yes.
Q. And that has your name, Darrin Tiernan, correct?
A. Correct.
Q. Okay. And this is a trip from Pittsburgh, Pennsylvania to Sulpher Springs, Texas to Conroe, Texas, according to the information on this sheet, correct?
A. Correct.
Q. We go through this -- there are several pages of dispatching information, and then we get a document, page 9, that's labeled -- or sorry, that looks like the envelope that we talked about before, correct?
A. Correct.
Q. And this one has a trip number of 3646054, correct?
A. Correct.
Q. Do you recognize the handwriting that

FOR READ AND SIGNING PURPOSES ONLY

filled out this ninth page of Exhibit 5?
A. It looks like mine.
Q. Is that your handwriting?
A. Yes.
Q. And it does have your name, correct?
A. Correct.
Q. And -- and if we scroll down, there is a place where it says settlement clerk, and then you have the letters AL, correct?
A. Correct.
Q. And we talked previously that that was the settlement clerk who was assigned to you, based on your last name, correct?
A. Yes.
Q. And then there's also a dispatcher, and it says Robert R.J., and then the last name, I think it's Fournier, F-o-u-r-r-n-i-e-r, correct?
A. Correct.
Q. Does that sound right for the name of the dispatcher you've been talking about?
A. Yes, Robert, RJ.
Q. Yeah, you called him RJ, and earlier you couldn't remember his last name, but it looks like it's Fournier, correct?
A. Yeah, correct.

FOR READ AND SIGNING PURPOSES ONLY

Q. And on this sheet you have the starting odometer and ending odometer mileage, and they're both over 371,00 miles, correct?
A. Correct.
Q. So this -- this truck had seen some miles, prior to you having it, correct?
A. Yes.
Q. And then the scales, it says there's a reimbursement for $13, under the Reimbursement section, correct?
A. Yes.
Q. Okay. Continuing, we have the Bill of Lading from the customer Saputo, correct?
A. Correct.
Q. It looks like you were carrying cheese of some kind?
A. Dairy food, some type of dairy, yeah.
Q. And then we have a Delivery Receipt that's in page 11 of Exhibit 5, correct?
A. Correct.
Q. Is that your handwriting on the Delivery Receipt?
A. Correct, yes.
Q. There's also a receipt from Loves in Sulphur Springs, Texas, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.
Q. And this is a scales receipt?
A. Yeah, that's a scale receipt.
Q. And it says scales for $13, correct?
A. Correct.
Q. And that matches up with the reimbursement that you requested?
A. Yes.
Q. We can go back to page 9, where it says scale $13, correct?
A. Yes, correct.
Q. And then page 14 we have that same document from the envelope, only now it's been stamped received, correct?
A. Correct.
Q. Do you know who stamped it?
A. I can't remember.
Q. Okay. Going back to the -- sorry if I make you sick by scrolling through this too fast -- going back to these -- these dispatching pages, you'll notice the -- you know, the beginning of page 1 of Exhibit 5, most of the document stays the same from page to page, but these two lines of dispatching information changes from page to page.
So the first one starts with 0420 2119.

FOR READ AND SIGNING PURPOSES ONLY

Do you see that?
A. Yes.
Q. And then as you go through, they change.
So page 2, there's two different lines there, page 3.
Do you know what those dates refer to, like the 0420 on page 1 of Exhibit 5?
A. 0420, no.
Q. And then right next -- after that, it's 2119.
I think you said earlier, you all used military time, right?
A. Yeah. Oh, okay, so that's the date. That's the date, then.
Q. So April 20th at 2119?
A. Military time.
Q. Would be a date and a time, we would call it 9:19 p.m., correct?
A. Correct.
Q. And then it says RockTX.
Do you know what that refers to?
A. The shipper -- no, no, that's Texas. That's Texas, right.
Q. So it's some location in Texas?
A. I think so.

FOR READ AND SIGNING PURPOSES ONLY

Q. It looks like -- it looks like maybe Rockwall, because it looks like you filled up with fuel there, and got 130 gallons, and it cost $481?
A. Correct.
Q. And then the next line is April 20th at 2148; so just a little bit after that, it says you arrived at the shipper, and that's SUSPTX.
Do you know what that refers to?
A. SUPEX.
Q. SUSPTX, right there.
A. Oh, no. What's that refer to?
Q. Could it be Sulphur Springs, Texas?
FOR READ AND SIGNING PURPOSES ONLY
A. Oh, yeah, yes, yeah, that's right.
Q. On the next page it says April 21st, so the next day at 12:55, there's an L and a PU.
Do you know what that refers to?
A. L and a PU?
Q. Right here (indicating).
A. Load pickup.
Q. Okay. So the next day you picked up the load, and then there's a line that says something about late for stop No. 90.
Any idea what that means?
A. Yeah, late.
Q. Then continuing again on April 21st, it

indicates that you arrived at your final destination at 1336, correct?

A. Correct.

Q. And do you know what E CR means?

A. No.

Q. Okay. On the next line it refers to -- so it's April 23rd, and this is now 6 o'clock in the morning or 0616, and it says MONRLA.

Do you know what that's in reference to?

A. No.

Q. Could that be Monroe, Louisiana?

A. Oh, yeah, yeah, that's Monroe, yeah, that's Monroe.

FOR READ AND SIGNING PURPOSES ONLY

Q. So on April 23rd you're in Monroe, Louisiana, according to this dispatch record, and it says something about voiding of the dispatch.

Do you recall having a -- a dispatch voided, and being in Monroe?

A. I wasn't sure was they talking about a load, or it's -- it's been a minute, so --

Q. Sure.

A. Not while I was at Monroe, I don't -- I don't recall them voiding one.

Q. Okay. We're at page 5. April 24th lists you as home in Monroe.

A. Correct.

Q. Page 6 indicates home, and then it says term home.

Do you know what that means?

A. No.

Q. And then on page 7 there's a dispatch note that says driver bobtailed home without authorization sayings and needs to go back to Houston where he left. Do you see that?

A. Yes.

Q. Do you recall that happening, where you drove home --

FOR READ AND SIGNING PURPOSES ONLY

A. I mean, I couldn't --

Q. -- without authorization?

A. I was supposed to -- I was supposed to make a delivery in Houston, and after that delivery I was supposed to be able to go home.

And I was trying to verify that process, that delivery that I had made, and to -- to go home.

And no, I had no response.

It was in the middle of the night. It wasn't my dispatcher, and then went -- yeah, that's how that came about.

Q. So you -- so sometime in April of 2023 you completed a delivery, you were planning to go home,

and you --

A. Yes, I was supposed -- I was supposed to go home. That's the -- the layout plan that they had for me.

But I tried to notify a dispatcher and let them know.

I didn't get no response so, I mean, they laid the plan out. They didn't tell me to stop, make sure you do this and that; so once I got done, I just bobtailed home.

Q. And bobtail home, we talked about earlier, that's driving without a trailer attached to your truck?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.

MR. KATAEV: Objection, asked and answered.

BY MR. WEISSLER:

Q. And then here it says that it was without authorization.

Do you agree that you drove -- that you bobtailed home without authorization?

A. I mean, they told me after I got done delivering, I can go home, so that's -- that's what I -- that's -- I mean, they -- they -- that's what I thought at the time, because I just got off the road

with the trainer, so I thought I was following orders of what they wanted, I mean, because they -- they said after you get done with this, this is your load going home.

Q. There's additional lines. I guess this continues the previous line, needs to go back to Houston where he left his trailer, will need rerouted when dispatched.

Do you remember where you left the trailer?

A. Yeah, it was -- I want to say it was at the -- at the beer company I was delivering at, if I ain't mistaken.

FOR READ AND SIGNING PURPOSES ONLY

Q. Was it -- Was there an issue with -- with the next pickup, that you weren't able to do it, and that's why you bobtailed home, or -- or do you remember why -- why did you leave a trailer somewhere other than -- than like --

A. The --

Q. -- the NCI yard?

A. No, the -- the company had the trailer.

They wouldn't -- they wouldn't release it. They wouldn't release the trailer.

Q. Who wouldn't release the trailer?

A. Like, the -- the delivery I went to,

they -- when I delivered there, they wouldn't release it, so from -- I don't know --

Okay, I can remember now. I think I am remembering a little bit.

Okay, I went to the shipper. It was a shipper, it wasn't a delivery.

So I went to the shipper; they wouldn't release the trailer.

Q. Do you know why they wouldn't release the trailer?

A. They said something about load bars. I had load bars on the back of the truck, but at the time, I didn't understand what a load bar was.

FOR READ AND SIGNING PURPOSES ONLY

THE COURT REPORTER: Are you saying load, l-o-a-d, or l-o-w?

THE WITNESS: L -- l-o-a-d, load bars.

THE COURT REPORTER: Thank you.

THE WITNESS: And I had load bars on the back of the truck.

And I -- I did try to notify the -- the dispatch about it, but they wouldn't release that trailer.

BY MR. WEISSLER:

Q. I see.

So you went to pick up your next load

that was dispatched to you, had an issue leaving with --
A. Yeah.
Q. -- that trailer --
A. Right.
Q. -- so you left the trailer there and went home?
A. Correct.
Q. And you tried to contact dispatch to tell them that's what you were doing?
A. Correct.
Q. And it -- it was --

FOR READ AND SIGNING PURPOSES ONLY

A. They --
Q. Sorry. Go ahead.
A. Dispatch never replied back, so I thought I was good.
And I didn't find out until after I kind of made it to the house. Like early that morning, I made it to the house early that morning, and early that morning, later on, they started telling me, they was calling me and stuff, like but nobody replied back. Nobody overnight replied back about no, you just -- just stand by or something, but I was reaching out.
I did make a couple of phone calls.

I don't know why they couldn't tell me or answer for me, and they didn't -- they didn't call me until later on that -- that day, that morning.

Q. After you -- after they were back in contact, did you then return to Houston to complete that trip?

A. I want to say no, they gave me my home time; but when I came back off my home time, I did have to -- I can't remember if I went back to the same place. I think it was the same place, I can't remember, but it was somewhere in Texas that they gave me my first pickup load.

FOR READ AND SIGNING PURPOSES ONLY

MR. WEISSLER: Yeah, I'll stop sharing Exhibit 5 and take a look at Exhibit 6.

THE COURT REPORTER: When you get to a good stopping point, I would like a break, if you don't mind.

MR. WEISSLER: Yeah, can we do just a few questions on Exhibit 6 while we're -- while it's still fresh, and then we'll take a break?

THE COURT REPORTER: Absolutely.

MR. WEISSLER: Thank you.

(Exhibit 6 marked.)

BY MR. WEISSLER:

Q. I'm now sharing Exhibit 6, which is another

set of trip information.

This one is -- starts on NCI 179, and it is 12 pages total; and if we look in the top left corner, it's Order # 3651248, correct?

A. Correct.

Q. And if we go down to the dispatching, we'll see that this one is dispatched on, it says April 25th at 1704, and is starting in Conroe, Texas, correct?

A. Correct.

Q. And I believe this was the next load that you took after you went home; does that sound right?

FOR READ AND SIGNING PURPOSES ONLY

A. So Baytown, yeah, somewhere around Baytown.

Q. So we have the -- the Trip Envelope for this one is -- again, this is your handwriting, correct?

A. Correct.

Q. And this is page 5 of Exhibit 6, and this has the origin being Baytown, Texas, correct?

A. Correct.

Q. And then you drove it to Wichita, Kansas?

A. Correct.

Q. And again, there's only one item requested for reimbursement, and that's $13 for the scales, correct?

A. Correct.
Q. Going back to the beginning of this document in Exhibit 6, it says April 26th.
Do you see that second line of dispatching notes, April 26th at 2:53, it says, driver on break, will head out in AM.
Do you know what that means?
A. Head out early in the morning after a ten-hour break.
Q. Okay. And then the next page shows April 26th at 9:40.
It looks like you stopped for fuel, and that's in Baytown, Texas, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.
Q. And then it says you arrived at the shipper on April 26th at 10:43?
A. Correct.
Q. Got some more fuel, or at least there's a line for fuel, although it doesn't say there's any gallons; and then it shows that you were loaded April 26th at 2013, correct?
A. Correct.
Q. Do you know why there's a fuel line without any fuel listed?
A. I have no clue.

Q. The next line is April 26th at 2014, so just -- just after the load; and it says Irving, Texas. It says C UT.

Do you know what that refers to?

A. Picked up a trailer out of Irving, the facility at Irving, and it was called a TCALL.

Q. Okay. What -- what did TCALL mean?

A. I'm thinking where another driver brings it in, and you're supposed to pick it up out -- out the yard, like a half and half trip, or something like that.

Q. So we have -- continuing to page 6 of Exhibit 6, we have a Bill of Lading, like we've seen before, correct?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.

Q. And we have a Love scale for -- or Love receipt for scales for $13 again?

A. Correct.

Q. And we have a receipt for a washout, correct?

A. Correct.

Q. I notice that this one is not listed on your reimbursements, correct?

A. Correct.

Q. Do you know why your washout wouldn't have

been listed on the reimbursements?
A. Why, not -- not that I know of.
Q. It looks like this has got a, like a purchase order number and a trip number.
Do you know if this washout company could bill the company directly, so you didn't have to pay for it?
A. Like I did -- I was going off how I saw the trainer do it, so -- because me and him used to go get washouts and stuff, and so I was going off of how he was doing it.
I don't know if I picked up bad habits from him or not. I mean, I thought it was right, if it was.
Q. Okay. And then page 11 of Exhibit 6 is a Delivery Receipt; and that's your handwriting, correct?
A. Correct.
Q. And then there's another copy of that Loves receipt on page 12, correct?
A. Correct.
MR. WEISSLER: Okay. We'll take a break.
Sorry that went longer than I intended to, Christine.
THE VIDEOGRAPHER: The time is 6:17 p.m.

FOR READ AND SIGNING PURPOSES ONLY

We are now off the record.
(Recess taken)
THE VIDEOGRAPHER: We are back on the record. The time is 6:26 p.m.
MR. WEISSLER: All right, Mr. Tiernan, we're going to go to Exhibit 7.
(Exhibit 7 marked.)
DIRECT EXAMINATION CONTINUED
BY MR. WEISSLER:
Q. Exhibit 7 is a nine-page document that starts at NCI 191. In the top left corner is Order # 364751, correct?
FOR READ AND SIGNING PURPOSES ONLY
A. Correct.
Q. And this is, again, dispatching information for a trip, and it starts, the dis -- dispatching information starts April 27th at 11:45, and it says L PU.
Do you know what that refers to?
A. Load pickup.
Q. And Irving, Texas, that's where National Carriers' like main terminal is?
A. Well, that's the --
Q. Or one of them?
A. Yeah, that's one of them, and that's the location I started at.

Q. Okay. So you started by picking up a load in Irving, and then also April 27th at 1320 in something that's called WEATH, Texas, or WEAT, Texas.
It says, cannot find fuel card. Do you see that?
A. Correct.
Q. Do you know what that's referring to?
A. The issue that I had, I -- I wound up paying -- I don't know if it was a scale or something, but I wound up forgetting my card on the -- by the -- the thing where you pay at.
Q. Oh, I see; so like you misplaced the -- the company fuel card that you were supposed to use?
A. Yes, sir.
Q. And so when that kind of thing happened, were you supposed to let dispatch know?
A. Yeah, I did. I notified them.
Q. Yeah, it looks like that's what they recorded here.
And then this trip continues -- again, lost fuel card is mentioned, and then says on April 28th -- this is on the third page of Exhibit 7, it says April 28th, 7:41, arrived at final designation. Do you see that?
A. Yes.

FOR READ AND SIGNING PURPOSES ONLY

Q. And that's Lubbock, Texas?
A. Correct.
Q. The next line, or the next stage -- this is page 4 of Exhibit 7 -- says April 28th, 9:15, Lubbock, Texas. There's an A with a bunch of numbers, and it says $210. Do you see that?
A. Yes.
Q. Do you know what that's referring to?
A. Not really.
Q. Okay. Below there's a notation called E CR.
Do you know what that refers to?
A. No.
Q. Okay. Going to page 6 of Exhibit 7, we see a Trip Envelope. This one got scanned in, and it is a bit rough, so I apologize; but you can see that's your handwriting, correct?
A. Correct.
Q. And the date on it is April 26th, correct?
A. Correct.
Q. And if you scroll down un -- under the Reimbursement section for this one, it says that there's a lumper fee for $210. Do you see that?
A. Yes.
Q. Okay. And again, the scan quality is not

FOR READ AND SIGNING PURPOSES ONLY

great.
If we go to the next pages, we have a Bill of Lading that's pretty dark, correct?
A. Correct.
Q. Yeah, there's a bill, and then after the Bill of Lading is a Delivery Receipt, correct?
A. Correct.
Q. And that's your handwriting on the Delivery Receipt?
A. Yes.
Q. And then on page 9 of Exhibit 7 we see a document from something called Costa Solutions. Do you see that?
FOR READ AND SIGNING PURPOSES ONLY
A. Yes.
Q. And this is a -- a re -- receipt for $210. It's kind of hard to see, but it's over on the right over here. Do you see that?
A. Yes.
Q. Okay. And this appears to be the receipt for the lumper fee that was re -- requested for reimbursement back on page 6 of Exhibit 6 -- sorry, of Exhibit 7, where there was a $210 lumper fee, correct?
A. Correct.
Q. Now, do you know -- we talked earlier about

a dropped trailer being like an incident that was reported to the Department of Transportation.
Do you recall testifying about that earlier?
A. Yes.
Q. Do you know if this is the day that that happened?
A. I really can't tell you the date that it happened; but no, hold on. Let me look at the location.
It did -- it did -- it happened when -- let me see. I was picking up out of Kansas, out of Leber, Kansas.
THE COURT REPORTER: Out of where, Kansas?
THE WITNESS: Leber, if I'm saying that correctly. The main -- the main National Carriers out of Kansas, Leber, if I'm saying that right. Libra. Somebody correct that.
BY MR. WEISSLER:
Q. Is it Liberal, Liberal, Kansas?
A. Yes, sir. Yes, sir, that's what I'm trying to say.
Q. Okay.
A. I was -- I was picking up out of there when

FOR READ AND SIGNING PURPOSES ONLY

the accident happened.

And I don't know where I was headed to, because it's been so long, but this wasn't it, though.

Q. This was not it?

A. I remember -- I remember being in Mississippi with them; but yeah, this one, this one right here ain't it.

Q. Okay, and this was a drop-off in Lubbock, Texas.

I'll stop sharing for a moment. All right, I'll be -- I'll share again. I forgot I already had that as an exhibit. One second.

Okay. We'll go back to -- this is Exhibit 7 again, so the date on this Trip Envelope is April 26th, 2023, correct?

A. Correct.

Q. And then if we go to Exhibit 3, this was your -- these were the settlement statements.

On page 5 of Exhibit 3 there was the breakdown timing, and that one was dated April 27th, which was the next day.

It's your understanding that that -- that that breakdown may have occurred as a result of the pickup that you were trying to do in Kansas?

FOR READ AND SIGNING PURPOSES ONLY

A. Yeah. Yeah, it -- it must have been, because that's the only breakdown I had.

Hold on. Hold on. I take that back. I take that back.

I had -- if I'm not mistaken -- yeah, that's got to be the breakdown. That's, yeah, that's it. That's it.

MR. WEISSLER: I'm going to go to Exhibit 8.

(Exhibit 8 marked.)

BY MR. WEISSLER:

Q. You should see on your screen in a moment Exhibit -- what's been marked as Exhibit 8.

FOR READ AND SIGNING PURPOSES ONLY

This is -- it's three pages, total.

They're all documents that were provided by your counsel during this litigation. They were in kind of a strange order, so I may need your help putting them back in the correct order, but this is -- it's three pages, and they are P1, P3, and P4; so P1, P3, and P4, and I -- and I don't know what order they're supposed to go in.

Do you recognize these documents in P1, P3, and P4?

A. Yes, I do.

I want to say the Query Overview; you

said P1, P4.

Q. This is the first page of this, so this is P4. It says Query Overview, and then it says that this was conducted or completed in February of 2024, and it was done by P & S Transportation. Do you see that?

A. Correct.

Q. And P & S is one of the companies that you applied for after you worked for NCI, correct?

A. Correct.

Q. Going through -- this is now P3 of Exhibit 8, there's Transportation Employment History. Do you see that?

FOR READ AND SIGNING PURPOSES ONLY

A. Correct.

Q. And then at the bottom of P3 in Exhibit 8 there is a section that's referred to as Accident/ Incident History/Sum or History Summary, and there it says there is one accident that was reported, correct?

A. Correct.

Q. And if we go back to P1, I believe this is now the actual report that was at the bottom of P3, and this is where it says that there was an incident on April 29th, 2023, correct?

A. Correct.

Q. And it says DOT recordable, and it says no, correct?
A. Correct.
Q. City and state, it says it happened in Dodge City, Kansas, correct?
A. Correct.
Q. It says zero injuries, zero fatalities, and no HAZMAT, correct?
A. Correct.
Q. And then it says Description, dropped trailer, and then it says non-preventable accident/ incident, correct?
A. Correct.
Q. Okay, Exhibit 8 -- Let me start over.
How did you get a copy of Exhibit 8?
A. I want to say it was a lot of -- I used to be able to log into the HireRight, and the HireRight used to send me emails of this same -- these same documents.
And when I was filling out for jobs, they sent me an email of they're pulling up my record of my commercial license, and seeing everywhere I worked at, and they'll have a record of it, too, so they can see what I -- what I can see with the HireRight when they sent me copies on my e -- to my email.

FOR READ AND SIGNING PURPOSES ONLY

Q. And so this one that says it was -- it was pulled or -- or requested by P & S?
A. Yes.
Q. And it says that --
A. It -- Go ahead --
Q. Was this when you were --
A. -- I'm sorry.
Q. Sorry.
Was this when you were applying to P & S?
A. Yes, this -- this was when I was trying to work for them.
Q. And so was this information provided to you by HireRight; that's your understanding?
A. No, not -- not that they -- not that the PS did.
The PS -- I mean, HireRight sent me -- they sent me an email of -- it looks different than this but it's similar, it's about the same thing; but this is the research that they did when they ran my license and everything and my background on my license.
Q. Okay. And did you request a copy of this, or did they provide it without you having to request it?
A. It was -- it was in my emails and stuff

FOR READ AND SIGNING PURPOSES ONLY

that they had sent me, along with when they called me and let me know that they weren't going to hire me.

Q. And so earlier, when we talked about that, I believe you thought that it was someone from Schneider who told you that they weren't going to hire you because of the not reportable -- or sorry, the trailer drop.

Is it now your understanding that you also talked to someone at P & S about that?

A. Yeah, I called the man, because I was asking him like why wouldn't he hire me.

And he sent me an email along with when -- he told me, he said, "Well, you didn't disclose that you had an accident."

And I said, "It was non-preventable. I didn't think it was going to matter."

But I did talk with somebody at Schneider, and that's -- they -- they did tell me about what we discussed earlier, with the trailer damage and the drop -- drop trailer. That's why they won't hire me; I was going to have to wait 12 months.

Q. Okay. And this happened in Dodge City.

Is that near Liberal?

A. Yes, sir, correct.

Q. And just to confirm from earlier, you

FOR READ AND SIGNING PURPOSES ONLY

don't -- you don't know who at NCI reported this accident?

A. I -- I -- I don't know who reported it.

Q. And you don't -- so you also don't know why they reported it?

A. Not at all.

We didn't -- we didn't need a crane. We got the trailer back up. There wasn't nothing wrong with the trailer. It was just minor -- well, there was stuff that was already wrong with the tractor, so there really wasn't no issue at all.

Q. Do you know when this was reported?

FOR READ AND SIGNING PURPOSES ONLY

A. Ah, I'm -- I'm guessing the same day that it happened, because I remember them coming out there taking pictures, the people who worked at -- in Liberal, Kansas, that was taking pictures.

Q. Did they tell you why they were taking pictures?

A. No.

Q. Did you assume it was for them to report the accident?

A. Yes.

Q. Did you think that at the time, or did you think that after the fact, when you found out that they reported the accident?

A. I was just -- I don't know.
I was kind of really shocked that it even happened because, like I said, I went through the procedure that I always go through, and it kind of shocked me when it did happen, so --
MR. WEISSLER: Okay. We're up to Exhibit 9 next.
(Exhibit 9 marked.)
BY MR. WEISSLER:
Q. Exhibit 9 is two documents, or a two-page document, I should say, that was produced by your counsel. It's P2 and P8, but they appear to be related to each other.
Do you recognize the documents in Exhibit 9?
A. Yeah, my check stubs.
Q. And these are check stubs from, it looks like Roadteam Staffing?
A. Yes, from my job, current job.
Q. This is your current job?
A. Correct.
Q. Earlier you said that you were working for a company called TLI.
A. Yes, that's -- that's their Transco, TLI.
Q. So TLI is the same as Roadteam Staffing?

FOR READ AND SIGNING PURPOSES ONLY

A. Well, that's their payment stuff, like that's -- that's how we get paid.
It's the Roadteam Staffing, Inc., but it don't come from -- I don't know why it's like that, but it just don't come from TLI Transco pay.
Q. Okay.
A. It's -- it's the -- yeah, that's how we get paid.
Q. Okay. If we look at your -- the first statement that's up here on the first page of Exhibit 9, it states it says for the pay date of February 13th. You'll see earnings, and then there's taxes, and then deductions, correct?
A. Correct.
Q. And under the Deduction section, there's something called a card advance line.
Do you know what that is?
A. Yeah, that's a cash advance.
Q. And then below that it's something called Express Check.
Do you know what that is?
A. Yep.
Q. Okay. What is that?
A. I want to say I had took a -- an advance on a -- it was an advance, because I couldn't get into a

FOR READ AND SIGNING PURPOSES ONLY

shipper without an advance one night, and I didn't have any money, so they sent me a code to buy the vest, and it was $20, and that's the Express Check.

Q. Are you saying vest, v-e-s-t?

A. Yes, vest, correct.

Q. Scrolling down, this is the pay stub for a pay date of February 6th, 2026.

If we go down there for Express Check for this one, you'll see a charge for or a deduction for $559. Do you know what that was?

MR. KATAEV: Objection to form on that question.

FOR READ AND SIGNING PURPOSES ONLY

THE WITNESS: 549?

MR. WEISSLER: 559 --

THE WITNESS: Which --

MR. WEISSLER: -- right here (indicating).

THE WITNESS: 59.

Show me where you see that at. 51?

MR. WEISSLER: Right there (indicating).

I can zoom in.

THE WITNESS: Oh, that. So what was -- they gave me -- what -- what's -- can I see -- can we see the date back on that check, so I can tell you?

MR. WEISSLER: Yeah. The date on the

check is February 6th, and it's for the pay period ending on February 1st.

THE WITNESS: Right.

Now, when they -- because I got the job and at the end of January, and didn't really start going until in February, so they had -- one of the loads they had dispatched me after orientation, because it was during the winter storms, so after -- after the winter storm and orientation, when they had dis -- when my dispatch first dispatched me, the load was already kind of, I want to say, late. He dispatched me a late load.

FOR READ AND SIGNING PURPOSES ONLY

So it fell on a weekend, and I couldn't deliver that load; so each day that went by, it was a late fee. So until the weekend, they was two days that I know of that was late, so each day went by, they just charged a late fee.

BY MR. WEISSLER:

Q. And so that -- so that was charged to you in your pay --

A. Ah --

Q. -- as a deduction?

A. -- correct.

Q. Okay. And then did you get reimbursed for that late fee?

A. Did I get reimbursed for it?
No, but I did discuss why would it happen, and how to prevent it from happening again.
Q. We also see on this check, this is where you had the -- the card advance that you mentioned.
This one is 47.45 and --
A. Correct.
Q. -- you said that was where you took a cash advance on your wages?
A. Correct.
Q. And so your current employer has a similar system of allowing you to, you know, get advance on wages, and then those get deducted out of your pay later?
MR. KATAEV: Objection, relevance.
THE WITNESS: Theirs are different.
You can't go over $50 with them.
BY MR. WEISSLER:
Q. They have a -- a limit on how much.
Was there a limit at NCI?
A. I don't know. My trainer used to do 200, but I ain't never went 200, not that I know of.
I just -- I think it was 200, but I ain't never went 200.
Q. Did you ever talk to any other drivers,

FOR READ AND SIGNING PURPOSES ONLY

other than your trainer, about how drivers are compensated?

A. I didn't know -- I didn't know anybody to talk to.

Q. Do you know how the other drivers were compensated?

A. Not necessarily.

Q. When you were working as a driver for NCI, did you have like a regular schedule where you started and stopped every day at around the same time?

A. That depends on what my -- what my dispatcher was booking me.

If I get done with one, he'll probably book me another one. He most of the time be waiting on me to get done with one.

FOR READ AND SIGNING PURPOSES ONLY

Q. Because your -- like when your day would start and stop would depend on what load you had been given by the dispatcher?

A. Correct.

Q. And like what time you needed to start, like your window for picking up and your window for dropping off, correct?

A. Correct.

Q. And in between, right, as you were driving

from one location to another, there were limits on when you could start and stop your day from the Department of Transportation, right?

A. Correct.

Q. Like you had to finish driving within 14 hours, that kind of thing?

A. Yeah, that 14-hour window.

Q. But -- but you could decide like when to drive, during those 14 hours, right?

A. Correct.

Q. On a day where you didn't have a load, where you weren't under a load, so either because of a layover between loads, or maybe because you were broken down, was there anything for you to do, work-related, during those days?

MR. KATAEV: Objection.

THE WITNESS: Not -- not really, if you -- if I wasn't underneath a load or anything like that.

BY MR. WEISSLER:

Q. Did anyone ever tell you that you had to work a certain number of hours every week?

A. In orientation, they used to recommend eight or nine hours.

Q. Eight or nine hours of driving?

FOR READ AND SIGNING PURPOSES ONLY

A. Yes.
Q. And what kind of truck did you drive?
A. A Kenworth.
Q. Do you have any idea what the -- what the gross vehicle weight rating on a Kenworth truck is?
A. The one I was driving?
Q. Yeah, appox -- like approximately?
A. I thought it was the same like every other truck, up to 80 (inaudible).
Q. Up to what?
A. I thought it was the same like most of them, like regular trucks like 8 -- 80,000.
FOR READ AND SIGNING PURPOSES ONLY
Q. Eighty thousand pounds?
A. Yes.
Q. And I think I saw from some of your dispatch, especially during the training and otherwise, like you drove -- you ended up driving all over the country, correct?
A. Correct.
Q. And so for NCI, you know, they were based kind of out of Kansas and Texas, but you drove those states and other states, correct?
A. Correct.
Q. Do you know if there were any drivers for NCI that -- that didn't drive across state lines?

A. Not necessarily.
I thought everybody did.
MR. WEISSLER: I'm going to share Exhibit 10.
(Exhibit 10 marked.)
BY MR. WEISSLER:
Q. Exhibit 10 is a single page. It's Bates labeled NCI 82.
Do you recognize the document in Exhibit 10?
A. Yes.
Q. Okay. What is this document?
FOR READ AND SIGNING PURPOSES ONLY
A. Telling us on the mileage and stuff like that, how we can see the -- the version of how they pay us by the miles, or something.
Q. Is that your signature on -- or initials, I should say -- on the signature line for Exhibit 10?
A. Yes.
Q. Do you remember receiving a copy of this when you first started working for NCI?
A. I don't know about -- I don't know about the copy.
I probably have, probably haven't. I can't remember.
Q. Do you remember initialing this when you

first started working for NCI?

A. Yes.

Q. The last sentence of the -- of the memo that starts with your mileage, it says your mileage pay includes -- sorry, your mileage pain includes compensation for all hours worked in delivering loads, including pre-trip and post-trip inspections, driving, fueling, waiting, loading and unloading, completing paperwork, deadheading or repositioning equipment, meetings, et cetera, except when otherwise specifically noted, correct?

A. Correct.

FOR READ AND SIGNING PURPOSES ONLY

Q. When you were working for NCI, did you understand that your mileage pay was meant to pay you for all of the work you were doing for NCI?

MR. KATAEV: Objection.

THE WITNESS: (Inaudible)

THE COURT REPORTER: What was the answer?

MR. KATAEV: Yes.

THE WITNESS: Yes.

BY MR. WEISSLER:

Q. Did you ever receive overtime pay when you were working for NCI?

A. No.

Q. Do you know why not?

A. No.
Q. Did you ever ask anybody about overtime pay?
A. No.
Q. As an over-the-road truck driver, have you ever received overtime pay?
And by overtime pay I mean time-and-a-half your hourly rate for hours over 40 in a week?
A. Similar, just getting more loads.
Other than that, no.
Q. And those loads, like when you work extra loads, you're still getting paid by the mile, correct?
A. Correct.
MR. WEISSLER: Okay, I'll share Exhibit 11.
(Exhibit 11 marked.)
BY MR. WEISSLER:
Q. Exhibit 11 is a single page on NCI 87, and this is a -- sort of a summary of information for you, Darrin Tiernan.
Do you recognize this document at all?
A. I think I do.
Q. On here it lists your start date as

FOR READ AND SIGNING PURPOSES ONLY

March 27th, 2023; is that correct, when you started with NCI?
A. Yes, that's correct.
Q. Below it has your -- your term date, it lists 5/24/23.
You believe you quit on May 19th, correct?
A. No, I -- I -- I did.
I quit like when -- when I woke up with no paycheck on 5/13 -- 5/19/23, I -- I quit; like I was done.
Q. Do you know why this --
FOR READ AND SIGNING PURPOSES ONLY
A. That --
Q. Oh, sorry. Continue.
A. You said, do I know why what?
Q. Do you know why this has a term date of May 24th, '23?
A. I have no -- I guess because -- well, even -- it shouldn't even have been that, because they received their truck -- I quit on the 19th, but they received their truck on the 20th, so they had their truck back, and I was done, so I -- I don't know. I don't know why.
Q. The term reason here is it says quit; and you agree that's -- that your employment ended after

you quit?
A. Yes. I didn't do no more loads.
MR. WEISSLER: Okay, I'll pull up Exhibit 12.
(Exhibit 12 marked.)
BY MR. WEISSLER:
Q. Exhibit 12 is a three-page document that's labeled the Declaration of Darrin James Tiernan. Do you see that?
A. Yes.
Q. Do you recall providing a declaration in this case in March of 2026?
FOR READ AND SIGNING PURPOSES ONLY
A. Yes.
Q. On the second page of Exhibit 12, there's a statement that's labeled No. 6.
It says, while employed by Defendant, I was expected to work a schedule of approximately 70 hours per week, on Monday through Sunday, from at least 8:00 a.m. to around 6:00 p.m.
Is that what it says?
A. Correct.
Q. Okay. Who told you that you needed to work a schedule of 8:00 to 6:00 p.m.?
A. That's normally like when I'm doing loads, I -- I normally be driving around that time normally.

MR. KATAEV: Objection to form on that.
BY MR. WEISSLER:
Q. Okay, and 8:00 a.m. to 6:00 p.m., that is a -- that's a ten-hour day, correct?
A. Correct.
Q. So the -- the schedule, the 8:00 a.m. to 6:00 a.m. was a schedule that was sort of what you -- you normally would drive if you were driving a -- a full week?
MR. KATAEV: Objection to form.
THE WITNESS: Yes, if -- if he was booking me loads and stuff, then I normally would be.
FOR READ AND SIGNING PURPOSES ONLY
BY MR. WEISSLER:
Q. During the -- the time that you worked for NCI, how often did you drive seven days in a row?
A. It depends on if I -- if he was giving me the loads back to back, ain't nothing wrong with the truck, no issues I'm having; but --
Q. How many miles --
I'm sorry. Go ahead?
A. Go ahead.
Q. No, you -- you -- you finish.
A. Most of them days was like a part on my deliveries, so it will be, you know, waking up whenever I'm out of rest and start driving, so it'd

be -- it -- it -- most of them days, like back to back, it would be close to about seven days.
Q. How -- how many miles would -- would you expect to be able to drive in a typical day, if you were driving a full day?
A. Full day, average around -- somewhere around five something.
Q. Like 500 miles?
A. Yeah, somewhere around there.
Q. Do you know what the most miles that you drove in a week for NCI was?
A. That was on a couple of day trips, so most miles in a day, or on a trip?
FOR READ AND SIGNING PURPOSES ONLY
Q. Most -- most miles in a -- most miles in a week, like in a seven-day period?
A. In a seven-day period, over a thousand something.
Q. Did you ever drive 2,000 miles in a week?
A. Let's see, 2,000 a week, probably was -- probably could be close. It probably can be close, because it -- it -- it depends on -- it depends on the -- the distance that I was driving.
Q. Paragraph 7 of -- of your declaration says on some occasions, I worked on deliveries that took two days, meaning I was required to work overnight,

or otherwise late nights and early mornings, outside of my typical schedule.

That's what it says, correct?

A. Correct.

Q. And there were times where you were -- where you were out on the road; in fact, most of the time, you were out on the road overnight, correct?

A. Correct.

Q. And in between driving, you were required to take rest time, correct?

A. Correct.

Q. Was there ever a time when you were working for NCI where you exceeded the limits that the Department of Transportation sets?

FOR READ AND SIGNING PURPOSES ONLY

A. No. I always shut down and get the ten hour in and start back the next day as soon as I can.

Q. Paragraph 13 says at any given time, my location had about nine other drivers like me working under the same common plan and policy of Defendants, which violates the Fair Labor Standards Act.

So let's start with who were the other nine drivers that were like you?

A. Probably the people that was going through the same thing. I don't know their names.

I'm just saying I'm just -- I -- I

probably couldn't have been the only one.
Q. Okay, so this -- this declaration that you provided specifically refers to about nine other drivers, and then it also says at your location.
What do you mean by my location?
A. The location I was hired out of.
Q. Which location is that?
A. Irving, Texas.
Q. So it's your understanding that there were nine drivers working out of Irving, Texas?
A. It was probably -- probably was in the -- out of the same room that I was -- did my orientation in.
FOR READ AND SIGNING PURPOSES ONLY
Q. When you did orientation, were there other drivers there with you?
A. Yes.
Q. Do you remember who any of them were?
A. Not off -- not off my head, I don't.
Q. Okay. And earlier you testified that you weren't aware of how any other driver was paid, correct?
A. Correct.
Q. So why is it that you believe that nine other drivers were being paid in a way that violated the FLSA?

A. Because I believe that --
MR. KATAEV: (Inaudible)
THE COURT REPORTER: Wait a minute. I didn't -- I didn't hear you.
MR. KATAEV: Objection, argumentative.
You can repeat the answer.
THE WITNESS: I was just -- I was just saying I made a statement at the time that if it happened to me, it -- it -- if this happened to me, I know it happened to somebody else, probably the ones that was in -- in the classroom with me that day.
BY MR. WEISSLER:

FOR READ AND SIGNING PURPOSES ONLY

Q. And I just want to understand, what's your basis for believing it happened to other people?
A. Because I came in with the will, and I really wanted to work there, and my intentions was trying to learn and be employed there.
MR. KATAEV: Objection, asked and answered for that.
BY MR. WEISSLER:
Q. Okay. You also state that the way you were paid violated the FLSA.
How did your compensation violate the FLSA?
A. I believe I should have been paid at least

minimum wage, or -- in overtime, for the time that I did put in and the deliveries and stuff I had made and all the miles and stuff I was driving.
Q. No. 18 in your declaration states, for example, while the location I worked at may have been the smallest, and had only nine drivers at most, Defender -- Defendant has a much larger location in Kansas, and that's -- you're referring to the Irving, Texas location as being the smallest?
A. Yes, Irving is -- it was smaller. It's smaller compared to -- to their location in Kansas.
Q. Okay. And then it says in 19, it has come to my attention that in total, that Defendant has over 200 employees; then it says, which I learned based on a simple Internet search about the Defendant.
When did you do an Internet search about the Defendant's workforce?
A. When I had looked them up and everything, I want to say, around when that happened.
Q. And you believe that there were 200 employees?
A. Correct.
Q. Do you know how many of those employees are drivers?

FOR READ AND SIGNING PURPOSES ONLY

A. I'm quite sure a lot of them are.
Q. NCI does employ individuals who are not drivers, correct?
A. Re -- repeat that for me again.
Q. Does NCI have employees who are not truck drivers?
A. Yes, they do also have employees that -- that are not truck drivers.
Q. They have maintenance employees, for example?
A. I think for their offices, and stuff like that.
FOR READ AND SIGNING PURPOSES ONLY
Q. And they have dispatchers, that we talked about?
A. Yes, they do have dispatchers.
Q. Okay. Do you know if anyone other than a driver was subject to a pay policy that you believe violates the FLSA?
MR. KATAEV: Objection to relevance.
You can answer.
THE WITNESS: Not -- not -- not just thinking of it.
BY MR. WEISSLER:
Q. In paragraph 9 you say that during some weeks you were paid as low as $300, correct?

A. Correct.
Q. Are you referring to the amount that was actually like on your paycheck when you received it?
A. Correct.
Q. Okay. You're not referring to your gross wages, correct?
A. No.
Q. And that includes in paragraph 10, where it says, I was not paid at all for the last week I worked for Defendant.
That's, again, referring to the fact that you received a paycheck for zero dollars, correct?
FOR READ AND SIGNING PURPOSES ONLY
A. Yes.
Q. And that zero dollars, as we looked at before, was the result of gross pay, and then deductions for what were called advances, correct?
A. Correct.
Q. Do you know if minimum wage is calculated based on gross wages or net wages?
MR. KATAEV: Objection, calls for a legal conclusion.
You can answer.
THE WITNESS: Minimum wage is just a state-to-state pay, like, minimum.
BY MR. WEISSLER:

Q. What did you do to prepare for your deposition today?
A. Repeat that for me again.
Q. Yeah.
Did you do anything to prepare for your deposition today?
A. I read over the things that what -- what we was going to be going over today.
Q. Okay. What -- what kind of things did you read over?
A. Just information.
Q. Okay. Do you -- do you remember any specific information that you reviewed?
A. Other than just what can I -- what -- what -- what to do if -- what to do in -- in a courtroom that's legal and not legal to do.
Q. Where -- where -- What were some examples of things that were not legal to do?
A. Like to know when to speak, and to know if I need a break, and stuff like that.
Q. Did you review any documents related to your lawsuit?
A. Yes, I did.
Q. What documents did you review?
A. Pretty much what's some of them that we

FOR READ AND SIGNING PURPOSES ONLY

went over.

Q. Okay. Did you review any documents to prepare that we did not go over today?

A. No.

Q. Do you remember any of the specific documents that we looked at today that you reviewed to prepare?

A. Pretty much of most of the stuff that we went over.

Q. Do you know -- and I may have asked this already, and I apologize if I did -- but I just want to make sure I get your answer to it.

Do you know how NCI's dispatchers decides who's going to get what load?

A. No, I ain't never knew how -- how they do it.

Q. Did you ever --

MR. KATAEV: (Inaudible)

THE WITNESS: I was thinking it --

MR. WEISSLER: I'm sorry. Go ahead.

THE COURT REPORTER: Did you object?

THE WITNESS: I was thinking that --

MR. KATAEV: Yes, objection, speculation and vague.

BY MR. WEISSLER:

FOR READ AND SIGNING PURPOSES ONLY

Q. Just -- just making sure; so the -- the answer was you -- you do not know, correct?
A. Correct.
Q. Did you ever ask a dis -- your dispatcher for more loads?
A. He used to -- he call -- he used to call me.
When he'll call me and ask me about a load, and he'll ask me, do you -- do you want this load, I got this load right here?
And I used to always accept, and he -- when -- when you get done, you just let them know.
FOR READ AND SIGNING PURPOSES ONLY
So when I got done, so most of the time, I let him know if -- if I wasn't in the sleeper getting my rest, and he'll book me a load.
Q. Do you know if NCI -- Let me start over.
You were required to submit receipts for expenses, correct?
A. Correct.
Q. Do you know if -- if NCI has a policy of not reimbursing expenses if there's no receipt?
MR. KATAEV: Objection --
THE WITNESS: Ah --
MR. KATAEV: -- (inaudible)
THE COURT REPORTER: I couldn't under-

stand your objection.

MR. KATAEV: Objection, calls for speculation.

You can answer.

THE WITNESS: Not -- not really, because I -- they never really -- they -- when I was in orientation, and from what my trainer said, my trainer ain't never say anything like they'll take some out of your check, or do this and that.

So from my understanding, I didn't know that they -- they could do it, or they would do it, or if they would do it.

FOR READ AND SIGNING PURPOSES ONLY

I'm thinking they'll -- they'll warn you or something, and I never had any of those times.

BY MR. WEISSLER:

Q. We talked at the very beginning today about some hotel expenses that you incurred when your truck was in the shop. Do you remember that?

A. Correct.

Q. How did you pay for the hotel?

A. I want to say, if -- if I'm not mistaken, I think the company -- the first one I went to, I went to the wrong hotel, so I had to go to the right one.

I ended up going to the right one, but I had to walk. It was the -- it was the cab. It was

the cab that I took, that I didn't get reimbursed for, because I didn't have a receipt, but --
Q. So --
A. -- I don't know how -- Go ahead.
Q. I'm sorry. I didn't mean to cut you off.
So just to make sure I understand.
So the -- your testimony is that the company paid for the hotel once you got to the correct hotel, correct?
A. Yeah, they did pay for the hotel.
Q. And -- but you did have an experience that didn't get reimbursed, and that was the cab to get from wherever your truck was being serviced to the hotel?
A. Yeah. I was told that I was supposed to pay for the cab and send it in for reimbursement.
Q. And you said you did not get reimbursed, because you lost the receipt?
A. Yes, correct.
Q. So that -- isn't that an example of NCI not reimbursing for an expense because there was no receipt?
MR. KATAEV: Objection, argumentative.
THE WITNESS: I don't know.
I guess at that time, it wouldn't matter,

FOR READ AND SIGNING PURPOSES ONLY

because it just -- it seemed like I wasn't making anything with them, so -- but it -- I guess --
I mean, I didn't bring it too their attention, because I was just -- my checks was already -- I wasn't really making nothing.
BY MR. WEISSLER:
Q. Do you know how much that cab cost was?
A. I want to say $20.
Q. Do you know how you paid for the cab?
A. I called and paid them cash.
Q. Since your employment with NCI ended, have you sought any kind of medical treatment for emotional distress caused by the end of your employment?
A. I used to talk to -- I was talking to a lot of people about it, and I ain't -- I ain't really see a -- see a doctor or nothing about it, but it -- it used to -- it used to -- it kind of used to bother me, where I couldn't really sleep on it, and just -- I have like some of my days just wouldn't be -- it was just bothering me --
Q. Well, what --
A. -- for a long time.
Q. What was bothering you?
A. That I wasn't getting paid, and I had

FOR READ AND SIGNING PURPOSES ONLY

trouble getting a job afterwards, and everything -- every time I applied, they always bring up National Carriers. They said this, and they put this on your DOT and, you know, and it kind of just -- it just made me feel kind of -- I was just stressed out, and stuff like that.

MR. WEISSLER: I'm going through the outline, to make sure there's nothing else to talk about. Just one moment.

Prior to your termination -- sorry, prior to the end of your employment --

Actually, no, never mind. I don't need to ask that. We already got through that.

FOR READ AND SIGNING PURPOSES ONLY

Let's go off the record.

Let's take a short break, and then we'll probably come on, and I will finish, but let me just review a few things, and let everyone take a break while I do that.

THE VIDEOGRAPHER: The time is 7:27 p.m.

We are now off the record.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record. The time is 7:33 p.m.

MR. WEISSLER: All right. I have no further questions.

MR. KATAEV: Thank you, everyone.

I appreciate everyone's professionalism.

THE VIDEOGRAPHER: Are we -- are we going to waive signature, or read and sign?

MR. KATAEV: Oh, we're still on the record.

Pursuant to Rule 30(e)(2), I am requesting a copy of the transcript for the Plaintiff to review and sign.

THE VIDEOGRAPHER: All right. Let me get the orders just real briefly.

Mr. Weissler, would you like to order video and/or transcript?

FOR READ AND SIGNING PURPOSES ONLY

MR. WEISSLER: Transcript, yes.

We will -- we'll wait on ordering a video.

THE VIDEOGRAPHER: All right.

And Mr. Kataev?

MR. KATAEV: I'm not ordering a separate copy.

I requested a copy pursuant to Rule 30(e)(2), which the Defendant will provide.

THE VIDEOGRAPHER: All right. The time is 7:34 p.m.

We are now off the record.

(Reading and signing of the deposition was not waived.)

(The deposition was concluded at 7:34 p.m.)

FOR READ AND SIGNING PURPOSES ONLY

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

June 2, 2026

To: Mr. Weisler

Case Name: Tiernan, Darrin James, On Behalf Of Himself And Others Similarly Situated v. National Carriers, Inc.

Veritext Reference Number: 8230404

Witness: Darrin James Tiernan Deposition Date: 5/26/2026

Dear Sir/Madam:

FOR READ AND SIGNING PURPOSES ONLY

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8230404
CASE NAME: Tiernan, Darrin James, On Behalf Of Himself And Others Similarly Situated v. National Carriers, Inc.
DATE OF DEPOSITION: 5/26/2026
WITNESS' NAME: Darrin James Tiernan

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_______________ ________________________
Date Darrin James Tiernan

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

FOR READ AND SIGNING PURPOSES ONLY

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8230404
CASE NAME: Tiernan, Darrin James, On Behalf Of Himself And Others Similarly Situated v. National Carriers, Inc.
DATE OF DEPOSITION: 5/26/2026
WITNESS' NAME: Darrin James Tiernan

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

FOR READ AND SIGNING PURPOSES ONLY

_______________      ________________________
Date      Darrin James Tiernan

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 8230404

PAGE/LINE(S) / CHANGE /REASON

____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________

FOR READ AND SIGNING PURPOSES ONLY

_______________ ________________________
Date Darrin James Tiernan

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ________________________, 20______ .

___________________________________
Notary Public

___________________________________
Commission Expiration Date

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

FOR READ AND SIGNING PURPOSES ONLY

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

FOR READ AND SIGNING PURPOSES ONLY

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

FOR READ AND SIGNING PURPOSES ONLY

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.